# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLGATE-PALMOLIVE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-417-GMS |
| | ) | |
| RANIR, L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S CLAIM CONSTRUCTION ANSWERING BRIEF

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware  19899
302-654-1888
sbalick@ashby-geddes.com
jday@asshby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant*

*Of Counsel:*

Charles E. Burpee
James Moskal
Chad E. Kleinheksel
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, N.W.
Grand Rapids, Michigan 49503
Phone (616) 752-2000
Fax (616) 752-2500

Dated: May 22, 2007
180797.1

## **TABLE OF CONTENTS**

Table of Citations ........................................................................................................ ii

Introduction ................................................................................................................. 1

Construction of Claim 1 of the '591 Patent ............................................................... 1

Attempted Construction of Claim 27 of the '591 Patent ............................................ 3

Claim Construction of the Design Patents .................................................................. 6

Conclusion ................................................................................................................... 8

## TABLE OF CITATIONS

**Cases:**

*Ampex Corp. v. Eastman Kodak Co.,* 460 F.Supp.2d 541 (D. Del. 2006) ....................................4

*Avia Group Int'l, Inc. v. L.A. Gear California,* 853 F.2d 1557 (Fed. Cir. 1988) ..........................6

*Hsin Ten Enter. USA, Inc. v. Clark Enters.,* 149 F.Supp.2d 60 (S.D.N.Y. 2001) ........................5

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.,* 887 F.2d 1050 (Fed.Cir.1989) .......................................4

*Lee v. Dayton-Hudson,* 838 F.2d 1186, 1188-89 (Fed.Cir.1988) ...................................................6

*Oddzon Prods., Inc. v. Just Toys Inc.,* 122 F.3d 1396 (Fed. Cir. 1997) ..........................................5

*PHG Technologies, LLC v. St. John Companies, Inc.,* 469 F.3d 1361 (Fed. Cir. 2006) ...............7

*Process Control Corp. v. Hydreclaim Corp.,* 190 F.3d 1350 (Fed. Cir. 1999) .............................4

*Schering Corp. v. Amgen Inc.,* 18 F.Supp.2d 372 (D. Del. 1998) .................................................4

*Spotless Enterprises, Inc. v. A & E Prod. Grp. L.P.,* 294 F.Supp.2d 322 (E.D. N.Y. 2003) ..........6

**Statutes:**

35 U.S.C. § 112 ...........................................................................................................................3, 4

Defendant Ranir submits this answering brief to address the claim construction arguments advanced by plaintiff Colgate in its opening brief.

## INTRODUCTION

Ranir has agreed to accept Colgate's proffered constructions for the terms originally disputed in the parties' Joint Disputed Claim Terms Chart (D.I. #34, the "Chart"), except for 1) the terms in claim 27 of the '591 utility patent, and 2) Colgate's proposed constructions for the design patents. The discussion below focuses on these two exceptions and explains why Ranir's proposed constructions should be adopted over Colgate's. Initially, however, Ranir will address Colgate's proposed construction of claim 1 of the '591 utility patent, because it appears that there may be some ambiguity with Colgate's proposed construction.

## CONSTRUCTION OF CLAIM 1 OF THE '591 PATENT

Although Ranir has accepted Colgate's constructions of the terms in the Chart for claim 1, it is necessary to clarify Colgate's construction of the phrase "the gripping member having a different durometer characteristic than the resilient grip body" in view of Colgate's opening claim construction brief (D.I. #39, "Colgate's Opening Brief").

As stated in Colgate's proposed construction, "[h]ardness is a property measured by a durometer." Chart at 1-2. It its brief, Colgate states that "'Durometer' is a technical term but it is one that is commonly used and consistently understood to refer to an instrument for measuring hardness." Colgate's Opening Brief at 26. It is not clear, however, whether Colgate's proposed construction requires that the hardness actually be assessed in a standardized way. The claim specifically refers to a "durometer" characteristic. There is a standard test method for measuring durometer hardness with a durometer. It is set forth by ASTM International under the designation D2240. *Standard Test Method for Rubber Property—Durometer Hardness*, ASTM

1

Int'l. (2005) (Exhibit A). "This test method covers twelve types of rubber hardness measurement devices known as durometers: Types A, B, C, D, DO, E, M, O, OO, OOO, OOO-S, and R. The procedure for determining indentation hardness of substances classified as thermoplastic elastomers, vulcanized (thermoset) rubber, elastomeric materials, cellular materials, gel-like materials, and some plastics is also described." Exhibit A at 1.[1]  Thus, one of ordinary skill in the art reading Colgate's claim would know that the term "durometer" refers to this ASTM testing methodology.

It is also unclear whether Colgate's proposed construction requires a perceivable hardness difference, or whether any numeric difference is included in the claim scope, regardless of degree.  The former is correct.  The specification of the '591 patent states that "[i]n one preferred construction, resilient grip body 403 has a different hardness as compared to the hardness of the grip surface 410." Col. 6, lines 4-6.  Describing this difference, it further states that "[i]n this manner, the handle 103 may be provided different grip features to complement the particular control need. For example, the handle 103 may have a soft forward portion with a shock absorption advantage and a slightly harder aft portion with a comfort and control advantage." Col. 6, lines 7-11.  There is no suggestion that any trivial numeric difference in hardness is what is meant by "different durometer characteristic."

Furthermore, the file history supports the interpretation that "different" means a perceivable hardness difference.  The examiner originally rejected the claims on the basis of references that disclose a gripping member overlying a portion of a toothbrush handle, including U.S. Patent 6,325,626 to Blass and U.S. Published Patent Application 2002/0138931 to Davies.

---

[1] The International Standards Organization (ISO) also has a standard test method for measuring durometer hardness. It is published under the designation ISO 7619. The specifications for the ISO test are substantially the same as the ASTM test.

In response, Colgate amended the claims to include the phrase "the gripping member having a different durometer characteristic than the resilient grip body." Colgate's remarks accompanying this amendment state that "[i]n this way, for example, the user is provided with a shock absorption advantage during brushing, while having comfort and control of the oral care implement." Exhibit B, Amendment filed November 15, 2005, page 9. In other words, the durometer characteristics of the respective gripping elements must have enough difference to provide the handle with a meaningful advantage. These statements do not support an interpretation that "different durometer characteristic" can mean any minimal difference in durometer unperceivable to the user.

For these reasons, the Court should adopt Colgate's construction of this phrase, with which Ranir generally agrees, provided that the gripping member and grip body have different durometers when measured according to the standard methodology, and that the difference in durometers is perceivable to the user. If the Cout does not adopt this interpretation, then Ranir intends to assert that the claim is invalid as anticipated by or obvious in light of, for example, U.S. Patent 6,298,516 to Beals and U.S. Patent 6,353,958 to Weihrauch.

### ATTEMPTED CONSTRUCTION OF CLAIM 27 OF THE '591 PATENT

The parties disagree regarding the interpretation of the phrase "a rear segment and a front segment inclined relative to the rear segment wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion." There are two disputes. The first is whether the claim is indefinite under 35 U.S.C. § 112 or otherwise invalid for lack of written description. The second is the attempted interpretation of the claim, namely, (1) which portions of the brush comprise the "front segment" and the "rear segment," and (2) how the angle between those segments is measured.

3

The issue of indefiniteness is not yet before the Court. Indefiniteness is "a legal requirement, based on the court's role as construer of patent claims." *Process Control Corp. v. Hydreclaim Corp.,* 190 F.3d 1350, 1358 n. 2 (Fed. Cir. 1999). This Court, however, has held that indefiniteness is decided separately from claim construction. *See Ampex Corp. v. Eastman Kodak Co.,* 460 F.Supp.2d 541 (D. Del. 2006). In *Ampex*, the defendant in its claim construction brief asked the Court to find that a number of claims were invalid for indefiniteness. *Id.* at 543 n. 1. The Court held that "[t]he validity of a claim is not an issue of claim construction, but should have been addressed in a motion for summary judgment." *Id.*[2] Similarly, in *Schering Corp. v. Amgen Inc.*, 18 F.Supp.2d 372, 379 n. 13 (D. Del. 1998), this Court stated that "[i]n fact, the Federal Circuit has explicitly stated that such invalidity arguments are clearly not a part of the claim construction analysis. *See Intervet Am., Inc. v. Kee-Vet Labs., Inc.,* 887 F.2d 1050, 1053 (Fed.Cir.1989) ("Ambiguity, undue breadth, vagueness, and triviality are matters which go to claim *validity* for failure to comply with 35 U.S.C. § 112, ¶ 2, not to interpretation or construction.") (emphasis in original). Accordingly, the Court declines to consider arguments of validity during the claim construction phase without more clear guidance from the Federal Circuit." Thus, Ranir will address the invalidity issue separately, when it is before the Court on summary judgment or thereafter.

As a practical matter, however, the invalidity of claim 27 may turn out to be moot. In its proffered construction, Ranir has given its best guess as to how the disputed language can be construed, although admittedly an exercise in speculation. Colgate, in contrast, has offered no construction whatsoever, and certainly has not even attempted to articulate how one can or

---

[2] In our case, the Court has deferred summary judgment proceeding to the end of the case scheduling.

should measure the angle. If Ranir's interpretation is adopted, as it should be, then Ranir will establish that its brush does not infringe claim 27, and it will be unnecessary to decide invalidity.

## CLAIM CONSTRUCTION FOR THE DESIGN PATENTS

Two basic disputes remain with regard to the construction of Colgate's design patents. One is whether the Court should adopt a claim construction for each patent that is a narrative description of the patented design. The other is whether the functional features should be removed from the claimed designs. Ranir's constructions, which include a narrative description of each claimed design with the functional features removed, are correct based on the authority cited in Ranir's opening brief.

Colgate cites *Hsin Ten Enter. USA, Inc. v. Clark Enters.*, 149 F.Supp.2d 60 (S.D.N.Y. 2001), as supposed support for the proposition that a narrative description of each claimed design is not necessary, contending that "the proper claim construction is what is shown in the drawings." Colgate's Opening Brief at 16. Ranir, in its opening brief, has already shown that this position is wrong. In *Oddzon Prods., Inc. v. Just Toys Inc.*, 122 F.3d 1396 (Fed. Cir. 1997), the patentee argued that "a simple comparison of the accused products with the figures in the design patent is all that is required in an infringement inquiry." 122 F.3d at 1404. The Federal Circuit squarely rejected this approach. *Id.*

Moreover, not even the *Hsin Ten* decision supports Colgate's position. Although the *Hsin Ten* court stated initially that "the illustration is its own best description," 149 F.Supp.2d at 64, the court went on essentially to follow Ranir's proposed claim construction methodology, not Colgate's. The court stated that "the Court must further limit the scope of the patent claim by determining which elements of the claim are functional, and thus, not protected." *Id.* The court subsequently performed a feature-by-feature analysis of the design patent to

5

determine which features were functional and required removal. *Id.* at 65. Thus, in the present case, where there are functional features that need to be addressed, a narrative description of the features shown in each patent is the proper construction.

Furthermore, when reviewing the features of Colgate's design patents, it is apparent that the functional elements identified in Ranir's constructions must be removed from the claimed designs. As explained in *Spotless Enterprises, Inc. v. A & E Prod. Grp. L.P.*, 294 F.Supp.2d 322 (E.D. N.Y. 2003), the process of distinguishing the ornamental features during claim construction is distinct from the more stringent functionality analysis of invalidity. 294 F.Supp.2d at 344. "A design patent can be primarily ornamental, yet have swaths of features that are not infringed if copied." *Id.* at 344-45 (*citing Lee v. Dayton-Hudson,* 838 F.2d 1186, 1188-89 (Fed.Cir.1988)). "Accordingly, even elements that are not solely dictated by function are not included in the [infringement] comparison to the extent they are functional." *Id.* at 345.[3] In the present case, because Colgate has expressly listed the functional nature of so many features of the claimed toothbrush, they should be removed from the claimed designs in claim construction.

In fact, the Ranir constructions are correct even if the functional features are analyzed under the more stringent validity analysis of functionality. In the validity context, a particular feature is, in general, more likely to be ornamental if "the functional aspect or purpose could be accomplished in many other ways." *Avia Group Int'l, Inc. v. L.A. Gear California,* 853 F.2d 1557, 1563 (Fed. Cir. 1988). This may initially appear to be the case with some features of Colgate's claimed toothbrush. For instance, it may appear that the handle could have been given a variety of shapes to accomplish the function of providing a comfortable and controlled grip for the user. This is not, however, the end of the inquiry. As the Federal Circuit has recently

_____

[3] At footnote 1 of its opening brief, Ranir miscited the name of the *Spotless* case. In the accompanying text, the case was mistakenly cited as appearing in volume 297 of the reporter. The correct citation appears in the text above.

explained: "A full inquiry with respect to alleged alternative designs includes a determination as to whether the alleged 'alternative designs would adversely affect the utility of the specified article,' such that they are not truly 'alternatives' within the meaning of our case law." *PHG Technologies, LLC v. St. John Companies, Inc.*, 469 F.3d 1361, 1367 (Fed. Cir. 2006). As detailed in Ranir's opening brief, Colgate here has already expressly stated in its U.S. Patent 7,089,621 and U.S. Published Patent Application 2006/0026784 that alternative designs would adversely affect the utility of the features of the claimed toothbrush that Ranir proposes to remove from the scope of the claims. In these utility patent documents, Colgate has explicitly stated that the features Ranir proposes to remove from the claimed designs are not only functional, but that each particular feature has a specific functional purpose. Thus, Ranir's proposed constructions are therefore correct even under the stringent validity standard of functionality.

## CONCLUSION

For the '591 utility patent, Ranir accepts Colgate's proffered interpretation of claim 1, but that interpretation should be clarified as noted above. As for claim 27, the Court should adopt Ranir's construction in favor of the absence of construction proffered by Colgate, leaving validity of the claim to another day.

For the design patents, Colgate's proposed constructions are legally incorrect. Ranir's are correct and should be adopted.

ASHBY & GEDDES

/s/ *John G. Day*
_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware  19899
302-654-1888
sbalick@ashby-geddes.com
jday@asshby-geddes.com
tlydon@ashby-geddes.com

*Of Counsel:*

Charles E. Burpee
James Moskal
Chad E. Kleinheksel
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, N.W.
Grand Rapids, Michigan 49503
Phone (616) 752-2000
Fax (616) 752-2500
cburpee@wnj.com
jmoskal@wnj.com
ckleinheksel@wnj.com

Dated: May 22, 2007
180797.1

8

EXHIBIT A

**Designation: D 2240 – 05**

# Standard Test Method for
# Rubber Property—Durometer Hardness[1]

This standard is issued under the fixed designation D 2240; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

*This standard has been approved for use by agencies of the Department of Defense.*

## 1. Scope

1.1 This test method covers twelve types of rubber hardness measurement devices known as durometers: Types A, B, C, D, DO, E, M, O, OO, OOO, OOO-S, and R. The procedure for determining indentation hardness of substances classified as thermoplastic elastomers, vulcanized (thermoset) rubber, elastomeric materials, cellular materials, gel-like materials, and some plastics is also described.

1.2 This test method is not equivalent to other indentation hardness methods and instrument types, specifically those described in Test Method D 1415.

1.3 This test method is not applicable to the testing of coated fabrics.

1.4 All materials, instruments, or equipment used for the determination of mass, force, or dimension shall have traceability to the National Institute for Standards and Technology, or other internationally recognized organizations parallel in nature.

1.5 The values stated in SI units are to be regarded as standard. The values given in parentheses are for information only. Many of the stated dimensions in SI are direct conversions from the U. S. Customary System to accommodate the instrumentation, practices, and procedures that existed prior to the Metric Conversion Act of 1975.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:* [2]
D 374 Test Methods for Thickness of Solid Electrical Insulation
D 618 Practice for Conditioning Plastics for Testing

D 785 Test Method for Rockwell Hardness of Plastics and Electrical Insulating Materials
D 1349 Practice for Rubber—Standard Temperatures for Testing
D 1415 Test Method for Rubber Property—International Hardness
D 4483 Practice for Determining Precision for Test Method Standards in the Rubber and Carbon Black Industries
F 1957 Test Method for Composite Foam Hardness-Durometer Hardness
2.2 *ISO Standard:* [3]
ISO/IEC 17025: 1999 General Requirements for the Competence of Testing and Calibration Laboratories

## 3. Summary of Test Method

3.1 This test method permits hardness measurements based on either initial indentation or indentation after a specified period of time, or both. Durometers with maximum reading indicators used to determine maximum hardness values of a material may yield lower hardness when the maximum indicator is used.

3.2 The procedures for Type M, or micro hardness durometers, accommodate specimens that are, by their dimensions or configuration, ordinarily unable to have their durometer hardness determined by the other durometer types described. Type M durometers are intended for the testing of specimens having a thickness or cross-sectional diameter of 1.25 mm (0.050 in.) or greater, although specimens of lesser dimensions may be successfully accommodated under the conditions specified in Section 6, and have a Type M durometer hardness range between 20 and 90. Those specimens which have a durometer hardness range other than specified shall use another suitable procedure for determining durometer hardness.

## 4. Significance and Use

4.1 This test method is based on the penetration of a specific type of indentor when forced into the material under specified conditions. The indentation hardness is inversely related to the penetration and is dependent on the elastic modulus and viscoelastic behavior of the material. *The geometry of the*

---

[1] This test method is under the jurisdiction of ASTM Committee D11 on Rubber and is the direct responsibility of Subcommittee D11.10 on Physical Testing.
Current edition approved Aug. 15, 2005. Published September 2005. Originally approved in 1964. Last previous edition approved in 2004 as D 2240–04[1].
[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

[3] Available from International Organization for Standardization (ISO), 1 rue de Varembé, Case postale 56, CH-1211, Geneva 20, Switzerland.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.



**D 2240 – 05**

**FIG. 1 (a) Type A and C Indentor**

*indentor and the applied force influence the measurements such that no simple relationship exists between the measurements obtained with one type of durometer and those obtained with another type of durometer or other instruments used for measuring hardness.* This test method is an empirical test intended primarily for control purposes. No simple relationship exists between indentation hardness determined by this test method and any fundamental property of the material tested. For specification purposes, it is recommended that Test Method D 785 be used for materials other than those described in 1.1.

## 5. Apparatus

5.1 *Hardness Measuring Apparatus, or Durometer, and an Operating Stand*, Type 1, Type 2, or Type 3 (see 5.1.2) consisting of the following components:

5.1.1 *Durometer.*

5.1.1.1 *Presser Foot*, the configuration and the total area of a durometer presser foot may produce varying results when there are significant differences between them. It is recommended that when comparing durometer hardness determinations of the same type (see 4.1), that the comparisons be between durometers of similar presser foot configurations and total area, and that the presser foot configuration and size be noted in the Hardness Measurement Report (see 10.2.4 and 5.1.1.3).

5.1.1.2 *Presser Foot*, Types A, B, C, D, DO, E, O, OO, OOO, and OOO-S, with an orifice (to allow for the protrusion of the indentor) having a diameter as specified in Fig. 1 (a, b, c, d, e, f, and g), with the center a minimum of 6.0 mm (0.24 in.) from any edge of the foot. When the presser foot is not of a flat circular design, the area shall be not less than 500 mm² (19.7 in.²).

NOTE 1—The Type OOO and the Type OOO-S, designated herein, differ in their indentor configuration, spring force, and the results obtained. See Table 1 and Fig. 1 (e and g).

5.1.1.3 *Presser Foot*—flat circular designs designated as Type *xR*, where *x* is the standard durometer designation and *R* indicates the flat circular press foot described herein, for example, Type *aR, dR,* and the like. The presser foot, having a

centrally located orifice (to allow for the protrusion of the indentor) of a diameter as specified in Fig. 1 (a through g). The flat circular presser foot shall be 18 ± 0.5 mm (0.71 ± 0.02 in.) in diameter. These durometer types shall be used in an operating stand (see 5.1.2).

(a) Durometers having a presser foot configuration other than that indicated in 5.1.1.3 shall not use the Type *xR* designation, and it is recommended that their presser foot configuration and size be stated in the Hardness Measurement Report (see 10.2.4).

5.1.1.4 *Presser Foot, Type M*, with a centrally located orifice (to allow for the protrusion of the indentor), having a diameter as specified in Fig. 1 (d), with the center a minimum of 1.60 mm (0.063 in.) from any edge of the flat circular presser foot. The Type M durometer shall be used in a Type 3 operating stand (see 5.1.2.4).

5.1.1.5 *Indentor*, formed from steel rod and hardened to 500 HV10 and shaped in accordance with Fig. 1 (a, b, c, d, e, or g), polished over the contact area so that no flaws are visible under 20× magnification, with an indentor extension of 2.50 ± 0.04 mm (0.098 ± 0.002 in.).

5.1.1.6 *Indentor, Type OOO-S*, formed from steel rod and hardened to 500 HV10, shaped in accordance with Fig. 1 (f), polished over the contact area so that no flaws are visible under 20× magnification, with an indentor extension of 5.00 ± 0.04 mm (0.198 ± 0.002 in.).

5.1.1.7 *Indentor, Type M*, formed from steel rod and hardened to 500 HV10 and shaped in accordance with Fig. 1 (d), polished over the contact area so that no flaws are visible under 50× magnification, with an indentor extension of 1.25 ± 0.02 mm (0.049 ± 0.001 in.).

5.1.1.8 *Indentor Extension Indicator*, analog or digital electronic, having a display that is an inverse function of the indentor extension so that:

(1) The display shall indicate from 0 to 100 with no less than 100 equal divisions throughout the range at a rate of one hardness point for each 0.025 mm (0.001 in.) of indentor movement,

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.



D 2240 – 05



ø2.8±0.3mm.
(0.111±0.013in)

ø1.27±0.12mm.
(0.050±0.005in)

2.5±0.04mm.
(0.098±0.002in)

30°±1/2°

0.100±0.012mm. R
(0.004±0.0005in R)

AT ZERO
READING

**FIG. 1 (b) Type B and D Indentor** *(continued)*



ø3.6±0.1mm.
(0.140±0.004in)

ø2.38±0.08mm.
(0.0937±0.004in)

2.5±0.04mm.
(0.098±0.002in)

AT ZERO
READING

1.19±0.05mm R.
(0.0468±0.002in R.)

**FIG. 1 (c) Type O, DO, and OO Indentor** *(continued)*



ø1.19±0.03mm.
(0.047±0.001in)

ø0.7874±0.025mm.
(0.031±0.001in)

1.25±0.02mm.
(0.049±0.001in)

30°±1/2°

AT ZERO
READING

0.100±.012mm. R.
(.004±.0005in R.)

**FIG. 1 (d) Type M Indentor** *(continued)*

*(2)* The display for Type OOO-S durometers shall indicate from 0 to 100 with no less than 100 equal divisions throughout the range at a rate of one hardness point for each 0.050 mm (0.002 in.) of indentor movement,

*(3)* The display for Type M durometers shall indicate from 0 to 100 with no less than 100 equal divisions at a rate of one hardness point for each 0.0125 mm (0.0005 in.) of indentor movement, and

*(4)* In the case of analog dial indicators having a display of 360°, the points indicating 0 and 100 may be at the same point on the dial and indicate 0, 100, or both.

5.1.1.9 *Timing Device (optional)*, capable of being set to a desired elapsed time, signaling the operator or holding the

hardness reading when the desired elapsed time has been reached. The timer shall be automatically activated when the presser foot is in contact with the specimen being tested, for example, the initial indentor travel has ceased. Digital electronic durometers may be equipped with electronic timing devices that shall not affect the indicated reading or determinations attained by more than one-half of the calibration tolerance stated in Table 1.

5.1.1.10 *Maximum Indicators (optional)*, maximum indicating pointers are auxiliary analog indicating hands designed to remain at the maximum hardness value attained until reset by

3

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

D 2240 – 05



Ø 11.5/11.8 ± 0.13 mm
( 0.453/0.465 ± 0.005 in )

2.5 ± 0.04 mm
( 0.098 ± 0.002 in )

6.35 ± 0.03 mm SR
( 0.25 ± 0.001 in )

Ø 10.7/11.8 ± 0.13 mm
( 0.420/0.465 ± 0.005 in )

**AT ZERO
READING**

**FIG. 1 (e) Type OOO Indentor** (continued)



Ø 12.7 ± 0.3 mm
( 0.5 ± 0.01 in )

5.0 ± 0.04 mm
( 0.198 ± 0.002 in )

10.7 ± 0.13 mm R
( 0.420 ± 0.005 in )

**AT ZERO
READING**

Ø 11.9 ± 0.08 mm
( 0.468 ± 0.003 in )

**FIG. 1 (f) Type OOO-S Indentor** (continued)

the operator. Electronic maximum indicators are digital displays electronically indicating and maintaining the maximum value hardness valued achieved until reset by the operator.

5.1.1.11 Analog maximum indicating pointers have been shown to have a nominal effect on the values attained, however, this effect is greater on durometers of lesser total mainspring loads; for example, the effect of a maximum indicating pointer on Type D durometer determinations will be less than those determinations achieved using a Type A durometer. Analog style durometers may be equipped with maximum indicating pointers. The effect of a maximum indicating pointer shall be noted at the time of calibration in the calibration report (see 10.1.5), and when reporting hardness determinations (see 10.2.4). Analog Type M, OO, OOO, and Type OOO-S durometers shall not be equipped with maximum indicating pointers.

5.1.1.12 Digital electronic durometers may be equipped with electronic maximum indicators that shall not affect the indicated reading or determinations attained by more than one half of the spring calibration tolerance stated in Table 1.

5.1.1.13 *Calibrated Spring*, for applying force to the indentor, in accordance with Fig. 1 (a through g) and capable of applying the forces as specified in Table 1.

5.1.2 *Operating Stand* (Fig. 2):

5.1.2.1 Type 1, Type 2, and Type 3 shall be capable of supporting the durometer presser foot surface parallel to the specimen support table (Fig. 3) throughout the travel of each. The durometer presser foot to specimen support table parallelism shall be verified each time the test specimen support table is adjusted to accommodate specimens of varying dimensions. This may be accomplished by applying the durometer presser foot to the point of contact with the specimen support table and making adjustments by way of the durometer mounting assembly or as specified by the manufacturer.

5.1.2.2 *Operating Stand, Type 1* (specimen to indentor type), shall be capable of applying the specimen to the indentor in a manner that minimizes shock.

5.1.2.3 *Operating Stand, Type 2* (indentor to specimen type), shall be capable of controlling the rate of descent of the indentor to the specimen at a maximum of 3.20 mm/s (0.125

4

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.



**FIG. 1 (g) Type E Indentor** *(continued)*

**TABLE 1 Durometer Spring Force Calibration**[A]
**All Values are in N**

| Indicated Value | Type A, B, E, O | Type C, D, DO | Type M | Type OO, OOO | Type OOO-S |
|---|---|---|---|---|---|
| 0 | 0.55 | 0 | 0.324 | 0.203 | 0.167 |
| 10 | 1.3 | 4.445 | 0.368 | 0.294 | 0.343 |
| 20 | 2.05 | 8.89 | 0.412 | 0.385 | 0.520 |
| 30 | 2.8 | 13.335 | 0.456 | 0.476 | 0.696 |
| 40 | 3.55 | 17.78 | 0.5 | 0.566 | 0.873 |
| 50 | 4.3 | 22.225 | 0.544 | 0.657 | 1.049 |
| 60 | 5.05 | 26.67 | 0.589 | 0.748 | 1.226 |
| 70 | 5.8 | 31.115 | 0.633 | 0.839 | 1.402 |
| 80 | 6.55 | 35.56 | 0.677 | 0.93 | 1.579 |
| 90 | 7.3 | 40.005 | 0.721 | 1.02 | 1.755 |
| 100 | 8.05 | 44.45 | 0.765 | 1.111 | 1.932 |
| N/durometer unit | 0.075 | 0.4445 | 0.0044 | 0.00908 | 0.01765 |
| Spring Calibration Tolerance | ± 0.075 N | ± 0.4445 N | ± 0.0176 N | ± 0.0182 N | ± 0.0353 N |

[A] Refer to 5.1.1.3 for the Type *xR* designation.

in./s) and applying a force sufficient to overcome the calibrated spring force as shown in Table 1.

5.1.2.4 *Operating Stand, Type 3* (indentor to specimen type), hydraulic dampening, pneumatic dampening, or electromechanical (required for the operation of Type M durometers) shall be capable of controlling the rate of descent of the indentor to the specimen at a maximum of 3.2 mm/s (0.125 in./s) and applying a force sufficient to overcome the calibrated spring force as shown in Table 1. Manual application, Type 1 or Type 2 operating stands are not acceptable for Type M durometer operation.

5.1.2.5 The entire instrument should be plumb and level, and resting on a surface that will minimize vibration. Operating the instrument under adverse conditions will negatively affect the determinations attained.

5.1.2.6 *Specimen Support Table,* (Fig. 3) integral to the operating stand, and having a solid flat surface. The specimen support platform may have orifices designed to accept various inserts or support fixtures (Fig. 3) to provide for the support of irregularly configured specimens. When inserts are used to support test specimens, care must be taken to align the indentor to the center of the insert, or the point at which the indentor is to contact the specimen. Care should be exercised to assure that the indentor does not abruptly contact the specimen support table as damage to the indentor may result.

## 6. Test Specimen

6.1 The test specimen, herein referred to as "specimen" or "test specimen" interchangeably, shall be at least 6.0 mm (0.24 in.) in thickness unless it is known that results equivalent to the 6.0-mm (0.24-in.) values are obtained with a thinner specimen.

6.1.1 A specimen may be composed of plied pieces to obtain the necessary thickness, but determinations made on such specimens may not agree with those made on solid specimens, as the surfaces of the plied specimens may not be in complete contact. The lateral dimensions of the specimen shall be sufficient to permit measurements at least 12.0 mm (0.48 in.) from any edge, unless it is known that identical results are obtained when measurements are made at a lesser distance from an edge.

6.1.2 The surfaces of the specimen shall be flat and parallel over an area to permit the presser foot to contact the specimen over an area having a radius of at least 6.0 mm (0.24 in.) from the indentor point. The specimen shall be suitably supported to provide for positioning and stability. *A suitable hardness*

5

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

D 2240 – 05



RELEASE LEVER

DUROMETER MOUNTING ASSY.

DUROMETER
RETURN

MOUNTING ASSY. GUIDE POST

TABLE GUIDE POST

SPECIMEN SUPPORT
TABLE

TABLE HEIGHT
ADJUSTMENT KNOB

HYDRAULIC CYLINDER BASE

BASE

**FIG. 2 Durometer Operating Stand**

GUIDE POST ORIFICE

INSERT RECEPTACLE

SUPPORT TABLE (TOP VIEW)

TYPICAL TABLE INSERTS USED FOR POSITIONING TUBING, O-RINGS AND SMALL SPECIMENS



TUBING          O-RING          FLAT

**FIG. 3 Small Specimen Support Table**

*determination cannot be made on an uneven or rough point of
contact with the indentor.*

6.2 Type OOO, OOO-S, and M test specimens should be at
least 1.25 mm (0.05 in.) in thickness, unless it is known that

results equivalent to the 1.25-mm (0.05-in.) values are obtained
with a thinner specimen.

6.2.1 A Type M specimen that is not of a configuration
described in 6.2.2 may be composed of plied pieces to obtain

6

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.



D 2240 – 05



**FIG. 4 Detail of Indentor Extension and Display Adjustment**

the necessary thickness, but determinations made on such specimens may not agree with those made on solid specimens because the surfaces of the plied specimens may not be in complete contact. The lateral dimensions of the specimen should be sufficient to permit measurements at least 2.50 mm (0.10 in.) from any edge unless it is known that identical results are obtained when measurements are made at lesser distance from an edge. *A suitable hardness determination cannot be made on an uneven or rough point of contact with the indentor.*

6.2.2 The Type M specimen, when configured as an o-ring, circular band, or other irregular shape shall be at least 1.25 mm (0.05 in.) in cross-sectional diameter, unless it is known that results equivalent to the 1.25-mm (0.05-in.) values are obtained with a thinner specimen. The specimen shall be suitably supported in a fixture (Fig. 3) to provide for positioning and stability.

6.3 The minimum requirement for the thickness of the specimen is dependent on the extent of penetration of the indentor into the specimen; for example, thinner specimens may be used for materials having higher hardness values. The minimum distance from the edge at which measurements may be made likewise decreases as the hardness increases.

# 7. Calibration

7.1 *Indentor Extension Adjustment Procedure:*

7.1.1 Place precision ground dimensional blocks (Grade B or better) on the support table and beneath the durometer presser foot and indentor. Arrange the blocks so that the durometer presser foot contacts the larger block(s) and the indentor tip just contacts the smaller block (Fig. 4). It is necessary to observe the arrangement of the blocks and the presser foot/indentor under a minimum of 20× magnification to assure proper alignment.

7.1.2 Indentor extension and shape shall be in accordance with 5.1.1.5, 5.1.1.6, or 5.1.1.7, respective to durometer type. See Fig. 1 (a through g). Examination of the indentor under 20× magnification, 50× for Type M indentors, is required to examine the indentor condition. Misshapen or damaged indentors shall be replaced.

7.1.3 A combination of dimensional gage blocks shall be used to achieve a difference of 2.54 + 0.00/–0.0254 mm (0.100 + 0.00/–0.001 in.) between them. For Type OOO-S durometers, the gage block dimensions are 5.08 + 0.00/–0.0508 mm (0.200 + 0.00/–0.002 in.). For Type M durometers, the gage block

dimensions are 1.27 + 0.0/–0.0127 mm (0.050 + 0.00/–0.0005 in.) between them (Fig. 4).

7.1.4 Carefully lower the durometer presser foot until it contacts the largest dimensional block(s), the indentor tip should just contact the smaller block, verifying full indentor extension.

7.1.5 Adjust the indentor extension to 2.50 ± 0.04 mm (0.098 ± 0.002 in.). For Type OOO-S durometers, adjust the indentor extension to 5.0 ± 0.04 mm (0.198 ± 0.002 in.). For Type M durometers, adjust the indentor extension to 1.25 ± 0.02 mm (0.049 ± 0.001 in.), following the manufacturer's recommended procedure.

7.1.5.1 When performing the procedures in 7.1, care should be used so as not to cause damage to the indentor tip. Fig. 4 depicts a suitable arrangement for gaging indentor extension.

7.1.6 Parallelism of the durometer presser foot to the support surface, and hence the dimensional gage blocks, at the time of instrument calibration, may be in accordance with Test Methods D 374, Machinist's Micrometers, or otherwise accomplished in accordance with the procedures specified by the manufacturer.

7.2 *Indentor Display Adjustment:*

7.2.1 After adjusting the indentor extension as indicated in 7.1, use a similar arrangement of dimensional gage blocks to verify the linear relationship between indentor travel and indicated display at two points: 0 and 100. Following the manufacturer's recommendations, make adjustments so that:

7.2.2 The indicator displays a value equal to the indentor travel measured to within:

–0.0 +1.0 durometer units measured at 0;
±0.50 durometer units measured at 100;
±1 durometer units at all other points delineated in 7.4.

7.2.3 Each durometer point indicated is equal to 0.025 mm (0.001 in.) of indentor travel, except for:

7.2.3.1 Type M Durometers, each indicated point is equal to 0.0125 mm (0.0005 in.) of indentor travel;

7.2.3.2 Type OOO-S Durometers, each indicated point is equal to 0.050 mm (0.002 in.) of indentor travel.

7.2.4 The indicator shall not display a value greater than 100 or less than 0 at the time of calibration.

7.2.5 Other means of determining indentor extension or indentor travel, such as optical or laser measurement methods, are acceptable. The instrumentation used shall have traceability as described in 1.4.

7.2.6 The durometer shall be supported in a suitable fashion when performing the procedures described in 7.1 and 7.2.

7.3 *Calibration Device:*

7.3.1 The durometer spring shall be calibrated by supporting the durometer in a calibrating device, see Fig. 5, in a vertical position and applying a measurable force to the indentor tip. The force may be measured by means of a balance as depicted in Fig. 5, or an electronic force cell. The calibrating device shall be capable of measuring applied force to within 0.5 % of the maximum spring force necessary to achieve 100 durometer units.

7.3.2 Care should be taken to ensure that the force is applied vertically to the indentor tip, as lateral force will cause errors in calibration. See 7.1.5.1 and 7.1.6.

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

D 2240 – 05



**FIG. 5 Example of Durometer Calibration Apparatus**

7.4 *Spring Calibration*—The durometer spring shall be calibrated at displayed readings of 10, 20, 30, 40, 50, 60, 70, 80, and 90. The measured force (9.8× mass in kilograms) shall be within the spring calibration tolerance specified in Table 1. Table 1 identifies the measured force applied to the indentor for the entire range of the instrument, although it is necessary only to verify the spring calibration at points listed herein.

7.5 *Spring Calibration Procedure*:

7.5.1 Ensure that the indentor extension has been adjusted in accordance with 7.1, and the linear relationship between indentor travel and display is as specified in 7.2.

7.5.2 Place the durometer in the calibration device as depicted in Fig. 5. Apply the forces indicated in Table 1 so that forces applied are aligned with the centerline of the indentor in a fashion that eliminates shock or vibration and adjust the durometer according to manufacturers' recommendations so that:

7.5.3 At the points enumerated in 7.4, the display shall indicate a value equal to 0.025 mm (0.001 in.) of indentor travel. For Type OOO-S durometers, the display shall indicate a value equal to 0.05 mm (0.002 in.) of indentor travel. For Type M durometers, the display shall indicate a value equal to 0.0125 mm (0.0005 in.) of indentor travel within the spring calibration tolerances specified in 7.6.

7.6 Spring calibration tolerances are ±1.0 durometer units for Types A, B, C, D, E, O, and DO, ±2.0 durometer units for Types OO, OOO, and OOO-S, and ±4.0 durometer units for Type M, while not indicating below 0 or above 100 at the time of calibration (see Table 1).

7.7 *Spring Force Combinations*:

7.7.1 For Type A, B, E, and O durometers:
Force, N = 0.55 + 0.075 HA
Where HA = hardness reading on Type A, B, E, and O durometers.

7.7.2 For Type C, D, and DO durometers:
Force, N = 0.4445 HD
Where HD = hardness reading on Type C, D, and DO durometers.

7.7.3 For Type M durometers:
Force, N = 0.324 + 0.0044 HM
Where HM = hardness reading on Type M durometers.

7.7.4 For Type OO and OOO durometers:
Force, N = 0.203 + 0.00908 HOO
Where HOO = hardness reading on Type OO durometers.

7.7.5 For Type OOO-S durometers:
Force, N = 0.167 + 0.01765 HOOO-S
Where HOOO-S = hardness reading on Type OOO-S durometers.

7.8 The rubber reference block(s) provided for verifying durometer operation and state of calibration are not to be relied upon as calibration standards. The calibration procedures outlined in Section 7 are the only valid calibration procedures.

7.8.1 The use of metal reference blocks is no longer recommended (see Note 2).

7.9 Verifying the state of durometer calibration, *during routine use*, may be accomplished by:

7.9.1 Verifying that the zero reading is no more than 1 indicated point above zero, and not below zero (on durometers so equipped), when the durometer is positioned so that no external force is placed upon the indentor.

7.9.2 Verifying that the 100 reading is no more than 100 and no less than 99 when the durometer is positioned on a flat surface of a non-metallic material so that the presser foot is in complete contact, causing the indentor to be fully retracted.

7.9.2.1 It is important that when performing the verification of 100, as described in 7.9.2, that extreme care be taken so as to not cause damage to the indentor. Verification of the 100 value is not recommended for durometers having a spring force greater than 10 N (Types C, D, and DO).

7.9.2.2 When performing the verification of 100, as described in 7.9.2, the non-metallic material shall be of a hardness value greater than 100 of the type (scale) of the durometer being employed. Tempered glass of a thickness greater than 6.35 mm (0.25 in.) has been found satisfactory for this application.

7.9.3 Verifying the displayed reading at any other point using commercially available rubber reference blocks which are certified to a stated value of the type (scale) of the durometer being employed. The displayed value of the durometer should be within ±2 durometer points of the reference block's stated value.

7.9.4 Verification of the zero and 100 readings of a durometer provide reasonable assurance that the linear relationship between the indicated display and the durometer mechanism remain valid.

7.9.5 Verification of points between zero and 100 provide reasonable assurance that the curvilinear relationship between the indicated display and the durometer mechanism remain valid.

7.9.6 *This is not a calibration procedure, it is a means by which a user may routinely verify that the durometer may be functioning correctly.* (See Note 2.)

**8. Laboratory Atmosphere and Test Specimen Conditioning**

8.1 Tests shall be conducted in the standard laboratory atmosphere, as defined in Practice D 618, Section 4.2.

8.2 The instrument shall be maintained in the standard laboratory atmosphere, as defined in Practice D 618, Section 4.1, for 12 h prior to performing a test.

8

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

**D 2240 – 05**

8.3 The specimen shall be conditioned in accordance with condition 40/23 exclusive of humidity control, as described in Practice D 618, Section 8.1, Procedure A and tested under the same conditions, exclusive of humidity control.

8.4 These procedures may be modified if agreed upon between laboratories or between supplier and user and are in accordance with alternative procedures identified in Practice D 618.

8.5 No conclusive evaluation has been made on durometers at temperatures other than 23.0 ± 2.0°C (73.4 ± 3.6°F). Conditioning at temperatures other than the above may show changes in calibration. Durometer use at temperatures other than the above should be decided locally (see Practice D 1349).

## 9. Procedure

9.1 *Operating Stand Operation (Type 3 Operating Stand Required for Type M)*:

9.1.1 Care shall be exercised to minimize the exposure of the instrument to environmental conditions that are adverse to the performance of the instrument, or adversely affect test results.

9.1.2 Adjust the presser foot to support table parallelism as described in 5.1.2.1. It is necessary to make this adjustment each time the support table is moved to accommodate specimens of varying dimensions.

9.1.3 Prior to conducting a test, adjust the vertical distance from the presser foot to the contact surface of the test specimen to 25.4 ± 2.5 mm (1.00 ± 0.100 in.), unless it is known that identical results are obtained with presser foot at a greater or lesser vertical distance from the test specimen contact surface, or if otherwise stipulated by the manufacturer.

9.1.4 Place the specimen on the specimen support table, in a manner that the contact point of the indentor is in accordance with Section 6, unless it is known that identical results are obtained when measurements are made with the indentor at a lesser distance from the edge of the test specimen.

9.1.5 Actuate the release lever (Fig. 2) of the operating stand or activate the electromechanical device, allowing the durometer to descend at a controlled rate and apply the presser foot to the specimen in accordance with 5.1.2. In the case of "specimen to indentor" type operating stands, operate the lever or other mechanism to apply the specimen to the indentor in a manner that assures parallel contact of the specimen to the durometer presser foot without shock and with just sufficient force to overcome the calibrated spring force as shown in Table 1.

9.1.6 An operating stand that applies the mass at a controlled rate of descent, without shock is mandatory for Type M durometers. Hand-held application or the use of a Type 1 or Type 2 operating stand for the Type M durometer is not an acceptable practice, see 5.1.2.4.

9.1.7 For any material covered in 1.1, once the presser foot is in contact with the specimen, for example, when the initial indentor travel has ceased, the maximum indicated reading shall be recorded. The time interval of 1 s, between initial indentor travel cessation and the recording of the indicated reading, shall be considered standard. Other time intervals, when agreed upon among laboratories or between supplier and user, may be used and reported accordingly. The indicated hardness reading may change with time.

9.1.7.1 If the durometer is equipped with an electronic maximum indicator or timing device (refer to 5.1.1.9) the indicated reading shall be recorded within 1 ± 0.3 s of the cessation of indentor travel and reported (refer to 10.2.9 for reporting protocols), unless otherwise noted.

9.1.7.2 If the durometer is equipped with an analog type maximum indicator (refer to 5.1.1.10), the maximum indicated reading may be recorded and shall be reported (refer to 10.2.9), unless otherwise noted.

9.1.7.3 If the durometer is not equipped with the devices described in 5.1.1.9 or 5.1.1.10, the indicated reading shall be recorded within 1 s as is possible and reported (refer to 10.2.9), unless otherwise noted.

9.1.8 Make five determinations of hardness at different positions on the specimen at least 6.0 mm (0.24 in.) apart, 0.80 mm (0.030 in.) apart for Type M; and calculate the arithmetic mean, or alternatively calculate the median. The means of calculating the determinations shall be reported according to 10.2.8

9.2 *Manual (Hand Held) Operation of Durometer*:

9.2.1 Care shall be exercised to minimize the exposure of the instrument to environmental conditions that are adverse to the performance of the instrument, or adversely affect test results.

9.2.2 Place the specimen on a flat, hard, horizontal surface. Hold the durometer in a vertical position with the indentor tip at a distance from any edge of the specimen as described in Section 6, unless it is known that identical results are obtained when measurements are made with the indentor at a lesser distance.

9.2.3 Apply the presser foot to the specimen, maintaining it in a vertical position keeping the presser foot parallel to the specimen, with a firm smooth downward action that will avoid shock, rolling of the presser foot over the specimen, or the application of lateral force. Apply sufficient pressure to assure firm contact between the presser foot and the specimen.

9.2.4 For any material covered in 1.1, after the presser foot is in contact with the specimen, the indicated reading shall be recorded within 1 ± 0.1 s, or after any period of time agreed upon among laboratories or between supplier and user. If the durometer is equipped with a maximum indicator, the maximum indicated reading shall be recorded within 1 ± 0.1 s of the cessation of initial indentor travel. The indicated hardness reading may change with time.

9.2.5 Make five determinations of hardness at different positions on the specimen at least 6.0 mm (0.24 in.) apart and calculate the arithmetic mean, or alternatively calculate the median. The means of calculating the determinations shall be reported according to 10.2.8.

9.3 It is acknowledged that durometer readings below 20 or above 90 are not considered reliable. It is suggested that readings in these ranges not be recorded.

9.4 Manual operation (handheld) of a durometer will cause variations in the results attained. Improved repeatability may be obtained by using a mass, securely affixed to the durometer and centered on the axis of the indentor. Recommended masses

9

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

**D 2240 – 05**

**TABLE 2 Type 1 Precision—Type M Durometer Method**

| Material | MEAN | Within Laboratories | | | Between Laboratories | | |
|---|---|---|---|---|---|---|---|
| | | $Sr^A$ | $r^B$ | $(r)^C$ | $SR^D$ | $R^E$ | $(R)^F$ |
| 1 | 31.8 | 1.26 | 3.58 | 11.24 | 3.76 | 10.63 | 33.41 |
| 2 | 40.8 | 1.14 | 3.23 | 7.90 | 2.47 | 7.00 | 17.13 |
| 3 | 54.0 | 0.975 | 2.76 | 5.11 | 2.38 | 6.73 | 12.46 |
| 4 | 62.8 | 0.782 | 2.21 | 3.52 | 2.24 | 6.34 | 10.10 |
| 5 | 70.9 | 0.709 | 2.01 | 2.83 | 0.974 | 2.76 | 3.89 |
| 6 | 80.6 | 1.686 | 4.77 | 5.92 | 1.61 | 4.56 | 5.65 |
| 7 | 87.7 | 1.15 | 3.25 | 3.71 | 2.63 | 7.45 | 8.50 |
| 8 | 32.4 | 0.947 | 2.68 | 8.26 | 3.64 | 10.29 | 31.73 |
| 9 | 41.8 | 0.797 | 2.26 | 5.40 | 2.23 | 6.31 | 15.11 |
| 10 | 53.3 | 0.669 | 1.89 | 3.55 | 2.29 | 6.49 | 12.17 |
| 11 | 63.2 | 0.485 | 1.37 | 2.17 | 2.19 | 6.20 | 9.80 |
| 12 | 69.6 | 0.737 | 2.09 | 3.00 | 0.99 | 2.80 | 4.02 |
| 13 | 78.3 | 0.784 | 2.22 | 2.84 | 1.04 | 2.94 | 3.75 |
| 14 | 87.6 | 1.121 | 3.17 | 3.62 | 2.65 | 7.49 | 8.55 |
| 15 | 34.1 | 0.85 | 2.40 | 7.05 | 1.84 | 5.20 | 15.25 |
| 16 | 42.3 | 0.635 | 1.80 | 4.25 | 1.20 | 3.39 | 8.01 |
| 17 | 54.6 | 0.56 | 1.59 | 2.90 | 2.15 | 6.09 | 11.15 |
| 18 | 62.9 | 1.12 | 3.17 | 5.04 | 1.47 | 4.16 | 6.61 |
| 19 | 70.3 | 0.689 | 1.95 | 2.77 | 0.944 | 2.67 | 3.80 |
| 20 | 81.7 | 0.483 | 1.37 | 1.67 | 1.10 | 3.10 | 3.80 |
| 21 | 87.9 | 0.879 | 2.49 | 2.83 | 2.07 | 5.86 | 6.67 |
| AVERAGE | 61.4 | | | | | | |
| POOLED VALUES | | 0.924 | 2.62 | 4.26 | 2.146 | 6.07 | 9.89 |

$^A$ $Sr$ = repeatability standard deviation, measurement units.
$^B$ $r$ = repeatability = 2.83 × $Sr$, measurement units.
$^C$ $(r)$ = repeatability, relative, (that is, in percent).
$^D$ $SR$ = reproducibility standard deviation, measurement units.
$^E$ $R$ = reproducibility = 2.83 × $SR$, measurement units.
$^F$ $(R)$ = reproducibility, relative, (that is, in percent).

**TABLE 3 Type 1 Precision—Type A Durometer Method**

| Material | Average Level | Within Laboratories | | | Between Laboratories | | |
|---|---|---|---|---|---|---|---|
| | | $Sr^A$ | $r^B$ | $(r)^C$ | $SR^D$ | $R^E$ | $(R)^F$ |
| 1 | 51.4 | 0.646 | 1.83 | 3.56 | 1.56 | 4.41 | 8.59 |
| 2 | 65.3 | 0.878 | 2.48 | 3.81 | 2.21 | 6.06 | 9.27 |
| 3 | 68.0 | 0.433 | 1.23 | 1.80 | 2.28 | 6.45 | 9.49 |
| Pooled | 61.6 | 0.677 | 1.92 | 3.11 | 2.018 | 5.72 | 9.28 |

$^A$ $Sr$ = repeatability standard deviation, measurement units.
$^B$ $r$ = repeatability = 2.83 × $Sr$, measurement units.
$^C$ $(r)$ = repeatability, relative, (that is, in percent).
$^D$ $SR$ = reproducibility standard deviation, measurement units.
$^E$ $R$ = reproducibility = 2.83 × $SR$, measurement units.
$^F$ $(R)$ = reproducibility, relative, (that is, in percent).

**TABLE 4 Type 1 Precision—Type D Durometer Method**

| Material | Average Level | Within Laboratories | | | Between Laboratories | | |
|---|---|---|---|---|---|---|---|
| | | $Sr^A$ | $r^B$ | $(r)^C$ | $SR^D$ | $R^E$ | $(R)^F$ |
| 1 | 42.6 | 0.316 | 0.894 | 2.10 | 2.82 | 7.98 | 18.7 |
| 2 | 54.5 | 0.791 | 2.24 | 4.11 | 3.54 | 10.0 | 18.4 |
| 3 | 82.3 | 1.01 | 2.86 | 3.47 | 3.54 | 10.0 | 12.2 |
| Pooled | 59.8 | 0.762 | 2.16 | 3.61 | 3.32 | 9.40 | 15.7 |

$^A$ $Sr$ = repeatability standard deviation, measurement units.
$^B$ $r$ = repeatability = 2.83 × $Sr$, measurement units.
$^C$ $(r)$ = repeatability, relative, (that is, in percent).
$^D$ $SR$ = reproducibility standard deviation, measurement units.
$^E$ $R$ = reproducibility = 2.83 × $SR$, measurement units.
$^F$ $(R)$ = reproducibility, relative, (that is, in percent).

are 1 kg for Type A, B, E, and O durometers, 5 kg for Type C, D, and DO durometers, and 400 g for Type OO, OOO, and OOO-S durometers. The introduction of an additional mass on Type M durometers is not permitted. Further improvement may be achieved by the use of a durometer operating stand that controls the rate of descent of the durometer presser foot to the test specimen and incorporates the masses described above.

## 10. Report

10.1 *Instrument Calibration Report (Durometer or Operating Stand)*:
10.1.1 Date of calibration.
10.1.2 Date of last calibration.
10.1.3 Calibration due date (see Note 2).
10.1.4 Manufacturer, type, model, and serial number of the instrument, and a notation when a maximum indicator or timing device is present.
10.1.5 Values obtained (pre- and post-calibration results), including a notation of the effect of a maximum indicator, if present. The method of reporting the calibrated value shall be by attaining the arithmetic mean of the determinations.
10.1.6 Ambient temperature.
10.1.7 Relative humidity.
10.1.8 Technician identification.
10.1.9 Applicable standards to which the instrument is calibrated.
10.1.10 Calibrating instrument information to include type, serial number, manufacturer, date of last calibration, calibration due date (see Note 2), and a statement of traceability of standards used to NIST or other acceptable organization. See 1.4.

10.2 *Hardness Measurement Report*:
10.2.1 Date of test.
10.2.2 Relative humidity.
10.2.3 Ambient temperature.
10.2.4 Manufacturer, type, and serial number of the durometer or operating stand, or both, including a notation when a maximum indicator or timing device is present, date of last calibration, and calibration due date (see Note 2).

NOTE 2—The calibration interval (calibration due date) for a durometer is to be determined by the user, based upon frequency of use, severity of conditions, environmental factors, and other variables.

Periodic checking of the operation and state of durometer calibration using commercially available rubber test blocks (refer to 7.8), specifically designed for this purpose, is permitted.

An instrument that has been exposed to severe shock, is visibly damaged, produces test determinations more than 2 points different from calibrated rubber test blocks or other reference standard, or is otherwise suspected of unreliability, should be removed from service and returned to a qualified calibration facility.

A calibration interval of one year is recommended for durometer test blocks and durometer instruments that are infrequently used, more often for others.

The calibration interval for instruments and peripheral devices employed in the calibration of durometers is to be determined by the calibration service provider. It is recommended that the protocols outlined in ISO/IEC 17025, as required by the manufacturer, and those to which the service is provided, be followed.

10.2.5 Means of testing, whether manual (hand held), Type 1 operating stand (specimen to indentor), Type 2 operating stand (indentor to specimen type), or Type 3 operating stand (electromechanical or hydraulically dampened).
10.2.6 Description of test specimen, including thickness, number of pieces plied if less than the thickness indicated in Section 6, including the vulcanization date.
10.2.7 Complete identification of material tested.
10.2.8 Hardness value obtained and method of calculation, either arithmetic mean or alternatively, the median.

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

D 2240 – 05

10.2.9 Indentation hardness time interval at which determination was made. Readings may be reported in the form: M/60/1 where M is the type of durometer, 60 the reading, and 1 the time in seconds that the presser foot is in contact with the specimen or from an electronic timing device.

## 11. Precision and Bias

11.1 These precision and bias statements have been prepared in accordance with Practice D 4483. Refer to this Practice for terminology and other testing and statistical concepts.

11.2 The Type 1 precision for the Type M method was determined from an interlaboratory program with 21 materials of varying hardness, with six participating laboratories. Tests were conducted on two separate days in each laboratory for the Type M testing program. All materials were supplied from a single source, being those commonly supplied as reference materials with the instruments from the manufacturer.

11.3 The precision results in this precision and bias section give an estimate of the precision of this test method with the materials (rubbers) used in the particular interlaboratory program as described above. The precision parameters should not be used for acceptance or rejection testing, or both, of any group of materials without documentation that they are applicable to those particular materials and the specific testing protocols that include this test method.

11.4 The Type 1 precision for both Type A and D methods was determined from an interlaboratory program with 3 materials of varying hardness, with six participating laboratories. Tests were conducted on two separate days in each laboratory for both A and D testing programs. All materials were supplied from a single source.

11.5 A test result for hardness, for Types A, D, and M, was the median of five individual hardness readings on each day in each laboratory.

11.6 Table 2 shows the precision results for Type M method,[4] Table 3 shows the precision results for Type A method,[5] and Table 4 gives the precision results for Type D method.[5]

11.7 *Precision*—The precision of this test method may be expressed in the format of the following statements which use as appropriate value r, R, (r), or (R), that is, that value to be used in decisions about test results (obtained with the test method). The appropriate value is that value of r or R associated with a mean level in Table 1 closest to the mean level under consideration (at any given time, for any given material) in routine testing operations.

NOTE 3—A Type 1 precision statement for Types E, OOO, OOO-S, and R have not yet been made available.

11.7.1 *Repeatability*—The repeatability, r, of these test methods has been established as the appropriate value tabulated in Tables 2-4. Two single test results, obtained under normal test method procedures, that differ by more than this tabulated r (for any given level) must be considered as derived from different or non-identical sample populations.

11.7.2 *Reproducibility*—The reproducibility, R, of these test methods has been established as the appropriate value tabulated in Tables 2-4. Two single test results obtained in two different laboratories, under normal test method procedures, that differ by more than the tabulated R (for any given level) must be considered to have come from different or non-identical sample populations.

11.7.3 Repeatability and reproducibility are expressed as a percentage of the mean level, (r) and (R), and have equivalent application statements as above for r and R. For the (r) and (R) statements, the difference in the two single test results is expressed as a percentage of the arithmetic mean of the two test results.

11.8 *Bias*—In test method terminology, bias is the difference between an average test value and the reference (or true) test property value. Reference values do not exist for this test method since the value (of the test property) is exclusively defined by this test method. Bias, therefore cannot be determined.

## 12. Keywords

12.1 durometer; durometer hardness; hardness; indentation hardness; micro durometer hardness

---

[4] Supporting data have been filed at ASTM International Headquarters and may be obtained by requesting Research Report RR: D11-1091.

[5] Supporting data have been filed at ASTM International Headquarters and may be obtained by requesting Research Report RR: D11-1029.

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

 **D 2240 – 05**

## APPENDIXES

### (Nonmandatory Information)

### X1. DUROMETER SELECTION GUIDE

X1.1  The durometer selection guide is designed to assist in the selection of the proper durometer type for various applications.

X1.2  It is generally recognized that durometer hardness determination below 20 and above 90 are unreliable. It is recommended that the next lower or higher type (scale) be used in these situations.

X1.3  It is also recommended that, whenever possible, an operating stand be employed in performing durometer hardness tests.

**TABLE X1.1 Durometer Selection: Typical Uses**

| Type (Scale) | Typical Examples of Materials Tested | Durometer Hardness (Typical Uses) |
|---|---|---|
| A | Soft vulcanized rubber, natural rubber, nitriles, thermoplastic elastomers, flexible polyacrylics and thermosets, wax, felt, and leathers | 20–90 A |
| B | Moderately hard rubber, thermoplastic elastomers, paper products, and fibrous materials | Above 90 A / Below 20 D |
| C | Medium-hard rubber, thermoplastic elastomers, medium-hard plastics, and thermoplastics | Above 90 B / Below 20 D |
| D | Hard rubber, thermoplastic elastomers, harder plastics, and rigid thermoplastics | Above 90 A |
| DO | Moderately hard rubber, thermoplastic elastomers, and very dense textile windings | Above 90 C / Below 20 D |
| M | Thin, irregularly shaped rubber, thermoplastic elastomer, and plastic specimens | 20–85 A |
| O | Soft rubber, thermoplastic elastomers, very soft plastics and thermoplastics, medium-density textile windings | Below 20 DO |
| OO | Extremely soft rubber, thermoplastic elastomers, sponge, extremely soft plastics and thermoplastics, foams, low-density textile windings, human and animal tissue | Below 20 O |
| CF | Composite foam materials, such as amusement ride safety cushions, vehicle seats, dashboards, headrests, armrests, and door panels | See Test Method F 1957 |

### X2. RELATED TEST METHODS[2]

C 367 Test Methods for Strength Properties of Prefabricated Architectural Acoustical Tile or Lay-In Ceiling Panels

C 473 Test Methods for Physical Testing of Gypsum Panel Products

C 581 Practice for Determining Chemical Resistance of Thermosetting Resins Used in Glass-Fiber-Reinforced Structures Intended for Liquid Service

C 661 Test Method for Indentation Hardness of Elastomeric-Type Sealants by Means of a Durometer

C 836 Specification for High Solids Content, Cold Liquid-Applied Elastomeric Waterproofing Membrane for Use with Separate Wearing Course

D 461 Test Methods for Felt

D 531 Test Method for Rubber Property—Pusey and Jones Indentation

D 619 Test Methods for Vulcanized Fibre Used for Electrical Insulation

D 1037 Test Methods for Evaluating Properties of Wood-Base Fiber and Particle Panel Materials

D 1054 Test Method for Rubber Property—Resilience Using a Goodyear-Healey Rebound Pendulum

D 1414 Test Methods for Rubber O-Rings

D 1474 Test Methods for Indentation Hardness of Organic Coatings

D 2134 Test Method for Determining the Hardness of Organic Coatings with a Sward-Type Hardness Rocker

D 2287 Specification for Nonrigid Vinyl Chloride Polymer and Copolymer Molding and Extrusion Compounds

D 2583 Test Method for Indentation Hardness of Rigid Plastics by Means of a Barcol Impressor

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

D 2240 – 05

D 2632 Test Method for Rubber Property—Resilience by Vertical Rebound

D 4289 Test Method for Elastomer Compatibility of Lubricating Greases and Fluids

D 5672 Test Method for Flexible Cellular Materials Measurement of Indentation Force Deflection Using a 25-mm (1-in.) Deflection Technique

D 6546 Test Methods for and Suggested Limits for Determining Compatibility of Elastomer Seals for Industrial Hydraulic Fluid Applications

F 1151 Test Method for Determining Variations in Hardness of Film Ribbon Pancakes

NOTE X2.1—The hardness testing of other nonmetallic materials may be under the jurisdiction of one or more ASTM committees; the respective committee should be contacted for specific information.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

# EXHIBIT B

PTO/SB/21 (02-04)
Approved for use through 07/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FORM

*(to be used for all correspondence after initial filing)*

| | |
|---|---|
| Application Number | 10/902,257 |
| Filing Date | July 30, 2004 |
| First Named Inventor | Douglas J. HOHLBEIN |
| Art Unit | 3731 |
| Examiner Name | M. SPISCH |
| Attorney Docket Number | 6989-01 |

Total Number of Pages in This Submission

## ENCLOSURES (check all that apply)

- [ ] Fee Transmittal Form
  - [ ] Fee Attached
- [x] Amendment / Reply
  - [ ] After Final
  - [ ] Affidavits/declaration(s)
- [ ] Extension of Time Request
- [ ] Express Abandonment Request
- [ ] Information Disclosure Statement
- [ ] Certified Copy of Priority Document(s)
- [ ] Response to Missing Parts/ Incomplete Application
- [ ] Response to Missing Parts under 37 CFR 1.52 or 1.53

- [ ] Drawing(s)
- [ ] Licensing-related Papers
- [ ] Petition (See attached IDS)
- [ ] Petition to Convert to a Provisional Application
- [x] Change of Correspondence Address
- [ ] Terminal Disclaimer
- [ ] Request for Refund
- [ ] CD, Number of CD(s) _____

Remarks

- [ ] After Allowance Communication to Group
- [ ] Appeal Communication to Board of Appeals and Interferences
- [ ] Appeal Communication to Group (Appeal Notice, Brief, Reply Brief)
- [ ] Proprietary Information
- [ ] Status Letter
- [ ] Other Enclosure(s) *(please identify below):*

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT

| Firm or Individual name | Darrell G. Mottley, Reg. No. 42, 912 |
|---|---|
| Signature | *Darrell G. Mottley* |
| Date | November 15, 2005 |

## CERTIFICATE OF TRANSMISSION/MAILING

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date shown below.

| Typed or printed name | | |
|---|---|---|
| Signature | | Date |

This collection of information is required by 37 CFR 1.5. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

OIPE
NOV. 15 2005
PATENT & TRADEMARK OFFICE

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| In re the Application of: | Atty. Docket No.: 6989-01 |
| **Douglas J. Hohlbein** | |
| Serial No.: 10/902,257 | Group Art Unit: 3731 |
| Filed: July 30, 2004 | Examiner: Mark Spisich |
| For: Oral Care Implement | Confirmation No.: 1397 |

## AMENDMENT

U.S. Patent and Trademark Office
220 20th Street S.
Customer Window
Crystal Plaza Two, Lobby, Room 1B03
Arlington, VA  22202

Sir:

     This paper is responsive to the non final Office Action mailed August 15, 2005, please amend the instant application as follows:

     **Amendments to the Claims** are reflected in the Listing of Claims, which begins on page 2 of this paper.

     **Remarks/Arguments** begin on page 9 of this paper.

App. No. 10/902,257

**Listing of Claims:**

1. (Currently Amended)    An oral care implement comprising:

a base with a gripping region and an oral engaging region, the base having an aperture extending therethrough; and

a gripping member at least partially overlying the gripping region of the base and having a grip surface provided with at least one opening exposing a portion of the base; and

a resilient grip body in the gripping region and extending through the aperture, the gripping member having a different durometer characteristic than the resilient grip body.

2. (Currently Amended)    The oral care implement according to claim 1, in which the gripping member and the grip body comprises an elastomeric material.

3. (Currently Amended)    The oral care implement according to claim 2, in which the at least one opening exposed exposing a portion of the base are is recessed in the grip surface to define a cavity in the opening.

4. (Currently Amended)    The oral care implement according to claim 3, in which the base further includes at least one projection which has an outer surface, and the exposed portion of the base in the least one opening is being the outer surface of the projection.

5. (Currently Amended)    The oral care implement according to claim 2 wherein the at least one opening further comprises a plurality of the openings are provided in the grip surface gripping member.

6. (Currently Amended)    The oral care implement according to claim 5, in which the grip surface gripping member further includes a concaved region disposed between each pair of adjacent openings.

7. (Original)    The oral care implement according to claim 6, in which the base further includes a plurality of projections and a base surface extending between the projections, wherein the base

App. No. 10/902,257

surface between each adjacent pair of said projections has a groove disposed between the projections, and wherein the groove is disposed below the concaved regions.

8. (Original)   The oral care implement of claim 5, in which the openings are elongate, transverse slots.

9. (Original)   The oral care implement according to claim 8, in which the slots have varying lengths along a longitudinal direction of the gripping region.

10. (Currently Amended)    The oral care implement according to claim 5 wherein the ~~base includes an aperture, and a~~ resilient grip body is fixed in the aperture to define <u>tactile</u> finger gripping surfaces on opposite sides of the base.

11. (Currently Amended)    The oral care implement according to claim 10, in which the <u>openings in the gripping member with</u> exposed portions of the base are recessed ~~in the grip surface~~.

12. (Currently Amended)    The oral care implement according to claim 11, in which the <u>gripping region of the</u> base includes a rear segment and a front segment that is inclined <u>relative</u> to the rear segment<u>, the rear segment including the gripping member</u>.

13. (Original)  The oral care implement according to claim 12 wherein the aperture is formed in the front segment.

14. (Currently Amended)  The oral care implement according to claim 2 ~~further including an independent, resilient~~ <u>wherein the</u> grip body <u>is surrounded by the gripping member on one side of the aperture</u> ~~extending through the base~~.

15. (Currently Amended)    The oral care implement according to claim <u>1</u> ~~14~~, in which the grip body is of a softer material than said gripping member.

App. No. 10/902,257

16. (Original) The oral care implement according to claim 15 wherein the aperture and grip body received therein has a width at its largest dimension which is more than one half of the width of the base at the same location.

17. (Currently Amended)    The oral care implement according to claim 16 1 wherein the at least one opening further comprises a plurality of the openings are provided in the grip surface gripping member.

18. (Currently Amended)    The oral care implement according to claim 17, in which the exposed portions of the base in the gripping member are recessed in the grip surface.

19. (Currently Amended)    The oral care implement according to claim 1, wherein the base includes an aperture, and a resilient grip body is fixed in the aperture to define tactile finger gripping surfaces on opposite sides of the base.

20. (Original) The oral care implement according to claim 19 wherein the aperture and grip body received therein has a width at its largest dimension which is more than one half of the width of the base at the same location.

21. (Currently Amended)    The oral care implement according to claim 1, in which the handle base includes first and second sections and an intermediate section that connects the first and second sections, wherein the intermediate section is narrower than the first and second sections.

22. (Original) The oral care implement according to claim 21, in which the first section is inclined relative to the second section.

23. (Currently Amended)    The oral care implement according to claim 1, in which the exposed portion of the base is recessed in the grip surface gripping member to define a cavity in the opening.

App. No. 10/902,257

24. (Currently Amended)    The oral care implement according to claim 1, in which the gripping member is composed of a softer material than the base <u>and the grip body is composed of a softer material than the gripping member</u>.

25. (Currently Amended)    The oral care implement according to claim 24, in which the <u>at least one opening includes a plurality of openings</u> ~~exposed~~ <u>exposing</u> base portions <u>that</u> are recessed relative to the <u>gripping member</u> ~~grip surface~~.

26. (Original)  The oral care implement according to claim 1, in which the oral engaging region includes teeth cleaning elements.

27. (Currently Amended)    An oral care implement comprising:

a base with a gripping region and an oral engaging region, the gripping region including a rear segment and a front segment inclined relative to the rear segment<u>; wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion;</u>

<u>a resilient grip surface being disposed on the rear segment;</u> and

a grip body extending through <u>an aperture in</u> the base <u>and spaced from the grip surface,</u> the grip body forming opposite finger gripping surfaces on the inclined portion of the base.

28. (Original)  The oral care implement according to claim 27, in which the grip body comprises an elastomeric material.

29. (Original)  The oral care implement according to claim 27, in which the grip body is configured to counterbalance forces acting on the handle.

30. (Original)  The oral care implement according to claim 27, in which the grip body has a hardness of about 8-24 Shore A.

App. No. 10/902,257

31. (Currently Amended)    The oral care implement according to claim 30, ~~in which the handle further includes a resilient grip surface on the base,~~ wherein the resilient grip surface has a hardness of about 13-50 Shore A.

32. (Currently Amended) The oral care implement according to claim 27 wherein <u>the grip body is spaced from the grip surface by a portion of the base</u> ~~front segment is inclined to the rear segment at about 5-40 degrees~~.

33. (Original) The oral care implement according to claim 27 wherein the aperture and grip body received therein has a width at its largest dimension which is more than one half of the width of the base at the same location.

34. (Original)  The oral care implement according to claim 27 wherein each said finger gripping surface includes a plurality of projections.

35. (Original)  An oral care implement comprising:

      a base with gripping region and an oral engaging region, the gripping region including an aperture extending through the base; and

      a resilient grip body disposed in the aperture and extending through the base to define finger gripping surfaces on opposite sides of the base, the grip body further having a centroid that is shiftable within the aperture by user pressure to opposite sides of the base.

36. (Original)  The oral care implement according to claim 35, in which the grip body comprises an elastomeric material.

37. (Currently Amended) The oral care implement of claim <u>35</u> ~~34~~, in which the grip <u>body</u> ~~element~~ is disposed in a widest portion of the base.

38. (Currently Amended)    The oral care implement according to claim <u>35</u> ~~34~~, in which the grip <u>body</u> ~~element~~ has hardness of about 8-24 Shore A.

App. No. 10/902,257

39. (Currently Amended)    The oral care implement according to claim 35 ~~34~~ wherein the aperture is defined by side surfaces that are inclined toward a central portion of the aperture to define a narrowed rounded edge surface.

40. (Currently Amended)    An oral care implement comprising:

a base with a gripping region and an oral engaging region, the gripping region including an aperture extending through the base, the aperture being defined by at least one inclined sidewall that defines a narrowed edge surface within the aperture; wherein the base includes a peripheral groove in the gripping region; and

a resilient grip body being molded into the aperture, the grip body defining grip surfaces exposed on opposite sides of the base.

41. (Previously Presented)    The oral care implement according to claim 40, in which the grip body comprises an elastomeric material.

42. (Original)  The oral care implement according to claim 40, in which the handle includes first and second sections and an intermediate section that connects the first and second sections, wherein the intermediate section is narrower than the first and second sections.

43. (Original)  The oral care implement according to claim 40 wherein the grip body has a hardness of about 8-25 Shore A.

44. (Original)  The oral care implement according to claim 43, further including a grip surface on the base, the grip surface having hardness of about 13-40 Shore A.

45. (Original)  The oral care implement according to claim 40 wherein the grip body has a hardness of about 11-15 Shore A.

46. (Original)  The oral care implement according to claim 40, in which the grip body is disposed in the widest portion of the base.

App. No. 10/902,257

47. (Original)  An oral care implement comprising:

a base with a gripping region and an oral engaging region, the gripping region including an aperture extending through the base; and

a resilient grip body secured within the aperture to extend through the base and define a gripping surface on opposite sides of the base to be gripped by a thumb of a user and one finger, the grip body being configured to dampen the forces applied to the oral engaging region by the user holding the gripping region.

48. (Original)  The oral care implement according to claim 47 wherein the aperture and grip body received therein has a width at its largest dimension which is more than one half of the width of the base at the same location.

49. (Original)  The oral care implement according to claim 47 wherein the aperture is defined by side surfaces that are inclined toward a central portion of the aperture to define a narrowed rounded edge surface.

50. (Original)  The oral care implement according to claim 49 wherein the grip body defines a centroid that is shiftable to opposite sides of the rounded edge surface upon application of pressure by the user.

51. (Original)  The oral care implement according to claim 47 wherein the grip body has a hardness of about 8-25 Shore A.

52. (Original)  The oral care implement according to claim 47, in which the grip element is disposed in a widest portion of the base.

App. No. 10/902,257

# **REMARKS**

These remarks are responsive to the non-final Office Action mailed August 15, 2005. Claims 1-6, 10-12, 14, 15, 17, 18, 19, 21, 23, 24, 25, 27, 31, 32 and 37-40 have been editorially amended. Claims 1-52 are pending. No new matter has been added. Reconsideration and allowance the application is respectfully requested.

*Claims Discussion*

Claim 1 recites an oral care implement a base with a gripping region and an oral engaging region, the base having an aperture extending therethrough; and a gripping member at least partially overlying the gripping region of the base and provided with at least one opening exposing a portion of the base, and a resilient grip body in the gripping region and extending through the aperture, the gripping member having a different durometer characteristic than the resilient grip body. In this way, for example, the user is provided with a shock absorption advantage during brushing, while having comfort and control of the oral care implement.

Claim 1 was rejected under 35 U.S.C. § 102(b) by Blass (U.S. Pat. No. 6,325,626); or Davies (U.S. Pub. No. 2002/0138931). The noted references fail to anticipate claim 1. For example, Blass and Davies fail to disclose the recited aperture extending through a base, and a resilient grip body. Additionally, both references fail to disclose the recited gripping member having a different durometer characteristic than the resilient grip body. In view of the foregoing, claim 1 is allowable over Blass or Davies. Claims 2-26, depending directly or indirectly from claim 1, are allowable for at least the reasons of claim 1 and for further features recited therein.

Independent claims 27, 35 40, and 47 were rejected under 35 U.S.C. § 102(e) by Weihrauch (U.S. Pat. No. 6,353,958). Regarding claim 27, Weihrauch fails to teach the recited oral care implement including a base with a gripping region and an oral engaging region, wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion; a resilient grip surface being disposed on the rear segment. If Weihrauch's embodiments had a rear segment, there are no resilient grip surfaces shown or described on a rear segment. Further, Weihrauch fails to disclose a grip body extending through an aperture in the base and spaced from the grip surface. In view of the foregoing, claim 27 is

App. No. 10/902,257

allowable.    Claims 28-34, depending directly or indirectly from claim 27, are allowable for at least the reasons of claim 27 and for further features recited therein.

Regarding claim 35, the Office Action alleges that an elastomeric material "would be capable of shifting within the aperture." (Office Action, pg. 3, para. 5).  There is absolutely no teaching in Weihrauch of the recited oral care implement including a resilient grip body disposed in the aperture and extending through the base to define finger gripping surfaces on opposite sides of the base, the grip body further having a centroid that is shiftable within the aperture by user pressure to opposite sides of the base.   Nothing in Weihrauch provides one of ordinary skill to gleam the inventive concepts as recited in claim 35.   Hence, claim 35 is not anticipated Weihrauch.    Claims 36-39, depending directly or indirectly from claim 35, are allowable for at least the reasons of claim 35 and for further features recited therein.

Regarding claim 40, Weihrauch fails to disclose the recited oral care implement including a base with a gripping region and an oral engaging region, wherein the base includes a peripheral groove in the gripping region. In the instant application, the peripheral groove is at least shown in FIG. 7. Claim 40 is not anticipated by Weihrauch.    Claims 41-46, depending directly or indirectly from claim 40, are allowable for at least the reasons of claim 40 and for further features recited therein.

Regarding claim 47, there is absolutely no teaching in Weihrauch of the recited oral care implement including a resilient grip body secured within an aperture to extend through a base and define a gripping surface on opposite sides of the base to be gripped by a thumb of a user and one finger, the grip body being configured to dampen the forces applied to the oral engaging region by the user holding the gripping region.   Weihrauch merely mentions grip elements 10, 11 could be made of an elastomer. There is no grip body being configured to dampen the forces applied to the oral engaging region during use of the oral care implement. Nothing in Weihrauch provides one of ordinary skill to gleam the inventive concepts as recited in claim 47.   Hence, claim 47 is not anticipated Weihrauch.

App. No. 10/902,257

Claims 48-52, depending directly or indirectly from claim 47, are allowable for at least the reasons of claim 47 and for further features recited therein. Regarding claim 48, Weihrauch has no teaching of the dimensional feature recited therein. Claim 48 is allowable at least on this basis. Regarding claim 49, among other lacking features, Weihrauch has no teaching of the recited narrowed rounded edge surface disposed with the aperture. Claim 49 is allowable at least on this basis. Regarding claim 50, among other lacking features, Weihrauch is devoid of a grip body with a centriod that is shiftable as recited. Claim 50 is allowable at least on this basis.

Independent claims 35 and 47 were rejected under 35 U.S.C. § 102(e) by Desimone et al. (U.S. Pat. 5,339,482). Regarding claim 35, there is absolutely no teaching in Desimone et al. of the recited oral care implement including a resilient grip body disposed in the aperture and extending through the base to define finger gripping surfaces on opposite sides of the base, the grip body further having a centroid that is shiftable within the aperture by user pressure to opposite sides of the base. Nothing in Desimone et al. provides one of ordinary skill to gleam the inventive concepts as recited in claim 35. Hence, claim 35 is not anticipated Desimone et al. Claims 36-39, depending directly or indirectly from claim 35, are allowable for at least the reasons of claim 35 and for further features recited therein.

Regarding claim 47, there is absolutely no teaching in Desimone et al. of the recited oral care implement including a resilient grip body secured within an aperture to extend through a base and define a gripping surface on opposite sides of the base to be gripped by a thumb of a user and one finger, the grip body being configured to dampen the forces applied to the oral engaging region by the user holding the gripping region. Desimore et al. merely states that the insert 22 could be made of an elastomer. There is no grip body being configured to dampen the forces applied to the oral engaging region during use of the oral care implement. Nothing in Desimore et al. provides one of ordinary skill to gleam the inventive concepts as recited in claim 47. Hence, claim 47 is not anticipated Desimore et al. Claims 48-52, depending directly or indirectly from claim 47, are allowable for at least the reasons of claim 47 and for further features recited therein.

App. No. 10/902,257

Claim 1 was rejected under 35 U.S.C. § 103(a) under a combination of Caradarelli (U.S. Pat. No. 6,070,286) and Lai (U.S. Pat. 6,408,524). Caradarelli fails to disclose the recited oral care implement. For example, Caradarelli fails to disclose the recited aperture extending through a base, a resilient grip body and the recited gripping member having a different durometer characteristic than the resilient grip body. Additionally, Lai fails to make up for the deficiencies of Caradarelli.

The combination of Lai and Caradarelli is improper. Lai merely pertains to a tableware grip structure. Contrary to the assertions in the Office Action, Lai does not disclose any elastomeric grip member. Lai is completely devoid of suggesting use with oral care implements and is completely devoid of a toothbrush or any oral care implement. The references are not combinable in that the references deal with completely different areas. Further, motivation to combine Caradarelli and Lai is simply lacking. Hence, one of ordinary skill in the oral care art would not have considered Lai or modified Caradarelli. In view of the foregoing, claim 1 is allowable. Claims 2-26, depending directly or indirectly from claim 1, are allowable for at least the reasons of claim 1 and for further features recited therein.

Claims 6 and 7 were rejected under 35 U.S.C. § 103(a) under a combination of Caradarelli (U.S. Pat. No. 6,070,286) and Lai (U.S. Pat. 6,408,524) and Sweet et al. (U.S. Pat. 3,848,871). Claims 6 and 7 depend from claim 1. The arguments against the combination of Caradarelli and Lai with respect to claim 1 are incorporated herein. Furthermore, the alleged combination of Sweet is improper. Sweet merely pertains to hand grip for a tennis racket. Sweet is completely devoid of suggesting use with oral care implements and is completely devoid of a toothbrush or any oral care implement. The references are not combinable in that the references deal with completely different areas (e.g., oral care, tableware, and the sport of tennis). Further, motivation to combine Sweet is simply lacking. There is no reason why Lai's tableware grip sections 12 would be modified with Sweet's suction cups 35 (See, Sweet col. 2, lines 53-55). Hence, one of ordinary skill in the oral care art would not have considered Sweet. Claims 6 and 7 are allowable.

Claim 1 was rejected under 35 U.S.C. § 103(a) under a combination of Munro U.S. Pat. No. 6,266,840) and Sweet et al. Munro fails to disclose the recited oral care implement with an

App. No. 10/902,257

aperture extending through a base, a resilient grip body and the recited gripping member having a different durometer characteristic than the resilient grip body. The combination of Murno and Sweet et al. is improper. Sweet merely pertains to hand grip for a tennis racket. Sweet is completely devoid of suggesting use with oral care implements and is completely devoid of a toothbrush or any oral care implement. The references are not combinable in that the references deal with completely different areas (e.g., oral care, and the sport of tennis). Further, motivation to combine Sweet is simply lacking. There is no reason why Munro would be modified with Sweet's suction cups 35 (See, Sweet col. 2, lines 53-55). Hence, one of ordinary skill in the oral care art would not have considered Sweet. Nevertheless, Sweet et al. is devoid of the recited oral care implement with a base including a peripheral groove for retaining the grip member on the base. In view of the foregoing, claim 1 is allowable. Claims 2-26, depending directly or indirectly from claim 1, are allowable for at least the reasons of claim 1 and for further features recited therein.

The Office Action rejected claims 30, 31, 38, 43-45 and 51 under 35 U.S.C. § 103(a) under a combination of Weihrauch (U.S. Pat. 6,353,958) and Beals et al. (U.S. Pat. 6,298,516). Claims 30, 31, 32 and 38 depend from independent claim 27. The previous comments for allowability of claim 27 are incorporated herein. Claims 43-45 depend from independent claim 40. The previous arguments for allowability of claim 40 are incorporated herein. Claim 51 is allowable for at least the reason of independent claim 47.

The Office Action rejected claims 10-16, 19 and 20 under 35 U.S.C. § 103(a) under a combination of Davies (U.S. Pub 2002/0138931) and Desimone et al. (U.S. Pat. 5,339,482). The noted claims are allowable for at least the reasons of independent claim 1. For example, Davies fails to disclose the recited aperture extending through a base, and a resilient grip body. Further, Davies fails to disclose the recited gripping member having a different durometer characteristic than the resilient grip body. Desimone et al. fails to make up the deficiencies of Davies et al. Furthermore, none of the cited references in combination or singularity teaches as a whole the recited oral implement of claim 1. Regarding claim 10, there is no teaching of the recited conical shape finger gripping surfaces. Regarding claim 14, nothing in Davies and Desimone et

Page 13 of 14

App. No. 10/902,257

al. teaches or suggests the grip body being surrounded by the grip member. In view of the foregoing reasons, claims 10-16, 19 and 20 are allowable.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that this application is in condition for allowance. Should the Examiner believe that anything further is desirable in order to place the application in better form for allowance, the Examiner is respectfully urged to contact Applicants' undersigned representative at the below-listed number. If any additional fees are required or if an overpayment has been made the Commissioner is authorized to charge or credit Deposit Account No. 19-0733.

Respectfully submitted,

BANNER & WITCOFF, LTD.

Dated:  November 15, 2005          By:

Darrell G. Mottley
Registration No. 42,912

1001 G Street, N.W.
Washington, D.C.  20001-4597
Tel:    (202) 824-3000
Fax:    (202) 824-3001

Page 14 of 14