## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **COLGATE-PALMOLIVE COMPANY,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | **Civil Action No. 06-417-GMS** |
| | ) | |
| **RANIR, L.L.C.,** | ) | **REDACTED** |
| | ) | **VERSION** |
| **DEFENDANT.** | ) | |
| | | **May 30, 2007** |

## PLAINTIFF COLGATE-PALMOLIVE COMPANY'S RESPONSIVE BRIEF IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTIONS

Francis DiGiovanni (#3189)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899
Phone (302) 658-9141

Robert F. Altherr, Jr.
Nina L. Medlock
Christopher B. Roth
Elizabeth Almeter
Banner & Witcoff, Ltd.
1100 13th Street, N.W., Suite 1200
Washington, DC 20005
Phone (202) 824-3000

*Attorneys for Colgate-Palmolive Company*

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    THE COLGATE '591 UTILITY PATENT............................................................. 3

    A.     This Court Should Adopt Colgate's Proposed Construction of Claim 27 –
        the Only Claim Construction of the '591 Patent Now in Dispute ........................ 3

III.   THE COLGATE DESIGN PATENTS .................................................................. 6

    A.     Colgate's Proposed Claim Constructions are Fully Consistent with
        Established Precedent ...................................................................................... 6

    B.     A Design is Not Dictated By Function Where Alternative Designs Can
        Be Used To Perform the Same Function ........................................................... 7

    C.     The Features of Colgate's Patented Designs Were Not Dictated By
        Functional Considerations ................................................................................ 8

        1.     The Bristle Configuration ............................................................. 10

                a)     Loop Configuration ................................................. 11

                b)     Central Cleaning Elements ...................................... 12

                c)     Outer Ring and Peripheral Cleaning Elements ........... 13

        2.     The Handle ................................................................................... 15

                a)     The Shape of the Handle........................................... 17

                b)     The Thumb and Finger Grips .................................... 18

                c)     The Gripping Member .............................................. 20

                d)     The Tongue Cleaner ................................................. 22

IV.    CONCLUSION................................................................................................ 27

## TABLE OF AUTHORITIES

### Cases

*Amini Innovation Corp. v. Anthony California, Inc.,*
439 F.3d 1365 (Fed. Cir. 2006) ........................................................................ 2

*Avia Group Int'l., Inc.  v L.A. Gear Cal., Inc.,*
853 F.2d 1557 (Fed. Cir. 1988) ................................................................. 8, 25

*Contessa Food Prods., Inc. v. Conagra, Inc.,*
282 F.3d 1370 (Fed. Cir. 2002) ................................................................. 1, 26

*Howmedica Osteonics Corp v. Tranquil Prospects, Ltd.,*
401 F.3d 1367 (Fed. Cir. 2005) ........................................................................ 6

*L.A. Gear, Inc. v. Thom McAn Shoe Co.,*
988 F.2d 1117 (Fed. Cir. 1993) ................................................................. 8, 25

*Minka Lighting, Inc. v. Craftmade Int'l., Inc.,*
93 Fed. Appx 214; 2004 WL 506587 (Fed. Cir. 2004) ............................... 2, 7

*Puritan-Bennett Corp. v. Penox Technologies, Inc.,*
297 F. Supp.2d 1110 (S.D. Ind. 2003) ..................................................... 2, 18

### Statutes

35 U.S.C. § 112 .................................................................................... 3, 5, 6

35 U.S.C. § 171 ............................................................................................ 7

37 C.F.R. § 1.153(a) ..................................................................................... 2

## I.    **INTRODUCTION**

In its "Memorandum in Support of Its Proposed Claim Constructions," Colgate provided this Court with the plain and ordinary meaning of the disputed patent claim terms of Colgate's '591 utility patent as those terms would have been understood by a person of ordinary skill in the art at the time of the invention. Colgate's proposed constructions are supported by the claim language, the '591 patent specification, the prosecution history and, should the Court require, extrinsic evidence, including expert testimony.

Ranir acknowledges in its opening claim construction brief that Colgate's proposed constructions are correct for virtually all of the claim terms of the '591 patent identified in the parties' Joint Disputed Claim Terms Chart. However, Ranir steadfastly refuses to acknowledge the plain and ordinary meaning of the terms in claim 27 and also ignores fundamental canons of claim construction to avoid a finding of infringement of the '591 patent.

In a further effort to avoid a finding of infringement, Ranir also insists on construing Colgate's design patent claims by setting forth a detailed narrative description of the patented designs, which focuses on individual features rather than the overall impression that each design creates.

The law is clear that design patent claims are visual. "[T]he scope of the claimed design encompasses its visual appearance *as a whole*, and in particular the visual impression it creates." *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002) (citations omitted) (emphasis added). Claim construction of a design patent thus properly requires reference to the ornamental design as shown in

1

the figures. *See Amini Innovation Corp. v. Anthony California, Inc.,* 439 F.3d 1365, 1371 (Fed. Cir. 2006) ("Claim Construction – The '219 patent claims '[t]he ornamental design for a bed frame, as shown and described.'"). Construction of a design patent claim also properly focuses on the overall design, rather than on isolated features of the design. *See id.* ("These drawings affirm that it is the overall 'bed frame' that is patented – not just the details of its ornamentation.").

Ranir describes the figures of the Colgate design patents in copious and minute detail in an apparent attempt to reduce the patent drawings to claims of the type found in utility patents. However, as the court observed in *Puritan-Bennett Corp. v. Penox Technologies, Inc.,* 297 F. Supp.2d 1110 (S.D. Ind. 2003), in rejecting the Defendants' similar strategy, this approach defeats the purpose of limiting written descriptions in design patents. *Id.* at 1117-18. *See also* 37 C.F.R. § 1.153(a) ("No description, other than a reference to the drawing, is ordinarily required. The claim shall be in formal terms to the ornamental design for the article (specifying name) as shown, or as shown and described.").

Moreover, the Federal Circuit has made clear that a verbal description of a design patent's drawings is *not* required and does not necessarily aid in the infringement analysis – a process that involves comparing the drawings to the accused device. *See Minka Lighting, Inc. v. Craftmade Int'l., Inc.,* 93 Fed. Appx 214; 2004 WL 506587, *2 (Fed. Cir. 2004).[1]

As described below in more detail, and also as set forth in Colgate's opening brief, Ranir's proposed claim constructions are improper and run afoul of established

---

[1]    A copy of the opinion in *Minka Lighting, Inc.* is attached hereto as Exhibit 1.

claim construction precedent.  This Court's adoption of Ranir's proposed constructions would be reversible error.

## II.    THE COLGATE '591 UTILITY PATENT

### A.    This Court Should Adopt Colgate's Proposed Construction of Claim 27 – the Only Claim Construction of the '591 Patent Now in Dispute

Colgate respectfully submits that the phrase "a rear segment and a front segment inclined relative to the rear segment wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion" in claim 27 of the '591 patent, which is the only claim term that remains in dispute between the parties, is sufficiently clear such that the phrase should be given its ordinary and customary meaning as set forth below in Colgate's proposed construction:

> the gripping region including *a rear segment and a front segment inclined relative to the rear segment wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion;*

| Colgate's Proposed Construction | Ranir's Proposed Construction |
|---|---|
| **"a rear segment and a front segment inclined relative to the rear segment wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion":** the front segment of the gripping region is inclined at an angle of about 20 to about 40 degrees relative to the rear segment of the gripping region. *See, e.g., '591 Patent, col. 1, lines 57-62; col. 2, lines 44-67; col. 3, lines 1-12; Figs 2, 3, identified by numbers 111, 113, and 115;   Merriam-Webster's   Collegiate Dictionary, 10th Ed. (1999)* | **"a rear segment and a front segment inclined relative to the rear segment wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion":** This language does not comply with 35 U.S.C. § 112, First and Second Paragraphs.   Nevertheless, the following best guess is provided.  The rear segment is the portion of the implement from the tip of the base to center of the top-most finger opening in the grip surface.   The front segment is the portion of the implement from the lower-most edge of the base material surrounding the grip body to the top-most portion of the grip surface.  The angle of inclination of the front segment to the rear segment is defined by the angle of the intersection of |

|  | the midlines of the front and rear segments. Each midline is defined by the midpoints of the thickness of the implement at each end of the respective segment. *Col. 2, lines 49-64; Fig. 2, Fig. 4.* |
|---|---|

This phrase is drafted in simple and readily understandable language. "Segment," for example, is generally defined as "one of the constituent parts into which a body, entity or quantity is divided or marked off by or as if by natural boundaries," *Merriam-Webster's Collegiate Dictionary, 10th Ed.* at 1058, and the term is used in its ordinary and customary way in the '591 patent specification. Further, by reference to Figs. 2 and 3, one of ordinary skill in the art can readily understand what constitutes a front segment (111) and rear segment (115). "Inclined" also is used in its ordinary and customary way in the '591 patent specification to mean that the front segment of the gripping region is sloped or deviates from the horizontal relative to the rear segment of the gripping region. *Id.* at 588. Further, by reference to Fig. 4, one of ordinary skill can readily understand the term "inclined."

Ranir's proposed construction takes this otherwise plain and ordinary claim language and introduces a myriad of limitations that are nowhere supported either in the claims or the patent specification. The simple fact is that a person of skill in the art would readily understand from the claim language and the '591 patent specification that the phrase "a rear segment and a front segment inclined relative to the rear segment wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion" means exactly what it says and what the specification clearly describes and depicts in the figures – the front segment of the gripping region is inclined at an angle of about 20 to about 40 degrees relative to the

4

rear segment of the gripping region. *See* '591 Patent, col. 2, lines 58-64 and Figs. 2-4. A person skilled in the art also would know how to measure the incline angle. Nothing in the claim language, the patent specification, or the prosecution history of the '591 patent requires measurement of the incline angle as Ranir proposes.[2]

Contrary to Ranir's assertions, Colgate's proposed construction, not Ranir's, is the only construction of the phrase "a rear segment and a front segment inclined relative to the rear segment wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion" that "makes sense" because it is the only construction that adopts the plain and ordinary meaning of the words of the phrase as those words would have been understood by a person of ordinary skill in the art at the time the claimed invention was made. Ranir's proposed construction should be rejected.

Ranir has taken the position (which is reflected in the parties' Joint Disputed Claim Terms Chart) that the phrase "a rear segment and a front segment inclined relative to the rear segment wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion" does not comply with the requirements of 35 U.S.C. § 112. As described in more detail in Colgate's opening brief, whether a claim is sufficiently definite so as to comply with 35 U.S.C. § 112 is a question of law and depends on whether a person experienced in the field of the invention would understand the scope of the claim when read in light of the

---

[2]    During prosecution of the '591 patent before the U.S. Patent & Trademark Office, the patent examiner stated in an Office Action, "[t]he angling of segments of a handle (claim 12) is very well known in the art of toothbrushes . . . ." Exhibit 2, Office Action dated August 15, 2005, p. 7

specification. *See, e.g., Howmedica Osteonics Corp v. Tranquil Prospects, Ltd.,* 401 F.3d 1367, 1371 (Fed. Cir. 2005).

Ranir has offered *no* evidence, let alone clear and convincing evidence, to support its argument that a person of ordinary skill in the art would be unable to understand the scope of the claim when read in light of the patent specification. Ranir also was not prevented by any alleged indefiniteness from offering its own proposed construction of the claim phrase.

Nevertheless, compliance with § 112 is a validity issue. The issue of patent validity, as Ranir acknowledges in its opening brief, is *not* before this Court on claim construction.

## III.  THE COLGATE DESIGN PATENTS

### A.  Colgate's Proposed Claim Constructions are Fully Consistent with Established Precedent

As set forth in Colgate's opening brief, in the design context, claim construction focuses on the overall impression that the design creates, not on individual features of that design. Thus, in construing the claims of Colgate's design patents, this Court must determine the visual impression created by the patent figures in each design patent, which can only be done by reference to the figures themselves.

Ranir mischaracterizes Colgate's proposed constructions, including the references to the patent drawings, as an attempt to determine the scope of the design patents by deciding infringement rather than by construing the claims. In fact, Colgate's constructions are fully consistent with established claim construction precedent and properly delineate the scope of each design patent claim by referencing

6

the figures and specifically describing those portions of the figures shown in broken lines that have been disclaimed and, therefore, are not a part of the claimed invention.

Design patents, unlike utility patents, present a court only with visual descriptions, i.e., patent drawings. The court may translate these design patent drawings into words, but a verbal description is *not* required and does not necessarily aid the trier of fact in comparing the drawings to an accused device in the infringement analysis:

> However, a district court *need not* always verbally construe at length a design patent's drawings. The infringement analysis essentially involves comparing the drawings to an accused device; a verbal description of the drawings does not necessarily aid such a comparison.

*See Minka Lighting, Inc.,* 2004 WL 506587 at *2 (emphasis added).

### B.     A Design is Not Dictated By Function Where Alternative Designs Can Be Used To Perform the Same Function

Design patents are intended to promote the decorative arts by protecting the design for an article of manufacture that is "new, original and ornamental." 35 U.S.C. § 171. A design patent thus protects the appearance of an article of manufacture, rather than its utility or functionality. A design is "primarily functional" when the function of the article dictates its design such that other articles having the same utility or function cannot be made without duplicating the design. In that instance, design patent protection is not available because such protection would not promote the decorative arts.

Colgate does not deny that toothbrushes are functional and that certain features of Colgate's designs perform functions. However, there is a clear distinction between the functionality of an article or features of the article and the functionality of a

7

particular design of the article or feature that performs a function. *See Avia Group Int'l., Inc. v L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1563 (Fed. Cir. 1988). "Were that not true, it would not be possible to obtain a design patent on a utilitarian article of manufacture or to obtain both design and utility patents on the same article." *Avia Group Int'l.,* 853 F.2d at 1563 (citations omitted).

In the design context, the ultimate question in judging functionality is not whether a particular design or design feature performs a function. Instead the question is whether the function can be accomplished in ways other than those involved in the design. *Id. See also L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1123 (Fed. Cir. 1993) ("When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose.").

### C.    The Features of Colgate's Patented Designs Were Not Dictated By Functional Considerations

Ranir contends that Colgate's U.S. Patent No. 7,089,621 (the '621 patent) and its published application, Publication No. 2006/0026784 (the '784 application) define functional features of the Colgate toothbrush that must be excluded from the scope of the Colgate design patents.[3]  However, Ranir has not and cannot show that any features of Colgate's designs or the designs themselves were dictated by function.

This is not a situation where other products, i.e., toothbrushes, having the same utility or function as Colgate's toothbrush can only be made by duplicating the Colgate designs. To the contrary, the United States Patent & Trademark Office records alone

---

[3]    The '621 patent and the '784 application are Exhibits A and B, respectively to Ranir's opening claim construction brief

show that since January 1, 1976, more than 1300 toothbrush designs have been developed for which design patents were granted. This, of course, does not account for the many other toothbrush designs that were developed during this same period for which no patent protection was sought.

In developing the Colgate 360° toothbrush, Colgate's designers considered a wide variety of alternative designs, many of which are specifically described in the '591 and '621 patents and the '784 application. Any number of these alternative designs would have provided functionality equivalent to that of the toothbrush components and features shown in the Colgate design patents in suit and would not have adversely affected their utility. The designers chose the designs depicted in the Colgate patents, not because these were the only designs that could provide the required functionality, but because they were the designs that looked best. In other words, the designs were chosen for aesthetic, not functional, reasons. *See* Exhibit 3, Declaration of Douglas J. Hohlbein ("Hohlbein Dec.") at ¶¶ 2-5 and 14.

Ranir's "functionality" arguments are without merit and, moreover, are disingenuous in light of Ranir's sworn deposition testimony in this case. Asked about various features of the Colgate designs, including the bristle, handle, and tongue cleaner configurations, Ranir testified that changes in the visual appearance of these features would not affect their functionality:

Q.

A.                               **REDACTED**

9

*See* Exhibit 4, Deposition of Ranir's Rule 30(b)(6) designee, Scott Crossman, given on May 2, 2007 ("Crossman Dep.") at 63.

### 1.    The Bristle Configuration

Addressing Ranir's contentions in turn, Ranir first asserts that the '621 patent shows that Colgate's bristle configuration, including the loop configuration and the central, outer ring, and peripheral cleaning elements, as shown for example in Figs. 5 and 6 of the Colgate 'D753 patent (reproduced below with annotated Fig. 5 of 'D7812), was chosen for primarily functional reasons.



FIG. 6

Loop Configuration

Outer Ring Cleaning Element

Central Cleaning Element

Peripheral Cleaning Element

FIG. 5

An essentially arch shaped cleaning element

3 essentially equally spaced generally target shaped cleaning elements

1 outer ring cleaning element essentially surrounding the central target shape

Basically linear peripheral cleaning elements produced by grouping of smaller shapes

An essentially arch shaped cleaning element

FIG. 5

Ranir is flatly wrong.

There is nothing in the '621 patent specification to support Ranir's arguments; the '621 patent makes it abundantly clear that various changes in the design can be made without sacrificing or adversely affecting functionality. Ranir also has admitted

in deposition testimony that the bristles in the Colgate design could have a different visual appearance and still provide the same functionality:

Q.
A.
Q.                          **REDACTED**
A.
Q.
A.

*See* Crossman Dep. at 61-62.

a)    <u>**Loop Configuration**</u>

Ranir contends that the '621 patent specification demonstrates that the use of loop configurations that have a circular shape formed from four (4) arc-shaped elastomeric wall members and the positioning of three loop configurations spaced longitudinally along the toothbrush head in the Colgate designs (elements (36) and (37) in the list of features provided in Ranir's Exhibit C) were chosen for primarily functional reasons and that the use of alternative designs would adversely impact the utility of these features. Nothing could be farther from the truth.

Rather than mandating that the loop configuration must be circular-shaped, the '621 specification expressly states that the loop configuration can take a myriad of different forms:

> *While the loop configuration is preferably a circle, it could be in the form of a myriad of different closed loops including without limitation ovals, squares and irregular shapes.* It is believed that the use of interior concave wall surfaces within the loop will best retain and move the dentifrice on the teeth especially when the toothbrush is generally moved in the desired small circular motions to brush the teeth. *Nevertheless, other shapes can be used.* The loop should simply define a substantially closed configuration to retain the dentifrice.

'621 Patent, col. 2, lines 54-63 (emphasis added).

11

The specification also expressly states that while four segments have been illustrated to define each loop, other numbers of segments could be used:

> While four segments have been illustrated to define each loop, ***other numbers of segments could be used.***

'621 Patent, col. 3, lines 19-21 (emphasis added).

The loop also could be formed as a single member with slits rather than separate arc segments:

> Finally although the arc segments are preferably independent cleaning members, ***the loop could also be formed as a single member provided with slits*** to define gaps 212 and independently flexible cleaning elements 209 a-d.

'621 Patent, col. 3, lines 23-27 (emphasis added).

Still further, the specification describes that rather than positioning three loops front to back along the longitudinal axis a-a of the toothbrush head, any number of loops could be used and the loops also could be arranged in other patterns, including off the longitudinal axis:

> Nevertheless, one, two or more than three loops could be used. Moreover the loops could be arranged in other patterns including non-aligned arrangements or positioned off of axis a-a.

'621 Patent, col. 3, lines 32-35. *See also* Hohlbein Dec. at ¶ 6 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the loop configurations, existed and could have been used.).

#### b)   <u>Central Cleaning Elements</u>

Ranir further contends that the use of three central bristle tufts, each located in the center of one of the loop configurations (element (42) in the list of features provided in Ranir's Exhibit C) was chosen for primarily functional reasons and that the use of an

alternate design would adversely impact the utility of the central bristle tufts. Ranir is wrong.

The '621 patent specification plainly describes that other configurations are possible, including the use of larger loops with more than one central cleaning element provided within each loop:

> In a preferred construction, a central cleaning element 207 is disposed within each loop 214; although more than one cleaning element 207 could be provided within each loop when larger loops are used.

'621 Patent, col. 3, lines 35-38 (emphasis added).

The specification also describes that the central cleaning elements need not be bristles, but may be formed by one or more elastomer members:

> Central cleaning elements 207 are each preferably formed as bristle tufts for effectively cleaning the teeth. *Nevertheless, one or more elastomer members may be used to form the distal cleaning elements in lieu of or in addition to the use of bristles.*

'621 Patent, col. 3, lines 45-49 (emphasis added). *See also* Hohlbein Dec. at ¶ 7 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the central cleaning elements, existed and could have been used.).

### c)    Outer Ring and Peripheral Cleaning Elements

Ranir also contends that the use of bristles in an outer ring arranged in two opposing arc-shaped tufts and the arrangement of the peripheral tufts such that the middle tuft of each group of three peripheral tufts is taller than the outer two tufts (elements (41) and (46) in the list of features provided in Ranir's Exhibit C) were chosen primarily for functional reasons and that the use of alternative designs would adversely impact the utility of the outer ring cleaning elements and the peripheral tufts. Again, Ranir is wrong.

13

The '621 patent does not mandate that the outer ring cleaning elements must comprise a particular arrangement of bristles. In fact, the '621 patent specification describes that the outer ring cleaning elements need not be defined by bristles at all but may be formed of one or more elastomeric members in lieu of or in addition to bristles:

> While the outer arcuate cleaning elements 211a, b are preferably defined by elongate bristle tufts for effective brushing of the teeth, *they could be formed of one or more elastomeric members in lieu of or in addition to the bristles.*

'621 Patent, col. 4, lines 10-14 (emphasis added).

There also is no requirement that the outer ring cleaning elements must be arc-shaped tufts. The '621 patent specification describes that the outer ring cleaning elements "surround the loop cleaning elements 209a-d in the central region of head 105." *See* '621 Patent, col. 4, lines 3-6. However, as set forth above, the specification discloses that the loop elements, though preferably circular, can be formed of a myriad of different closed loops including without limitation ovals, squares, and irregular shapes. '621 Patent, col. 3, lines 19-27. It necessarily follows if the loop members can take a myriad of different shapes, the outer ring cleaning elements that surround the loop elements must also be capable of taking different shapes and need not be arc-shaped. *See* Hohlbein Dec. at ¶ 8 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the outer ring cleaning elements, existed and could have been used.).

The specific grouping of three peripheral bristle tufts depicted in the Colgate design patents also is not required for functionality. The '621 patent specification expressly describes that more or fewer than three bristle tufts may be used to form the

14

peripheral cleaning elements and that elastomeric members can be used in place of or with the bristles:

> In the illustrative embodiment, three bristles tufts form each group of peripheral cleaning elements 205a-c, 215a-c. ***Nevertheless, more or fewer bristles tufts in these groups may be used. Further, one or more elastomeric elements may be used to define the peripheral cleaning elements in place of or with the bristles.***

'621 Patent, col. 5, lines 8-14 (emphasis added).

The '621 patent describes that arranging the middle tuft of each group of three peripheral tufts so that it is taller than the outer two tufts allows for deeper engagement of tooth surfaces while stimulating the gums. But this function can be accomplished with bristle arrangements having more or less than three bristles and with bristle arrangements having a range of different bristle heights. There is nothing about the function of the peripheral bristles that dictates that the bristles must have the same proportionate heights depicted in Colgate's design patents. *See* Hohlbein Dec. at ¶¶ 8-9 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the peripheral cleaning elements, existed and could have been used.).

## 2.    The Handle

Ranir contends that the design of the toothbrush handle, as shown for example in Figs. 3, 4, and 5 of Colgate's 'D7812 design patent (reproduced below), was dictated by functional considerations:



There is no dispute that a handle is functional, i.e., it allows a user to grip and manipulate the toothbrush. Yet, it clearly is preposterous to suggest, with the wide variety of toothbrushes available on the market today, that a toothbrush handle can only be designed in one way. Indeed, Ranir even admitted in deposition testimony that a variety of shaped handles can be used without adversely affecting functionality:

Q.

A.                          **REDACTED**
Q.
A.

Crossman Dep. at 62.

16

a)    <u>**The Shape of the Handle**</u>

Ranir contends that Colgate's '784 application demonstrates that the shape of the toothbrush handle shown in Colgate's design patents, including the incline of the front handle segment relative to the neck, the bulbous shape of the front segment that is wider than the neck, the transition handle segment that is narrower than the front and rear handle segments, and the rear handle segment that is wider than the transition segment (elements (3), (5), and (7) in the list of features provided in Ranir's Exhibit C), was chosen for primarily functional reasons and that the use of alternative designs would adversely impact the utility of the handle. That is simply not true.

The '784 application is clear that the front handle segment need not be inclined relative the rear handle segment as depicted in the Colgate design patents. Instead, the incline angle can range anywhere between 5 and 40 degrees, while still allowing improved control of the handle during brushing:

> In a preferred construction, front segment 8111 is inclined relative to rear segment 8115 to define an inclined portion positioned for comfortable gripping and to facilitate a desired offset positioning of the head relative to the palm gripping region 8115. The angle .theta. of the incline is preferably 23 degrees, but may range approximately *between 5-40 degrees*. This feature allows improved control of the handle during brushing in which the head 8105 can be more desirably positioned within the mouth to engage the tooth cleaning elements 8200 against the teeth.

'784 Application at ¶ 265 (emphasis added). *See also* Hohlbein Dec. at ¶ 10 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the inclined handle segment, existed and could have been used.).

The '784 application also describes that although the figures show the front segment having the widest transverse dimension of any other part of the handle, other constructions are possible and *"other parts of handle 8103may be as wide or wider*

17

*than front segment 8111*." '784 Application at ¶ 268 (emphasis added). Indeed, although the '784 application describes that widened segments provide a structure that is more reliably and comfortably held within the user's hand, there are other ways to make a toothbrush comfortable. *See Puritan-Bennett Corp.,* 297 F. Supp.2d at 1116 (The slight concavity of the back portion of the dispenser is not functional because there are other designs that facilitate comfort for the user.).

"Bulbous" also is a relative term, which permits a range of variations. There is nothing about the function of the front handle segment that dictates that the handle must be proportioned as depicted in the Colgate design patents. *See* '784 Application at ¶ 268. *See also* Hohlbein Dec. at ¶ 10 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the handle segments, existed and could have been used.).

### b)    The Thumb and Finger Grips

Again, citing the '784 application as support, Ranir contends that the use of a thumb grip on the upper surface of the front handle segment, a finger grip on the lower surface of the front handle segment, the formation of the thumb and finger grips from a different material than the handle and the grip member, the convex, bulbous shape of the thumb and finger grips, and the use of a plurality of round nubs extending outwardly from the surfaces of the thumb and finger grips (elements (16) – (19), (21), and (23) in the list of features provided in Ranir's Exhibit C), were chosen primarily for functional reasons and that the use of alternative designs would adversely impact the utility of the thumb and finger grips.

18

The '784 application does not support Ranir's argument.  To the contrary, the '784 application is very clear that other constructions of the thumb and finger grips (referred to collectively as the "grip body"), which do not adversely affect functionality, existed and could have been used.  *See* Hohlbein Dec. at ¶ 11.  For example, the '784 application describes that the grip body need not have opposing sides on the upper and lower surfaces of the front handle segment for engaging the thumb and index finger; instead, the toothbrush can be held in other ways:

> Under a normal use position, grip portion 8400 is grasped by a user with the fingers engaging the handle 8103 so that the thumb is on one side and the index finger and other fingers are positioned on the opposite side. Front segment 8111 of grip portion 8400 includes grip body 8403 having opposing sides 8405, 8404 preferably for engaging the thumb and index finger of a user. Grip portion 8400 further includes a rear segment 8115 which enables reliable gripping of the toothbrush 8100 with the third through the fifth fingers of the user's hand in a normal use position. *While a normal use position is discussed, the features of the toothbrush could be employed by a user having less fingers or a user which holds the toothbrush in other ways.*

784 Application, ¶ 267 (emphasis added).

The '784 application also describes that the grip body can occupy a smaller portion of the transverse dimension of the toothbrush and can be non-bulging or have any number of shapes:

> As shown in FIGS. 81 and 84, aperture 8303 occupies more than one-half of the transverse dimension across front section 8111 of handle 8103. *Nevertheless, other constructions are possible.* As an example only, grip body 8403 may occupy a smaller portion of the transverse dimension, such as one-third of the transverse dimension of front section 8111.

784 Application, ¶ 268 (emphasis added).

> Referring to FIGS. 81-85, resilient grip body 8403 preferably has a generally bulbous shape that bulges out of aperture 8303 and which resembles an oval or elliptical shape. . . . . *Grip body 8403 could also be non-bulging or have any number of shapes, such as circular, a true oval shape and the like.*

'784 Application, ¶ 270 (emphasis added).

> Other roughened surfaces also can be used in place of the round nub protrusions:

> Finger grip protrusions 8411 are preferably provided in a desired conical or frusto-conical shape for improved grip performance. *Of course, other roughened surfaces could be used.*

'784 Application, ¶ 273 (emphasis added).  *See also* Hohlbein Dec. at ¶ 11 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the grip body, existed and could have been used.).The particular material used to form the thumb and finger grips, and whether that material is the same material or a different material from the material used in constructing the handle and gripping member, is irrelevant and has nothing to do with Colgate's *design* patents. Design patents only show differences or contrasts in appearance between particular features of a design.  Such differences or contrasts may be created using the same material or a different material.

### c)  The Gripping Member

Ranir next contends that the grip material overlying the lower surfaces of the front portion, transition portion, and rear portion of the handle, the series of nine transverse slots forming apertures in the grip material, and the concave regions in the grip material between each of the transverse slots (elements (10), (12), and (15) in the list of features provided in Ranir's Exhibit C) were chosen primarily for functional reasons and that the use of alternative designs would adversely impact the utility of the gripping member.  Ranir's argument is without merit.

There plainly are alternative ways of designing the gripping member without adversely impacting its utility, as the '784 application makes clear. *See* Hohlbein Dec.

at ¶ 12. The '784 application thus describes that "[w]hile gripping member 8407 is shown as a single unitary member or layer, it could be formed by separate independent parts or sections." '784 Application, ¶ 274.

The '784 application also describes that the transverse projections (which cooperate to form the shape of the transverse slots) could have virtually any shape:

> Base 8300 along rear segment 8115 includes at least one projection, and preferably a plurality of spaced projections. While *the projections could have virtually any shape,* they are preferably in the form of spaced, elongate, transverse projections or ribs 8315.

'784 Application, ¶ 275 (emphasis added).

> For example, the projections 8315 may be chevron shaped, circular, oval, elliptical, rectangular, or triangular or other shapes.

'784 Application, ¶ 276 (emphasis added).

> In one aspect, gripping member 8407 has a grip surface 8410 with at least one and preferably a plurality of spaced openings, . . . . In this way, the outline shape of slots 8415 is formed by the peripheral shape of projections 8315 of base 300 (FIGS. 86 and 87).

'784 Application, ¶ 277 (emphasis added).

The projections also can have different transverse lengths:

> The projections 8315 are preferably linear and span laterally between the longitudinal sides 8313, 8314 of handle 8103, although *they may have different transverse lengths.*

'784 Application, ¶ 275 (emphasis added).

And any number of projections, not just nine projections, can be used while still obtaining all the advantages of the inventive concepts:

> While nine projections are shown, *the inventive aspects may be obtained by other numbers of projections.*

'784 Application, ¶ 275 (emphasis added). *See also* Hohlbein Dec. at ¶ 12 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the gripping member, existed and could have been used.).

"Concavity" is a matter of degree. Therefore, the extent of concavity of the regions in the grip material between each of the transverse slots can be varied in any number of ways. There is nothing about the function of the regions in the grip material between each of the transverse slots that dictates that the concavity of these regions must duplicate that depicted in the Colgate design patents.

Also, contrary to Ranir's assertions, the '784 application does not disclose that the gripping member must be positioned on the lower surface of the handle for any functional reason.

### d)    The Tongue Cleaner

Finally, Ranir contends that the design of the tongue cleaner (referred to as the "tissue cleaning element" in the '784 application), including the positioning of the tooth cleaner on the lower surface of the toothbrush head and the inclusion of a plurality of nubs extending outwardly from the tongue cleaner (elements (27) and (30) in the list of features provided in Ranir's Exhibit C), was dictated by functional considerations. Again, Ranir's argument is without merit. Moreover, it is directly contrary to Ranir's own sworn deposition testimony:

Q.
A.
Q.
                          **REDACTED**
A.

Q.

22

A.                                  **REDACTED**

Crossman Dep. at 62.

Contrary to Ranir's assertions, the '784 application could not be clearer that the

tongue cleaner may be positioned in various locations:

> As seen in FIGS. 45-51, an oral care implement in the form of a toothbrush 4500
> includes a handle 4503 and a head 4505 which may be used for cleaning the
> teeth and soft tissue in the mouth, such as the tongue, interior surfaces of the
> cheeks, lips or the gums. . . . . In one construction, head 4505 has a first face
> 4506 that supports tooth cleaning elements 4507 (FIGS. 49 and 51) and a second
> face 4508 that supports a tissue cleanser 4800 (FIGS. 46 and 47). The first and
> second faces 4506, 4508 are preferably on opposite sides of head 4505.
> *Nevertheless, tissue cleanser 4800 may be mounted elsewhere, such as at the
> proximal end 4504 of handle 4503. The tissue cleanser 4800 or portions of it
> may also be located on the peripheral sidewall surface 4501 of head 4505 or
> extend farther towards the proximate end 4504 of handle 4503 than
> illustrated.*

'784 Application at ¶ 215 (emphasis added).

The tongue cleaner also can be formed of nubs of various sizes, shapes, and

densities:

> In a preferred construction, the thickness or width of the base of the nub in 0.64
> mm, and preferably within the range from about 0.51 mm to about 2.00 mm.
> Tip 4807 of the nubs is 0.127 mm and preferably within a range from about 0.10
> mm to about 0.75 mm for optimal penetration between the recesses of papillae
> of a user's tongue.  The length or height of nubs 303, as measured from base
> surface 301 to tip 307, is preferably 0.91 mm and preferably within range from
> about 0.5 mm to about 2.5 mm, and most preferably range between 0.75 mm to
> 1.5 mm. *Nevertheless, nubs of other sizes and shapes outside the given ranges
> can be used.*

'784 Application at ¶ 219 (emphasis added).

> In a preferred construction, nubs 4803 are disposed on the base surface 4801 of
> tissue cleanser 4800 in a high density pattern.  Each nub 4803 is preferably
> spaced apart from adjacent nubs 4803 between a range of about 0.5 mm to about
> 3 mm; more preferably the spacing ranges between 0.7 mm to 2.5 mm, and most
> preferably between 1 mm to 2 mm. *Nevertheless, other spacing ranges are
> possible*. The surface density of the nubs 4803 on base surface 4801 ranges
> preferably from about 100 to about 600 nubs per square inch.  In a more

> preferred construction of the tissue cleanser, the surface density may range from 200 to 500 nubs per square inch, and most preferably between 300 to 450 nubs per square inch. In one preferred example, tissue cleanser 300 includes about 400 nubs per square inch of surface area. The surface density features in conjunction with the height of the nubs 4803 enables the tissue cleanser to provide enhanced cleaning of the soft tissue surfaces with improved comfort. ***Nonetheless, other surface densities are possible.***

'784 Application at ¶ 221 (emphasis added).

Further, the nubs can be arranged randomly or in a myriad of different patterns:

> As seen in FIG. 47, nubs 4803 are preferably disposed in longitudinal rows in a direction generally parallel to the longitudinal axis a-a. Further, nubs 4803 are disposed in transverse rows R1, R2 on an axis parallel to base surface 4801 and generally perpendicular to the longitudinal axis a-a. In one preferred construction, adjacent nubs 4803 are provided on the base surface 4801 in a staggered arrangement. . . . . ***Nonetheless, the nubs could be arranged randomly or in a myriad of different patterns.***

'784 Application at ¶ 222 (emphasis added).

> ***Alternatively, the tissue cleaning elements 4803 may have other shapes.*** As one example, the tissue cleanser may have a grated form such as described in co-pending U.S. patent application Ser. No. 10/601,106, incorporated herein by reference.

'784 Application at ¶ 220 (emphasis added).

Were there any remaining doubt that a wide variety of tongue cleaner configurations are possible, that doubt surely is put to rest by even the most cursory review of Figs. 52-80 of the '784 application, which disclose at least twenty (20) different tongue cleaner configurations. *See, e.g.,* Figs. 62-65, reproduced below:

24



See also Hohlbein Dec. at ¶ 13 (Several functionally equivalent alternative designs, which would not have adversely affected the utility of the tongue cleaner, existed and could have been used.).

To summarize, the record unequivocally establishes that there are alternative ways to design virtually all of the features of Colgate's designs without adversely affecting utility or functionality. Ranir's proposal to construe the Colgate design patent claims so as to exclude these features is improper as a matter of law  Like the athletic shoe designs at issue in *L.A. Gear* and *Avia Group Int'l*, the toothbrush designs in this case include features that serve a utilitarian purpose, i.e., they perform a function. However, these toothbrush design features, like the design features of the athletic shoes in *L.A. Gear* and *Avia Group Int'l*., are not functional because there are a myriad of different design features that could be used to perform the same functions. The Colgate toothbrush designs may have functional aspects, but it is the ornamental aspects of these designs that are the basis of the design patents. Just as the Court concluded with respect to the athletic shoe designs in *L.A. Gear*, "[i]n today's marketplace, the primacy of appearance in the design of [toothbrushes] can not be ignored when analyzing functionality." 853 F.2d at 1123.

Ranir purports, with its proposed claim constructions to translate the design patent drawings into lengthy narrative descriptions of the component features of the designs. In effect, Ranir would transform Colgate's design patents into utility patents by replacing the figures that define the claimed designs with long, convoluted verbal claim limitations. Ranir's narrative descriptions are neither proper nor helpful. Rather than clarifying the meaning of the design patent claims, which is the purpose of claim construction, Ranir's proposed constructions would divert attention away from what actually defines the scope of the claimed designs -- the design patent drawings themselves. *See Contessa Food Prods.*, 282 F.3d at 1376. ("[T]he scope of the claimed design encompasses its visual appearance as a whole, and in particular the visual impression it creates.")

A toothbrush is an article that an ordinary observer readily understands because he sees and uses a toothbrush every day. Verbal descriptions of the design patent drawings are not required and the lengthy narratives proposed by Ranir will not aid in the infringement analysis where it is the design patent figures that must be compared to the accused toothbrush. Colgate's proposed constructions will aid this process by clearly delineating between those portions of the patent figures that are within the scope of the claims and those portions that have been disclaimed and, therefore, are not a part of the claimed inventions. Ranir's proposed constructions make no such distinctions and, therefore, should be rejected.

26

## IV.    <u>CONCLUSION</u>

For the reasons set forth above and in Colgate's opening claim construction brief, this Court should adopt Colgate's proposed claim constructions.

Date:   May 22, 2007

Respectfully submitted,

Francis DiGiovanni (#3189)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899
Phone (302) 658-9141

Robert F. Altherr, Jr.
Nina L. Medlock
Christopher B. Roth
Elizabeth Almeter
Banner & Witcoff, Ltd.
1100 13th Street, N.W., Suite 1200
Washington, DC 20005
Phone (202) 824-3000

*Attorneys for Colgate-Palmolive Company*

540541

27

# EXHIBIT
# 1

93 Fed.Appx. 214

93 Fed.Appx. 214, 2004 WL 506587 (C.A.Fed.)
**(Cite as: 93 Fed.Appx. 214)**

**H**

Minka Lighting, Inc. v. Craftmade Intern., Inc.
C.A.Fed.,2004.
This case was not selected for publication in the
Federal Reporter.NOTE: Pursuant to Fed.Cir.R.
47.6, this order is not citable as precedent. It is
public record.Please use FIND to look at the
applicable circuit court rule before citing this
opinion. Federal Circuit Rule 47.6. (FIND CTAF
Rule 47.6.)
United States Court of Appeals,Federal Circuit.
MINKA LIGHTING, INC., Plaintiff-Appellant,
andPan Air Electric Co., Ltd., Plaintiff,
v.
CRAFTMADE INTERNATONAL, INC.,
Defendant-Appellee.
**No. 03-1162.**

Jan. 16, 2004.
Rehearing and Rehearing En Banc Denied Feb. 24,
2004.

**Background:** Licensee sued ceiling fan
manufacturer to recover for infringement of design
patent for ceiling fan. The United States District
Court for the Northern District of Texas, Fish, Chief
Judge, 2002 WL 1331883, adopted magistrate's
findings and recommendation and entered summary
judgment in favor of manufacturer. Licensee
appealed.

**Holdings:** The Court of Appeals, Rader, Circuit
Judge, held that:

(1) district court could construe claim of design
patent through its own eyes, rather than as an
ordinary observer or a designer of ordinary skill, and

(2) the fan did not infringe the patent.

Affirmed.

West Headnotes
**[1] Patents 291 ☞180**

291 Patents
    291IX Construction and Operation of Letters
Patent
        291IX(B) Limitation of Claims
            291k180 k. Claims for Designs. Most
Cited Cases
District court could construe claim of design patent
for ceiling fan through its own eyes, rather than as
an ordinary observer or a designer of ordinary skill.

**[2] Patents 291 ☞252**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k252 k. Patents for Designs. Most
Cited Cases
Ceiling fan did not infringe design patent for fan
with football-shaped cutout in brackets; the bracket
arms differed.

**[3] Patents 291 ☞252**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k252 k. Patents for Designs. Most
Cited Cases
The substantial similarity test for design patent
infringement, by its nature, subsumes a doctrine of
equivalents analysis.

**[4] Patents 291 ☞252**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k252 k. Patents for Designs. Most
Cited Cases
Oval-shaped hole for ceiling fan in prior design
patent was substantially different from the cutouts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

93 Fed.Appx. 214, 2004 WL 506587 (C.A.Fed.)
**(Cite as: 93 Fed.Appx. 214)**

for allegedly infringed design patent for ceiling fan and, therefore, did not place the patent's cutouts in the prior art for allegedly infringing design; oval-shaped hole had a different proportion and orientation than the allegedly infringed patent's cutout, and the design hole completely penetrated its fan blade, while the allegedly infringed patent's football-shaped cutout did not penetrate the fan blade.

**[5] Patents 291 ☞252**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k252 k. Patents for Designs. Most Cited Cases
District court acted within its discretion in excluding commercial embodiments of the patented ceiling fan design and accused products for considering infringement.

**[6] Patents 291 ☞312(2)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k312 Evidence
            291k312(2) k. Admissibility. Most Cited Cases
District court ruling on alleged infringement of design patent may admit ordinary observer witness testimony to determine substantial similarity, but is not required to do so.

**[7] Patents 291 ☞252**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k252 k. Patents for Designs. Most Cited Cases
Likelihood of confusion as to the source of the goods is not a necessary or appropriate factor for determining infringement of a design patent.

**Patents 291 ☞328(1)**

291 Patents

**291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents**
      291k328 Patents Enumerated
         291k328(1) k. Design. Most Cited Cases
357,978. Cited.

**Patents 291 ☞328(1)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(1) k. Design. Most Cited Cases
380,539. Not Infringed.

Before MICHEL, RADER, and DYK, Circuit Judges.
RADER, Circuit Judge.
**\*\*1** On summary judgment, the United States District Court for the Northern District of Texas ruled that Craftmade International, Inc. (Craftmade) was not liable for infringing U.S. Patent No. Des. 380,539 (the '539 patent), unfair competition, or unjust enrichment. *Minka Lighting, Inc. v. Craftmade Int'l, Inc.,* No. 3-00-CV-0888-G, 2002 WL 1331883 (N.D.Tex. June 14, 2002), 2002 WL 31495990 (N.D.Tex. Nov.4, 2002). Because the district court did not err in its rulings, this court *affirms.*

I.

Minka Lighting, Inc. (Minka) is exclusive licensee of the '539 patent, a ceiling fan design patent whose commercial embodiment is the Viper fan. Craftmade manufactures the Solo and Cefiro ceiling fans. Minka sued Craftmade, alleging infringement of the '539 patent, unfair competition, and unjust enrichment. Craftmade moved for summary judgment of noninfringement. The district court adopted a magistrate judge's report construing the claims and finding no infringement. The magistrate judge compared the Solo and Cefiro fans to Minka's Viper fan and found that the overall visual impression of the Solo and Cefiro fans differs from the Viper because of differences in the blades' leading edges and bracket arms. The magistrate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

93 Fed.Appx. 214, 2004 WL 506587 (C.A.Fed.)
**(Cite as: 93 Fed.Appx. 214)**

judge concluded that the fans are not substantially similar. The district court granted summary judgment that Craftmade's fans did not Infringe. Craftmade moved for summary judgment dismissing the unfair competition and unjust enrichment claims. Adopting a second magistrate judge's recommendations, the district court granted the motion.

Minka appealed to this court, which has jurisdiction under 28 U.S.C. § 1295(a)(1) (2000).

II.

This court reviews a grant of summary judgment de novo, reapplying the summary judgment standard. *See Golan v. Pingel Enter., Inc.,* 310 F.3d 1360, 1367 (Fed.Cir.2002). Claim construction is a legal question that this court reviews without deference. *See Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc). This court reviews a district court's evidentiary decisions for abuse of discretion. *Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1547 (Fed.Cir.1994).

III.

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). Determining design patent infringement requires first construing the claim, then comparing the claim as properly construed to the accused design. *Elmer v. ICC Fabricating, Inc.,* 67 F.3d 1571, 1577 (Fed.Cir.1995).

A.

[1] Minka contends the district court erred in construing the claim of the '539 patent through its own eyes, rather than as an ordinary observer or a designer of ordinary skill. Minka proposes that this **\*216** court should follow the standard for utility patents of *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 986 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) and consider "what one of ordinary skill in the art at the time of the invention would have understood the term to mean."

**\*\*2** According to our precedent, a district court properly construes design claims through its own eyes and need not refer to an ordinary observer or a skilled artisan. In construing a design claim, a trial court may "translate visual descriptions into words" that "evoke the visual image of the design." *Durling v. Spectrum Furniture Co.,* 101 F.3d 100, 103 & n. 2 (Fed.Cir.1996) (replacing the district court's construction with a new construction without citing the perspective of an ordinary observer or a skilled designer). This court affirmed the construction of a design patent claim, where the district court "considered and described each of the Figures ... and based its claim construction on the ornamental features." *Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1377 (Fed.Cir.2002). This court also affirmed the construction of a design patent claim, where the district court "carefully noted the ornamental features" without referring to the perspective of an ordinary observer or a skilled designer. *See OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed.Cir.1997). Finally, this court in *Elmer* construed design claims without referring to the perspective of an ordinary observer or a skilled designer. *Elmer,* 67 F.3d at 1577.

However, a district court need not always verbally construe at length a design patent's drawings. The infringement analysis essentially involves comparing the drawings to an accused device; a verbal description of the drawings does not necessarily aid such a comparison. But an extensive verbal claim construction may be helpful particularly if the drawings contain features that are not part of the patented design, e.g., if the drawings contain functional features or if there is a point of novelty issue to consider. *See, e.g., OddzOn Prods.,* 122 F.3d at 1405. Here, the district court chose to verbally construe the claims. This court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discerns no error in that construction.

### B.

To find infringement, the accused design must satisfy two distinct tests: "(a) the 'ordinary observer ' test, and (b) the 'point of novelty' test." *Contessa,* 282 F.3d at 1377. Under the "ordinary observer" test,

[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Co. v. White,* 14 Wall. 511, 81 U.S. 511, 528, 20 L.Ed. 731 (1871); *see also L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1124 (Fed.Cir.1993) ("Design patent infringement requires a showing that the accused design is substantially the same as the claimed design. The criterion is deception of the ordinary observer, such that one design would be confused with the other...." ).

The point of novelty test requires proof that the accused design "appropriates the novelty which distinguishes the patented design from the prior art." *Contessa,* 282 F.3d at 1377. "[A] trier of fact must consider the ornamental aspects of the design as a whole and not merely isolated portions of the patented design." *Braun Inc. v. Dynamics Corp. of Am.,* 975 F.2d 815, 820 (Fed.Cir.1992). In any event, design patent scope is severely limited, essentially covering only the patent's figures and *217 nothing more. *In re Mann,* 861 F.2d 1581, 1582 (Fed.Cir.1988) ("Design patents have almost no scope. [They are] limited to what is shown in the application drawings.").

**\*\*3** [2] The district court found that the accused fans are not substantially similar to the claimed design. The district court compared the accused Cefiro and Solo fans to the claimed design as embodied in Minka's Viper fan, and found that they have a different overall visual appearance. The district court described in detail its findings based on the fans' specific features and overall appearance. The district court did not err in concluding that no reasonable jury could find substantial similarity.

[3] Minka contends that the district court erred by misapplying the law and in excluding certain evidence. First, Minka argues the district court erred by not considering infringement under the doctrine of equivalents. This court disagrees. The substantial similarity test by its nature subsumes a doctrine of equivalents analysis. *See Lee v. Dayton-Hudson Corp.,* 838 F.2d 1186, 1189-90 (Fed.Cir.1988).

[4] Second, the district court did not err in considering the brackets of the '539 patent in analyzing infringement. A fan with cutouts appears in Figures 1 and 2 of U.S. Patent No. Des. 357,978 (Young). Minka contends that the '539 patent's football-shaped cutouts are not novel over the Young cutouts, and therefore the district court should not have considered the fact that the brackets of the Solo and Cefiro fans lack the '539 design's football-shaped cutouts. To the contrary, Young's oval-shaped hole is substantially different from the cutouts and therefore does not place the '539 patent' s cutouts in the prior art. Young's oval-shaped hole has a different proportion and orientation than the '539 patent's cutout. Also, the Young design hole completely penetrates its fan blade, while the '539 patent's football-shaped cutout does not penetrate the fan blade. Therefore the district court properly considered the '539 patent's cutout.

Finally, Minka contends that the district court erred by failing to admit models of Craftmade's Solo fan and Minka's Viper fan, deposition testimony on the issue of deceptive similarity and expert reports and testimony about consumer survey evidence of confusion for considering infringement.

[5] The district court acted within its discretion in excluding commercial embodiments of the patented design and accused products for considering infringement. *See Braun,* 975 F.2d at 821 (" Nothing in *Gorham* suggests that, in finding design patent infringement, a trier of fact may not as a matter of law rely exclusively or primarily on a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

visual comparison."). Accordingly, the district court did not abuse its discretion in relying on photographs to analyze infringement.

[6][7] As to the excluded testimony and reports, a district court may admit ordinary observer witness testimony to determine substantial similarity, but is not required to do so. *Braun,* 975 F.2d at 821 ("[A fact finder] does not necessarily require empirical evidence as to whether ordinary observers would be deceived."). "Likelihood of confusion as to the source of the goods is not a necessary or appropriate factor for determining infringement of a design patent." *Unette Corp. v. Unit Pack Co.,* 785 F.2d 1026, 1029 (Fed.Cir.1986). Accordingly, the district court did not abuse its discretion.

**4 The district court correctly concluded that there is no genuine dispute over any material facts and that no reasonable fact finder could have found infringement. Summary judgment of noninfringement was therefore appropriate.

### C.

The district court did not err in granting summary judgment denying Minka's state *218 law claims of unfair competition and unjust enrichment. Minka's unfair competition claim is based on either infringement or misappropriation. Craftmade did not infringe, so the only basis for unfair competition would be misappropriation. To prove misappropriation, Minka must establish Craftmade's "use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition." *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 218 (1993). Because Craftmade's fans do not infringe and thus are not even substantially similar to the protected design, Minka did not "use" and thus did not misappropriate the design.

Minka's unjust enrichment claim is based on its unfair competition and infringement claims. Because neither claim prevailed, the district court properly granted summary judgment of no unjust enrichment.

C.A.Fed.,2004.
Minka Lighting, Inc. v. Craftmade Intern., Inc.
93 Fed.Appx. 214, 2004 WL 506587 (C.A.Fed.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# 2



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/902,257 | 07/30/2004 | Douglas J. Hohlbein | 006427.00042 | 1397 |

30751          7590          08/15/2005

BANNER & WITCOFF, LTD., ATTORNEYS FOR RESERVE
CLIENT NO. 3
1001 G STREET, N.W., 11TH FLOOR
WASHINGTON, DC 20001-4597

| EXAMINER |
|---|
| SPISICH, MARK |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1744 | |

DATE MAILED: 08/15/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/902,257 | HOHLBEIN, DOUGLAS J. |
| | Examiner | Art Unit |
| | Mark Spisich | 1744 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☐ Responsive to communication(s) filed on _____ .
2a) ☐ This action is **FINAL**.    2b) ☒ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

4) ☒ Claim(s) *1-52* is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☒ Claim(s) *1-52* is/are rejected.
7) ☐ Claim(s) _____ is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

9) ☐ The specification is objected to by the Examiner.
10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a) ☐ All   b) ☐ Some * c) ☐ None of:
        1. ☐ Certified copies of the priority documents have been received.
        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
        3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
    Paper No(s)/Mail Date <u>11/04 & 6/05</u>.
4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application (PTO-152)
6) ☐ Other: _____ .

S-22

Application/Control Number: 10/902,257                                    Page 2
Art Unit: 1744

## DETAILED ACTION

### *Claim Rejections - 35 USC § 112*

1.      Claims 16,21,22,31,33,37-39,42 and 52 are rejected under 35 U.S.C. 112,

second paragraph, as being indefinite for failing to particularly point out and distinctly

claim the subject matter which applicant regards as the invention. "Aperture" (claim 16,

line 1) lacks antecedent, as this element was not recited until claim 10. It is suggested

that – an aperture in – be inserted before "the base" (claim 14, line 2).    "Handle" (claim

21, line 1) lacks antecedent. It should probably be changed to – gripping region --.

"Handle" (claim 31, line 1) lacks antecedent.    "Aperture" (claim 33, line 1) lacks

antecedent.    "Grip element" (claims 37 and 38, line 1) lacks antecedent. It should

instead be "grip body". "Aperture" (claim 39, line 1) lacks antecedent.  "Handle" (claim

42, line 1) lacks antecedent. "Grip **element**" (claim 52, line 1) lacks antecedent.

Applicant should review the claims for any additional informalities.

### *Claim Rejections - 35 USC § 102*

2.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

Application/Control Number: 10/902,257                                    Page 3
Art Unit: 1744

3.      Claims 1,2,5,8,17,24 and 26 are rejected under 35 U.S.C. 102(b) as being
anticipated by Blass (USP 6,325,626).  The patent to Blass discloses an oral care
implement comprising a base (8) having a gripping region as well as an oral engaging
region and further including an elastomeric (column 3, lines 22-23) gripping member (9)
overlying the base an including openings exposing portions (12) of the base (figs 6-7).

4.      Claims 1-5,8,17,18,21, and 23-26 are rejected under 35 U.S.C. 102(b) as being
anticipated by Davies (US PUB 2002/0138931).  Davies discloses an oral care
implement comprising a base (3) having a gripping region and an oral engaging region
(2) and further including an elastomeric (paragraph 0029) gripping member including
openings which expose a portion (6) of the base and further wherein the exposed
portion may be recessed relative to the grip surface (fig 3 and paragraph 0032).

5.      Claims 27-29,32-37,39-42,46-50 and 52 are rejected under 35 U.S.C. 102(b) as
being anticipated by Weihrauch (USP 6,353,958).  The patent to Weihrauch discloses
an oral care implement comprising a base (1,2,3) and an elastomeric (column 5, lines
18-23) gripping element (10,11) within an aperture in the base which defines opposed
gripping  surfaces (12,13) on opposite sides of the base.  An elastomeric material fixed
in an aperture in the base would be capable of shifting within the aperture (claim 35).
See figure 1 for the inclined sidewalls of the aperture (claim 40).  The two gripping
elements may be molded in one piece (column 4, lines 3-8).

6.      Claims 35,36,39,47-50 and 52 are rejected under 35 U.S.C. 102(b) as being
anticipated by Desimone et al (USP 5,339,482).  The patent to Desimone discloses an
oral care implement (10) comprising a base (16) including an aperture (38,40) in which

Application/Control Number: 10/902,257                    Page 4
Art Unit: 1744

is located an elastomeric (column 5, lines 10-15) grip body (22) to define gripping

surfaces on opposite sides of the body.

### Claim Rejections - 35 USC § 103

7.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

8.    Claims 1-3,5,17,18,21 and 23-26 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Cardarelli (USP 6,070,286) in view of Lai (USP 6,408,524).  The

patent to Cardarelli discloses an oral care implement (1) comprising a body (2,7,9,15)

including a gripping portion (2) adapted for use by users suffering from arthritis or

having a physical handicap and fails only to discloses the elastomeric gripping member.

The patent to Lai discloses an implement handle (1) which is also particularly uaseable

by people with handicaps and which includes a rigid base (1) as well as an elastomeric

gripping member (2) partially overlying the base and including a plurality of openings

exposing portions (11) of the base (see column 3, lines 1-3 and claim 5).  It would have

been obvious to one of ordinary skill to have modified the grip of Cardarelli as such as it

is shown to be an equivalent ergonomic handle/grip.  For claim 21, see #9 in Cardarelli.

9.    Claims 6 and 7 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Cardarelli (USP 6,070,286) and Lai (USP 6,408,524) as applied to claim5 above, and

further in view of Sweet et al (USP 3,848,871).  The provision of concaved regions (35)

in the grip surface (S) between openings therein is taught by Sweet and as such it

would be obvious to provide such to the portions (12) of Lai to improve the user's grip.

Lai already discloses the base including projections defining grooves (11).

10.     Claims 1-3,5,6,8,9,17,18,21, and 23-26 are rejected under 35 U.S.C. 103(a) as

being unpatentable over Munro (USP 6,266,840) in view of Sweet et al (USP

3,848,871).  The patent to Munro discloses an oral care implement comprising a body

(10,14,16) comprising a gripping portion which is particularly adapted to be enable the

user to use the brush when the handle gets wet (column 1, lines 10-18).  The patent to

Munro fails only to disclose the particular grip.  The patent to Sweet discloses a handle

grip which also is designed to reduce slipping when wet (column 1, lines 40-50) and

which is comprised of a rigid base (16) with an overlying elastomeric (column 2, lines

40-50) gripping member (S) having a plurality of openings (38) exposing a portion of the

base.  It would have been obvious to one of ordinary skill to have modified the device of

Munro as such as it is an equivalent grip for preventing slipping under wet conditions.

With regard to claim 6, the grip surface includes concaved regions (35) between

adjacent openings.  As for claim 9, merely changing the size of the slots, absent some

criticality thereof, involoves only the aesthetic appearance thereof and would be obvious

to one having ordinary skill in the art.  For claim 21, see figure 7 (and neck portion 16) in

Munro.

11.     Claim 22 is rejected under 35 U.S.C. 103(a) as being unpatentable over Munro

(USP 6,266,840) and Sweet et al (USP 3,848,871) as applied to claim 21 above, and

further in view of Halm (USP 5,052,071).  The patent to Munro discloses the invention

substantially as claimed with the exception of the first section being "inclined".  The

provision of such is well known in the art (see #10 in Halm) for the purpose of getting to

hard to reach areas of the mouth and it would have been obvious to one of ordinary skill

to have modified the device of Munro as such for the same reason.

12.    Claims 30,31,38,43-45 and 51 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Weihrauch (USP 6,353,958) in view of Beals et al (USP 6,298,516).

The patent to Weihrauch discloses the invention substantially as claimed with the

exception of the hardness of the grip body.  The patent to Beals discloses an

elastomeric material (34) overlying a base material (18) and which has a hardness of

from 3 to 90 Shore A (column 7, lines 46-57).  It would have been obvious to one of

ordinary skill to have utilized such a material as it is shown in the art to be recognized

as a suitable grip for an oral cleaning implement.  The choice of a material within the

range taught by Beals would be obvious to one of ordinary skill as involving no more

than routine experimentation and optimization of the prior art.  The provision of other

surfaces of "grip elements" is also taught by Beals with the recited hardness thereof

also being in the range taught therein.

13.    Claims 10-16,19 and 20 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Davies (US PUB 2002/0138931) in view of Desimone et al (USP

5,339,482).  The patent to Davies discloses the invention substantially as claimed with

the exception of an additional grip member extending through an aperture in the base.

The patent to Desimone discloses the provision of discreet elastomeric members (22)

(column 3, lines 58-59) and the provision thereof to the device of Davies would be

obvious to provide an additional gripping surface on the handle and one that would yield

Application/Control Number: 10/902,257                                    Page 7
Art Unit: 1744

with pressure applied to the opposed sides of the base. The angling of segments of a

handle (claim 12) is very well known in the art of toothbrushes and the mere recitation

thereof does not define over the art as one of ordinary skill would deem it obvious to

angle the brush portion relative to the grip.

### *Conclusion*

14.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure. The cited patents are pertinent to additional handle grips with

overlying elastomeric materials.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Mark Spisich whose telephone number is (571) 272-

1278. The examiner can normally be reached on M-Th (5:30-3:00), Alternate Fri off.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, John Kim can be reached on (571) 272-1142. The fax phone number for

the organization where this application or proceeding is assigned is 703-872-9306.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).

MARK SPISICH
PRIMARY EXAMINER
GROUP 3400

# EXHIBIT
# 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COLGATE-PALMOLIVE COMPANY,  )
           )
  Plaintiff,      )
           )  Civil Action No. 06-417-GMS
  v.        )
           )
RANIR, L.L.C.      )
           )
  Defendant.     )

## DECLARATION OF DOUGLAS J. HOHLBEIN

I, Douglas J. Hohlbein, hereby declare as follows:

  1. I received a Bachelor of Science degree in Industrial Design from the University of Bridgeport, Connecticut in 1980. From 1980-1992, I was employed by Montalbano Design, Inc., a consumer, industrial and medical product design and development consulting firm as an industrial designer and subsequently as a vice president of the firm. From 1992-1995, I worked as a surgical instrument designer for Advanced Surgical, Inc., a surgical instrument company. In 1995, I began working for my current employer, the Colgate-Palmolive Company, as a Technical Design Associate in Colgate's Manual Toothbrush Research and Development Department. I have been personally and directly involved on a daily basis in designing and developing toothbrushes for Colgate for more than twelve years. My current position with Colgate is Manager, Manual Toothbrush Research and Development, a position in which I continued to be personally and directly involved on a daily basis in the design and development of toothbrushes. The following information is based upon personal knowledge and is true and correct to the best of my knowledge, information and belief.

  2. I am the named inventor or a co-inventor of each of the seven U.S. design patents and the U.S. utility patent no. 7,047,591 ("the '591 patent") that Colgate has asserted in this lawsuit against the defendant Ranir, L.L.C. ("Ranir"). I am also the named inventor of U.S. utility patent 7,089,621 ("the '621 patent) and a co-inventor of published U.S. patent application no. 2006/0026784 ("the '784 application), which are Exhibits A and B respectively to Ranir's "Defendant's Opening Claim Construction Brief," dated May 8, 2007.

I personally participated in the conception and development of each of these seven U.S. design patents, the '591 and '621 patents and the '784 application, which claims priority of invention based on the filing date of the application that issued as my '591 patent.

      3.   The process of conception and development of the Colgate 360°® toothbrush was lengthy and took a period of years. The design patents and the utility patent at issue in this lawsuit resulted from that work. During this process, my co-inventors and I considered a countless number of alternative designs for various toothbrush components and features that perform the very same functions and provide equivalent utility to the toothbrush components and features that are incorporated into the overall designs claimed in the seven design patents that Colgate has asserted against Ranir. Many of these functionally equivalent alternative component and feature designs are specifically described in the specifications of the '591 and '621 patents and the '784 application. Additionally, attached to this declaration as Exhibit 1, is a copy of a document entitled "Colgate Toothbrush Design – May 2002," which shows many functionally equivalent alternative designs of various toothbrush design elements that we had considered by May 2002. Attached as Exhibit 2 is a copy of a document entitled "Enhance: Prophy," dated November 8, 2002, which shows a functionally equivalent tongue cleaner alternate design that we had considered by November 8, 2002. Attached as Exhibit 3 is a copy of a document entitled "Enhance Re-Design," dated March 19, 2003 that also shows many functionally equivalent tongue cleaner alternative designs that we had considered by March 19, 2003.

      4.   There are many, many toothbrush component and feature designs that perform the same functions and provide equivalent utility to the design elements of the seven design patents asserted against Ranir. Many of these alternative designs for toothbrush components and features could have been incorporated into an overall design in place of the components and features selected for the seven design patents at issue, without adversely affecting the utility of the toothbrush or its components and features. The toothbrush components and features selected for the overall design of each of the seven design patents were preferred over equivalent performing alternative designs for aesthetic reasons, because in combination, they provided the best looking ornamental design for a toothbrush.

      5.   I have read Ranir's "Defendant's Opening Claim Construction Brief" and understand that it states that a number of design elements of the seven design patents were

chosen for primarily functional reasons and that the use of an alternative design would adversely impact the utility of the element. That is not true. The overall designs of the design patents were dictated primarily by how they looked, not by functional considerations of the design elements, as many alternative designs that performed equally well were in fact considered and were not preferred because they did not look as good.

6. **Loop Configurations.** Ranir's brief states that use of three loop configurations extending from the head opposite the tongue cleanser and spaced longitudinally along the head and each loop configuration having a circular shape formed from four arc-shaped elastomers (elements 36 and 37 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. My '621 patent at col. 2, lines 54-65, specifically identifies design alternatives that can function equivalently stating that "a myriad of different closed loops including without limitation ovals, squares and irregular shapes can be used" and at col. 3, lines 19-27 that "other numbers of segments could be used" and that "the loop could also be formed as a single member provided with slits." Also at col. 3, lines 32-35, it is pointed out that more or less than three loops can be used and that they can be "arranged in other patterns" or "positioned off axis." Additional examples of some of such functionally equivalent alternative designs that were considered are illustrated in attached Exhibit 1. *See, e.g.,* pp. CP0004602-4606, 4611-4614, 4616, 4618, 4628-4634, 4646, 4664-4665, 4680-4681, 4709, 4713, 4720, 4724, 4730-4733, 4740-4742.

7. **Central Cleaning Elements.** Ranir's brief states that three central bristle tufts, each located in the center of one of the loop configurations (element 42 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. My '621 patent specifically identifies design alternatives that can function equivalently as central cleaning elements stating at col. 3, lines 35-38 that "more than one cleaning element 207 could be provided within each loop" and at col. 3, lines 45-49 that these central cleaning elements do not even need to be bristle tufts, but may be "one or more elastomer members" that can be used "in lieu of or in addition to the use of bristles." Additional examples of some such functionally equivalent alternative

3

designs that were considered are illustrated in attached Exhibit 1. *See, e.g.,* CP0004606, 4628, 4630, 4631, 4720, 4724, 4730-4733, 4740-4742.

      8. **Outer Ring and Peripheral Cleaning Elements**. Ranir's brief states that the bristles of the outer ring arranged in two opposing arc-shaped tufts and the middle tuft of each group of three peripheral tufts being taller than the outer two tufts (elements 41 and 46 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. My '621 patent specifically identifies design alternatives that can function equivalently as outer ring cleaning elements, stating at col. 4, lines 10-14 that "they could be formed of one or more elastomeric members in lieu of or in addition to the bristles" and at column 4, lines 3-6 that the outer ring cleaning elements "surround the loop cleaning elements." As discussed above in paragraph 6, since the loop configurations can be any shape, e.g., oval, square or irregular, the outer ring does not need to be two opposing arc-shaped tufts to surround the loop configuration, but like the loop configuration can also have any shape. Further examples of some functionally equivalent alternative designs to the outer ring of the design patents that were consider are illustrated in attached Exhibit 1. *See, e.g.,* CP0004602, 4603, 4612, 4628, 4659, 4660, 4676.

      9. The '621 patent also specifically identifies design alternatives that can function equivalently as peripheral cleaning elements, stating at column 5, lines 8-14 that "more or fewer bristles tufts in these groups may be used" and that "one or more elastomeric elements may be used to define the peripheral cleaning elements in place of or with the bristles." Additionally, although having some peripheral bristles taller than others allows for deeper engagement of tooth surfaces while stimulating the gums, performance of this function can be equivalently accomplished with bristle arrangements having more or less than three bristles. Also, a range of bristle heights can accomplish this function equivalently and so this function does not dictate the proportional height differences, or the specific location on the periphery that is depicted in the design patents. Further examples of some functionally equivalent alternative designs to the peripheral cleaning elements of the design patents that were consider are illustrated in attached Exhibit 1. *See, e.g.,* CP0004605, 4618, 4635, 4641, 4643, 4647, 4653, 4683, 4719, 4720.

4

10. **The Toothbrush Handle**. Ranir's brief states that a front handle segment that is inclined relative to the neck and has a bulbous shape that is wider than the neck; a transition handle segment that is narrower than the front segment and the rear segment; and a rear handle segment that is wider than the transition segment (elements 3, 5 and 7 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. The '784 application of which I am a co-inventor has text and figures that were taken directly from the issued '591 patent and specifically identifies design alternatives that can function equivalently as handle segments. At ¶ 265, the '784 application states that in a preferred construction the front segment is inclined relative to the rear segment and that the angle of the incline "may range approximately between 5-40 degrees." That range provides many alternative designs for the incline that are functionally equivalent to the incline that is depicted in the design patents. At ¶ 268, the '784 application also states "other parts of the handle may be as wide or wider than the front segment." Further examples of some such functionally equivalent alternative designs to the incline depicted in the design patents and the shapes and relative widths of the front segment to other portions of the handle that were considered are also illustrated in attached Exhibit 1. *See, e.g.,* CP0004608-4626, 4639-4653, 4655-4672, 4674-4680, 4687-4698, 4702-4704.

11. **The Thumb and Finger Grips**. Ranir's brief states that use of a thumb grip on the upper surface of the front handle segment, a finger grip on the lower surface of the front handle segment, the formation of the thumb and finger grips from a different material than the handle and the grip material, the convex, bulbous shape of the thumb grip, the convex bulbous shape of the finger grip, and the use of a plurality of round nubs extending outwardly from the surfaces of the thumb and finger grips (elements 16-19, 21 and 23 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. The '784 application specifically identifies design alternatives that can function equivalently to these features. At ¶ 267, the '784 application states that "the features of the toothbrush could be employed by a user having less fingers or a user which holds the toothbrush in other ways" and at ¶ 270 that the

5

grip body "could also be non-bulging or have any number of shapes, such as circular, a true oval shape and the like." The '784 application further states at ¶ 268 that although the aperture holding the grip body is shown to occupy more than half of the transverse dimension of the front section of the handle "other constructions are possible" and the "grip body 8403 may occupy a smaller portion" and "the width and length of aperture 8303 may be adjusted as desired" and that "other parts of the handle may be as wide or wider than the front segment." The '784 application at ¶ 273 also discloses that the function of the grip body does not dictate the use of a plurality of round nubs but to the contrary "other roughened surfaces could be used." As such the function of the grip body does not dictate its location, shape, dimensions, or appearance. Other examples of some such functionally equivalent alternative designs to the thumb and finger grip features depicted in the design patents that were considered are also illustrated in attached Exhibit 1, *See, e.g.,* CP0004608, 4609, 4611-4613, 4618, 4632, 4641, 4643, 4646-4648, 4650-4652, 4665, 4669, 4670, 4676, 4683, 4699, 4700, 4709, 4713, 4719, 4722, 4740.

      12. **Gripping Member**. Ranir's brief states that use of a grip material overlying the lower surface of the front, transition and rear portions of the handle, the series of nine transverse slots forming apertures in the grip material, and the concave regions in the grip material between each of the transverse slots (elements 10, 12 and 15 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. The '784 application specifically identifies design alternatives that can function equivalently to the features depicted in the design patents. At ¶ 274, the '784 application states that "while the gripping member 8407 is shown as a single unitary member of layer, it could be formed by separate independent parts or sections." The '784 application also makes clear at ¶ ¶ 275-277 that there are alternate designs that are functionally equivalent to nine transverse slots and this design feature is not dictated by function. At ¶ 277, the '784 application states that the "shape of slots 8415 is formed by the peripheral shape of projections 8315; and at ¶ ¶ 275-276 that "the projections could have virtually any shape" including for example "chevron shaped, circular, oval, elliptical, rectangular or triangular or other shapes" and that they may also have "different transverse lengths;" and at ¶ 265, states that "other parts of the handle may be as wide or wider than the

6

front segment." Additionally, the '784 application makes it clear at ¶ 276 that nine slots are not dictated by function since "the inventive aspects may be obtained by other numbers of projections." As such, the functions of the openings in the gripping material do not dictate the number of openings, their shape, their dimensions or their appearance.    Other examples of some functionally equivalent alternative designs to gripping material features depicted in the design patents that were considered are also illustrated in attached Exhibit 1, *See, e.g.,* CP0004612-4614, 4616,  4621,4624, 4625-4626, 4632, 4637,  4662-4663, 4668, 4670, 4676, 4684, 4690-4694, 4696-4698, 4701, 4702, 4709, 4731.

13. **Tongue Cleaner**.  Ranir's brief states that the position of a tongue cleanser on the lower surface of the head, and the inclusion of a plurality of nubs extending outwardly from the tongue cleanser (elements 27 and 30 of Ranir's Exhibit D) were chosen primarily for functional reasons.  This is not correct.  Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used.  The '784 application specifically identifies design alternatives that can function equivalently to the features depicted in the design patents.  At ¶ 215, the '784 application states that the tongue cleanser "may be mounted elsewhere, such as at the proximal end 4504 of handle 4503" and "may also be located on the peripheral sidewall surface 4501 of head 4505 or extend farther towards the proximate end 4504 of handle 4503 than illustrated."  At ¶ 222, the '784 application states that "the nubs could be arranged randomly or in a myriad of different patterns" and at ¶ 221 that "other spacing ranges are possible" and that "other surface densities are possible."  Although a range of height and width dimensions for nubs are disclosed, ¶ 219 states that "nubs of other sizes and shapes outside the given ranges can be used."  As such function does not dictate the design, shape, dimensions, placement or appearance of the tongue cleaner elements.  Additional examples of functionally equivalent alternative designs to the tongue cleaner features depicted in the design patents are also shown in Figures 52-80 of the '784 application.    Other examples of some functionally equivalent alternative designs to the tongue cleaner features depicted in the design patents that were considered are also illustrated in attached Exhibit 2, p. CP0004468 and Exhibit 3, pp. CP0004407-4413, 4415-4417.

14. The combinations of features selected for the overall designs of the seven design patents at issue were preferred for aesthetic reasons.  None of the design elements of

the patented designs were dictated by function. Alternative designs having equivalent functionality of each of the design elements existed and could have been used without affecting utility. Many such functionally equivalent alternative designs were considered in developing the patented designs but were not selected because they did not look as good. The appearance of the claimed toothbrush designs was not dictated by the use or purpose of any of the design elements, but to the contrary was primarily ornamental. The toothbrush components and features selected for the overall design of each of the seven design patents were preferred over equivalent performing alternative designs for aesthetic reasons, because in combination, they provided the best looking ornamental design for a toothbrush.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 5/18/07.

Douglas J. Hohlbein

8

# HOHLBEIN
# DECLARATION
# EXHIBITS 1, 2, & 3
# FULLY REDACTED

# EXHIBIT 4
# FULLY REDACTED

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on May 22, 2007, I caused a copy of

the foregoing document to be served by e-mail (w/o exhibits) and hand-delivery on the

following counsel of record:

Steven J. Balick
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19801
sbalick@ashby-geddes.com

I, Francis DiGiovanni, hereby certify that on May 22, 2007, I caused a copy of

the foregoing document to be served by e-mail (w/o exhibits) and Federal Express on

the following counsel of record:

James Moskal, Esq.
Warner Norcross & Judd LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
jmoskal@wnj.com

Francis DiGiovanni (#3189)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building – 9th Floor
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141
fdigiovanni@cblh.com

28