## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **COLGATE-PALMOLIVE COMPANY,**<br><br>PLAINTIFF,<br><br>V.<br><br>**RANIR, L.L.C.,**<br><br>DEFENDANT. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Civil Action No. 06-417-GMS**<br><br>**REDACTED**<br>**VERSION**<br><br>**May 30, 2007** |

## JOINT APPENDIX OF INTRINSIC AND EXTRINSIC EVIDENCE
## VOLUME 2 OF 2

Francis DiGiovanni (#3189)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899
Phone (302) 658-9141

Robert F. Altherr, Jr.
Nina L. Medlock
Christopher B. Roth
Elizabeth Almeter
Banner & Witcoff, Ltd.
1100 13th Street, N.W., Suite 1200
Washington, DC 20005
Phone (202) 824-3000

*Attorneys for Colgate-Palmolive Company*

Steven J. Balick (#2114)
John G. Day (#2403)
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801

Charles E. Burpee
James Moskal
Warner Norcross & Judd LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487

*Attorneys for Ranir, L.L.C.*

COLGATE-PALMOLIVE v. RANIR, L.L.C.
U.S.D.C. Del. Case No. 06-417-GMS

**JOINT APPENDIX OF INTRINSIC AND EXTRINSIC EVIDENCE**

| TAB | DESCRIPTION | PARTY CITING | PAGE(S) |
|---|---|---|---|
| 1 | Joint Disputed Claim Chart | Colgate-Palmolive | JA00001-JA00017 |
| 2 | U.S. Patent No. D513,882 | Colgate-Palmolive | JA00018-JA00023 |
| 3 | U.S. Patent No. D514,812 | Colgate-Palmolive | JA00024-JA00027 |
| 4 | U.S. Patent No. D516,818 | Colgate-Palmolive | JA00028-JA00032 |
| 5 | U.S. Patent No. D516,819 | Colgate-Palmolive | JA00033-JA00036 |
| 6 | U.S. Patent No. D517,812 | Colgate-Palmolive | JA00037-JA00041 |
| 7 | U.S. Patent No. D517,813 | Colgate Palmolive | JA00042-JA00045 |
| 8 | U.S. Patent No. D520,753 | Colgate Palmolive | JA00046-JA00050 |
| 9 | U.S. Patent No. 7,047,591 | Colgate Palmolive | JA00051-JA00062 |
| 10 | U.S. Patent No. 7,089,621 | Ranir, L.L.C. | JA00063-JA00074 |
| 11 | U.S. Patent Application Publication US 2006/0026784 | Ranir, L.L.C. | JA00075-JA00167 |
| 12 | Prosecution History for U.S. Patent No. 7,047,591 | Colgate Palmolive | JA000168-JA000383 |
| 13 | May 18, 2007 Hohlbein Declaration | Colgate Palmolive | JA000384-JA000572 |
| 14 | May 2, 2007 Crossman Deposition Excerpts | Colgate Palmolive | JA000573-JA000578 |

COLGATE-PALMOLIVE v. RANIR, L.L.C.
U.S.D.C. Del. Case No. 06-417-GMS

| 15 | Merriam-Webster's Collegiate Dictionary 10th edition Excerpts | Colgate Palmolive | JA000579-JA000587 |
|----|----|----|----|
| 16 | Transmittal Form and November 15, 2006 Amendment for Application No. 10/902,257 | Ranir, L.L.C. | JA000588-JA000602 |
| 17 | Merriam-Webster's Collegiate Dictionary 10th edition Excerpts | Ranir, L.L.C. | JA000603-JA000604 |
| 18 | Standard Test Method for Rubber Property – Durometer Hardness | Ranir, L.L.C. | JA000605-JA000617 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COLGATE-PALMOLIVE COMPANY,       )
                                 )
        Plaintiff,               )
                                 )      Civil Action No. 06-417-GMS
        v.                       )
                                 )
RANIR, L.L.C.                    )
                                 )
        Defendant.               )

## DECLARATION OF DOUGLAS J. HOHLBEIN

I, Douglas J. Hohlbein, hereby declare as follows:

1.  I received a Bachelor of Science degree in Industrial Design from the
University of Bridgeport, Connecticut in 1980. From 1980-1992, I was employed by
Montalbano Design, Inc., a consumer, industrial and medical product design and
development consulting firm as an industrial designer and subsequently as a vice president of
the firm. From 1992-1995, I worked as a surgical instrument designer for Advanced
Surgical, Inc., a surgical instrument company. In 1995, I began working for my current
employer, the Colgate-Palmolive Company, as a Technical Design Associate in Colgate's
Manual Toothbrush Research and Development Department. I have been personally and
directly involved on a daily basis in designing and developing toothbrushes for Colgate for
more than twelve years. My current position with Colgate is Manager, Manual Toothbrush
Research and Development, a position in which I continued to be personally and directly
involved on a daily basis in the design and development of toothbrushes. The following
information is based upon personal knowledge and is true and correct to the best of my
knowledge, information and belief.

2.  I am the named inventor or a co-inventor of each of the seven U.S. design
patents and the U.S. utility patent no. 7,047,591 ("the '591 patent) that Colgate has asserted
in this lawsuit against the defendant Ranir, L.L.C. ("Ranir"). I am also the named inventor
of U.S. utility patent 7,089,621 ("the '621 patent) and a co-inventor of published U.S. patent
application no. 2006/0026784 ("the '784 application), which are Exhibits A and B
respectively to Ranir's "Defendant's Opening Claim Construction Brief," dated May 8, 2007.

1

I personally participated in the conception and development of each of these seven U.S. design patents, the '591 and '621 patents and the '784 application, which claims priority of invention based on the filing date of the application that issued as my '591 patent.

3.   The process of conception and development of the Colgate 360°® toothbrush was lengthy and took a period of years.  The design patents and the utility patent at issue in this lawsuit resulted from that work.  During this process, my co-inventors and I considered a countless number of alternative designs for various toothbrush components and features that perform the very same functions and provide equivalent utility to the toothbrush components and features that are incorporated into the overall designs claimed in the seven design patents that Colgate has asserted against Ranir.  Many of these functionally equivalent alternative component and feature designs are specifically described in the specifications of the '591 and '621 patents and the '784 application.  Additionally, attached to this declaration as Exhibit 1, is a copy of a document entitled "Colgate Toothbrush Design – May 2002," which shows many functionally equivalent alternative designs of various toothbrush design elements that we had considered by May 2002.  Attached as Exhibit 2 is a copy of a document entitled "Enhance: Prophy," dated November 8, 2002, which shows a functionally equivalent tongue cleaner alternate design that we had considered by November 8, 2002.  Attached as Exhibit 3 is a copy of a document entitled "Enhance Re-Design," dated March 19, 2003 that also shows many functionally equivalent tongue cleaner alternative designs that we had considered by March 19, 2003.

4.   There are many, many toothbrush component and feature designs that perform the same functions and provide equivalent utility to the design elements of the seven design patents asserted against Ranir.  Many of these alternative designs for toothbrush components and features could have been incorporated into an overall design in place of the components and features selected for the seven design patents at issue, without adversely affecting the utility of the toothbrush or its components and features.  The toothbrush components and features selected for the overall design of each of the seven design patents were preferred over equivalent performing alternative designs for aesthetic reasons, because in combination, they provided the best looking ornamental design for a toothbrush.

5.   I have read Ranir's "Defendant's Opening Claim Construction Brief" and understand that it states that a number of design elements of the seven design patents were

2

chosen for primarily functional reasons and that the use of an alternative design would adversely impact the utility of the element. That is not true. The overall designs of the design patents were dictated primarily by how they looked, not by functional considerations of the design elements, as many alternative designs that performed equally well were in fact considered and were not preferred because they did not look as good.

6. **Loop Configurations.** Ranir's brief states that use of three loop configurations extending from the head opposite the tongue cleanser and spaced longitudinally along the head and each loop configuration having a circular shape formed from four arc-shaped elastomers (elements 36 and 37 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. My '621 patent at col. 2, lines 54-65, specifically identifies design alternatives that can function equivalently stating that "a myriad of different closed loops including without limitation ovals, squares and irregular shapes can be used" and at col. 3, lines 19-27 that "other numbers of segments could be used" and that "the loop could also be formed as a single member provided with slits." Also at col. 3, lines 32-35, it is pointed out that more or less than three loops can be used and that they can be "arranged in other patterns" or "positioned off axis." Additional examples of some of such functionally equivalent alternative designs that were considered are illustrated in attached Exhibit 1. *See, e.g.,* pp. CP0004602-4606, 4611-4614, 4616, 4618, 4628-4634, 4646, 4664-4665, 4680-4681, 4709, 4713, 4720, 4724, 4730-4733, 4740-4742.

7. **Central Cleaning Elements.** Ranir's brief states that three central bristle tufts, each located in the center of one of the loop configurations (element 42 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. My '621 patent specifically identifies design alternatives that can function equivalently as central cleaning elements stating at col. 3, lines 35-38 that "more than one cleaning element 207 could be provided within each loop" and at col. 3, lines 45-49 that these central cleaning elements do not even need to be bristle tufts, but may be "one or more elastomer members" that can be used "in lieu of or in addition to the use of bristles." Additional examples of some such functionally equivalent alternative

3

designs that were considered are illustrated in attached Exhibit 1. *See, e.g.,* CP0004606, 4628, 4630, 4631, 4720, 4724, 4730-4733, 4740-4742.

8. **Outer Ring and Peripheral Cleaning Elements.** Ranir's brief states that the bristles of the outer ring arranged in two opposing arc-shaped tufts and the middle tuft of each group of three peripheral tufts being taller than the outer two tufts (elements 41 and 46 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. My '621 patent specifically identifies design alternatives that can function equivalently as outer ring cleaning elements, stating at col. 4, lines 10-14 that "they could be formed of one or more elastomeric members in lieu of or in addition to the bristles" and at column 4, lines 3-6 that the outer ring cleaning elements "surround the loop cleaning elements." As discussed above in paragraph 6, since the loop configurations can be any shape, e.g., oval, square or irregular, the outer ring does not need to be two opposing arc-shaped tufts to surround the loop configuration, but like the loop configuration can also have any shape. Further examples of some functionally equivalent alternative designs to the outer ring of the design patents that were consider are illustrated in attached Exhibit 1. *See, e.g.,* CP0004602, 4603, 4612, 4628, 4659, 4660, 4676.

9. The '621 patent also specifically identifies design alternatives that can function equivalently as peripheral cleaning elements, stating at column 5, lines 8-14 that "more or fewer bristles tufts in these groups may be used" and that "one or more elastomeric elements may be used to define the peripheral cleaning elements in place of or with the bristles." Additionally, although having some peripheral bristles taller than others allows for deeper engagement of tooth surfaces while stimulating the gums, performance of this function can be equivalently accomplished with bristle arrangements having more or less than three bristles. Also, a range of bristle heights can accomplish this function equivalently and so this function does not dictate the proportional height differences, or the specific location on the periphery that is depicted in the design patents. Further examples of some functionally equivalent alternative designs to the peripheral cleaning elements of the design patents that were consider are illustrated in attached Exhibit 1. *See, e.g.,* CP0004605, 4618, 4635, 4641, 4643, 4647, 4653, 4683, 4719, 4720.

4

10. **The Toothbrush Handle.** Ranir's brief states that a front handle segment that is inclined relative to the neck and has a bulbous shape that is wider than the neck; a transition handle segment that is narrower than the front segment and the rear segment; and a rear handle segment that is wider than the transition segment (elements 3, 5 and 7 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. The '784 application of which I am a co-inventor has text and figures that were taken directly from the issued '591 patent and specifically identifies design alternatives that can function equivalently as handle segments. At ¶ 265, the '784 application states that in a preferred construction the front segment is inclined relative to the rear segment and that the angle of the incline "may range approximately between 5-40 degrees." That range provides many alternative designs for the incline that are functionally equivalent to the incline that is depicted in the design patents. At ¶ 268, the '784 application also states "other parts of the handle may be as wide or wider than the front segment." Further examples of some such functionally equivalent alternative designs to the incline depicted in the design patents and the shapes and relative widths of the front segment to other portions of the handle that were considered are also illustrated in attached Exhibit 1. See, e.g., CP0004608-4626, 4639-4653, 4655-4672, 4674-4680, 4687-4698, 4702-4704.

11. **The Thumb and Finger Grips.** Ranir's brief states that use of a thumb grip on the upper surface of the front handle segment, a finger grip on the lower surface of the front handle segment, the formation of the thumb and finger grips from a different material than the handle and the grip material, the convex, bulbous shape of the thumb grip, the convex bulbous shape of the finger grip, and the use of a plurality of round nubs extending outwardly from the surfaces of the thumb and finger grips (elements 16-19, 21 and 23 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. The '784 application specifically identifies design alternatives that can function equivalently to these features. At ¶ 267, the '784 application states that "the features of the toothbrush could be employed by a user having less fingers or a user which holds the toothbrush in other ways" and at ¶ 270 that the

5

grip body "could also be non-bulging or have any number of shapes, such as circular, a true oval shape and the like." The '784 application further states at ¶ 268 that although the aperture holding the grip body is shown to occupy more than half of the transverse dimension of the front section of the handle "other constructions are possible" and the "grip body 8403 may occupy a smaller portion" and "the width and length of aperture 8303 may be adjusted as desired" and that "other parts of the handle may be as wide or wider than the front segment." The '784 application at ¶ 273 also discloses that the function of the grip body does not dictate the use of a plurality of round nubs but to the contrary "other roughened surfaces could be used." As such the function of the grip body does not dictate its location, shape, dimensions, or appearance. Other examples of some such functionally equivalent alternative designs to the thumb and finger grip features depicted in the design patents that were considered are also illustrated in attached Exhibit 1, *See, e.g.,* CP0004608, 4609, 4611-4613, 4618, 4632, 4641, 4643, 4646-4648, 4650-4652, 4665, 4669, 4670, 4676, 4683, 4699, 4700, 4709, 4713, 4719, 4722, 4740.

12. **Gripping Member.** Ranir's brief states that use of a grip material overlying the lower surface of the front, transition and rear portions of the handle, the series of nine transverse slots forming apertures in the grip material, and the concave regions in the grip material between each of the transverse slots (elements 10, 12 and 15 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. The '784 application specifically identifies design alternatives that can function equivalently to the features depicted in the design patents. At ¶ 274, the '784 application states that "while the gripping member 8407 is shown as a single unitary member of layer, it could be formed by separate independent parts or sections." The '784 application also makes clear at ¶ ¶ 275-277 that there are alternate designs that are functionally equivalent to nine transverse slots and this design feature is not dictated by function. At ¶ 277, the '784 application states that the "shape of slots 8415 is formed by the peripheral shape of projections 8315; and at ¶ ¶ 275-276 that "the projections could have virtually any shape" including for example "chevron shaped, circular, oval, elliptical, rectangular or triangular or other shapes" and that they may also have "different transverse lengths;" and at ¶ 265, states that "other parts of the handle may be as wide or wider than the

6

front segment." Additionally, the '784 application makes it clear at ¶ 276 that nine slots are not dictated by function since "the inventive aspects may be obtained by other numbers of projections." As such, the functions of the openings in the gripping material do not dictate the number of openings, their shape, their dimensions or their appearance. Other examples of some functionally equivalent alternative designs to gripping material features depicted in the design patents that were considered are also illustrated in attached Exhibit 1, *See, e.g.,* CP0004612-4614, 4616, 4621,4624, 4625-4626, 4632, 4637, 4662-4663, 4668, 4670, 4676, 4684, 4690-4694, 4696-4698, 4701, 4702, 4709, 4731.

      13. **Tongue Cleaner.** Ranir's brief states that the position of a tongue cleanser on the lower surface of the head, and the inclusion of a plurality of nubs extending outwardly from the tongue cleanser (elements 27 and 30 of Ranir's Exhibit D) were chosen primarily for functional reasons. This is not correct. Several functionally equivalent alternative designs which would not adversely affect the utility of such features existed and could have been used. The '784 application specifically identifies design alternatives that can function equivalently to the features depicted in the design patents. At ¶ 215, the '784 application states that the tongue cleanser "may be mounted elsewhere, such as at the proximal end 4504 of handle 4503" and "may also be located on the peripheral sidewall surface 4501 of head 4505 or extend farther towards the proximate end 4504 of handle 4503 than illustrated." At ¶ 222, the '784 application states that "the nubs could be arranged randomly or in a myriad of different patterns" and at ¶ 221 that "other spacing ranges are possible" and that "other surface densities are possible." Although a range of height and width dimensions for nubs are disclosed, ¶ 219 states that "nubs of other sizes and shapes outside the given ranges can be used." As such function does not dictate the design, shape, dimensions, placement or appearance of the tongue cleaner elements. Additional examples of functionally equivalent alternative designs to the tongue cleaner features depicted in the design patents are also shown in Figures 52-80 of the '784 application. Other examples of some functionally equivalent alternative designs to the tongue cleaner features depicted in the design patents that were considered are also illustrated in attached Exhibit 2, p. CP0004468 and Exhibit 3, pp. CP0004407-4413, 4415-4417.

      14. The combinations of features selected for the overall designs of the seven design patents at issue were preferred for aesthetic reasons. None of the design elements of

7

the patented designs were dictated by function. Alternative designs having equivalent functionality of each of the design elements existed and could have been used without affecting utility. Many such functionally equivalent alternative designs were considered in developing the patented designs but were not selected because they did not look as good. The appearance of the claimed toothbrush designs was not dictated by the use or purpose of any of the design elements, but to the contrary was primarily ornamental. The toothbrush components and features selected for the overall design of each of the seven design patents were preferred over equivalent performing alternative designs for aesthetic reasons, because in combination, they provided the best looking ornamental design for a toothbrush.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 5/18/07.

Douglas J. Hohlbein

8

# JA00392 – JA00578
# FULLY REDACTED

UPDATED ANNUALLY

# Merriam-Webster's Collegiate Dictionary

### TENTH EDITION

## THE WORDS YOU NEED TODAY

- Clear and precise
- Best guidance on word choice
- Most definitions—over 215,000



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1999 by Merriam-Webster, Incorporated

Philippines Copyright 1999 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data
Main entry under title:

Merriam-Webster's collegiate dictionary. — 10th ed.
      p.      cm.
   Includes index.
   ISBN 0-87779-708-0 (unindexed : alk. paper). — ISBN 0-87779-709-9 (indexed : alk. paper). — ISBN 0-87779-710-2 (deluxe indexed : alk. paper). — ISBN 0-87779-707-2 (laminated cover, unindexed).
   1. English language—Dictionaries.   I. Merriam-Webster, Inc.
PE1628.M36      1998
423—dc21                                    97-41846
                                              CIP

Merriam-Webster's Collegiate® Dictionary, Tenth Edition principal copyright 1993

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

23242526WC99

goods) *syn* see LASTING — **du·ra·bil·i·ty** \ˌdu̇r-ə-ˈbi-lə-tē, ˌdyu̇r-\ *n* — **du·ra·ble·ness** \ˈdu̇r-ə-bəl-nəs, ˈdyu̇r-\ *n* — **du·ra·bly** \-blē\ *adv*
**durable press** *n* (1966): PERMANENT PRESS
**du·ra·bles** \ˈdu̇r-ə-bəlz *also* ˈdyu̇r-\ *n pl* (1941): consumer goods (as vehicles and household appliances) that are typically used repeatedly over a period of years — called *also durable goods*
**du·ral·u·min** \du̇-ˈral-yə-mən *also* dyu̇-\ *n* [fr. *Duralumin*, a trademark] (1910): a light strong alloy of aluminum, copper, manganese, and magnesium
**du·ra ma·ter** \ˈdu̇r-ə-ˌmā-tər, ˈdyu̇r-\, -ˌmä-\ *n* [ME, fr. ML, lit., hard mother] (14c): the tough fibrous membrane that envelops the brain and spinal cord external to the arachnoid and pia mater
**du·rance** \ˈdu̇r-ən(t)s *also* ˈdyu̇r-\ *n* [ME, fr. MF, fr. *durer* to endure, fr. L *durare*] (15c) 1 *archaic*: ENDURANCE 2: restraint by or as if by physical force — usu. used in the phrase *durance vile*
**du·ra·tion** \du̇-ˈrā-shən *also* dyu̇-\ *n* (14c) 1: continuance in time 2: the time during which something exists or lasts
**du·ra·tive** \ˈdu̇r-ə-tiv, ˈdyu̇r-\ *adj* (1889): CONTINUATIVE — **durative** *n*
**dur·bar** \ˈdər-ˌbär, -bər-\ *n* [Hindi *darbār*, fr. Per, fr. *dar* door + *bār* admission, audience] (1609) 1: court held by an Indian prince 2: a formal reception held by an Indian prince or an African ruler
**du·ress** \du̇-ˈres *also* dyu̇-\ *n* [ME *duresse*, fr. MF *duresce* hardness, severity, fr. L *duritia*, fr. *durus*] (15c) 1: forcible restraint or restriction 2: compulsion by threat; *specif*: unlawful constraint
**Dur·ham** \ˈdər-əm, ˈdə-rəm, ˈdu̇r-\ *n* [County Durham, England] (1810): SHORTHORN
**Durham Rule** *n* [Monte *Durham*, 20th cent. Am. litigant] (1955): a legal hypothesis under which a person is not judged responsible for a criminal act that is termed a mental disease or defect
**du·ri·an** \ˈdu̇r-ē-ən, -ē-ˌän *also* ˈdyu̇r-\ *n* [Malay] (1588) 1: a large oval tasty but foul-smelling fruit with a prickly rind 2: an East Indian tree (*Durio zibethinus*) of the silk-cotton family that bears durians
**dur·ing** \ˈdu̇r-iŋ *also* ˈdyu̇r-\ *prep* [ME, fr. prp. of *duren* to last, fr. OF-*durer*, fr. L *durare* to harden, endure, fr. *durus* hard; perh. akin to Skt *dāru* wood — more at TREE] (14c) 1: throughout the duration of (swims every day ~ the summer) 2: at a point in the course of (was offered a job ~ a visit to the capital)
**dur·mast oak** \ˈdər-ˌmast-\ *n* [perh. alter. of *dun mast*, fr. ¹*dun* + *mast*] (1791): a European oak (*Quercus petraea*) valued esp. for its dark heavy tough elastic wood and for its tannin-rich bark
**durn** \ˈdərn\, **durned** \ˈdərn(d)\, *var of* DARN, DARNED
**du·ro** \ˈdu̇r-(ˌ)ō\, *n, pl* **duros** [Sp, short for *peso duro* hard peso] (1832): a Spanish or Spanish American peso or silver dollar
**du·roc** \ˈdu̇r-ˌäk *also* ˈdyu̇r-\ *often cap* [*Duroc*, 19th cent. Am. stallion] (1883): any of a breed of large vigorous red American hogs
**du·rom·e·ter** \du̇-ˈräm-ə-tər *also* dyu̇-\ *n* [L *durus* hard] (ca. 1879): an instrument for measuring hardness
**dur·ra** *also* **dura** \ˈdu̇r-ə\, *n* [Ar *dhurah*] (1798): any of several grain sorghums widely grown in warm dry regions
**durst** \ˈdərst\ *archaic & dial past of* DARE
**du·rum wheat** \ˈdu̇r-əm-, ˈdyu̇r-, ˈdə-rəm-\, ˈdə-rəm-\ *n* [NL *durum*, fr. L, neut. of *durus* hard] (ca. 1903): a wheat (*Triticum durum*) that yields a gluten flour used esp. in pasta — called *also durum*
**dusk** \ˈdəsk\ *adj* [ME *dusk*, alter. of OE *dox*, akin to L *fuscus* dark brown, OE *dunn* dun, *dūst* dust] (13c): DUSKY
¹**dusk** *vi* (13c): to become dark ~ *vt*: to make dark or gloomy
²**dusk** *n* (1622) 1: the darker part of twilight esp. at night 2: darkness or semidarkness caused by the shutting out of light
**dusky** \ˈdəs-kē\, *adj* **dusk·i·er; -est** (1558) 1: somewhat dark in color; *specif*: having dark skin 2: marked by slight or deficient light: SHADOWY — **dusk·i·ly** \-kə-lē\ *adv* — **dusk·i·ness** \-kē-nəs\ *n*
¹**dust** \ˈdəst\ *n* [ME, fr. OE *dūst*; akin to OHG *tunst* storm, and prob. to L *fumus* smoke — more at FUME] (bef. 12c) 1: fine particles of matter (as of earth) 2: the particles into which something disintegrates 3 **a**: something worthless **b**: a state of humiliation 4 **a**: the earth esp. as a place of burial **b**: the surface of the ground 5 **a**: a cloud of dust **b**: CONFUSION, DISTURBANCE 6 *archaic*: a single particle (as of earth) 7 *Brit*: refuse ready for collection — **dust·less** \-ləs\ *adj* — **dust·like** \-ˌlīk\ *adj*
²**dust** *vt* (1530) 1 *archaic*: to make dusty 2: to make free of dust 3 **a**: to sprinkle with fine particles **b**: to sprinkle in the form of dust ~ *vi* 1 *of a bird*: to work dust into the feathers 2: to remove dust 3: to give off dust
**dust·bin** \ˈdəs(t)-ˌbin\, *n* (1848) 1 *Brit*: a can for trash or garbage 2: DUSTHEAP 2
**dust bowl** *n* (1936): a region that suffers from prolonged droughts and dust storms
**dust-cov·er** \-ˌkə-vər\, *n* (1899) 1: a cover (as of cloth or plastic) used to protect furniture or equipment from dust 2: DUST JACKET
**dust devil** *n* (1888): a small whirlwind containing sand or dust
**dust·er** \ˈdəs-tər\, *n* (1576) 1: one that removes dust 2 **a** (1): a long lightweight overgarment to protect clothing from dust (2): a long coat cut like a duster *also duster coat* **b**: a dress-length housecoat 3: one that scatters fine particles; *specif*: a device for applying insecticidal or fungicidal dusts to crops 4: DUST STORM
**dust·heap** \ˈdəst-ˌhēp\, *n* (1599) 1: a pile of refuse 2: a category of forgotten items (the ~ of history — *New Republic*)
**dust jacket** *n* (1920): a paper cover for a book
**dust·man** \ˈdəs(t)-mən\, *n* (1707) *Brit*: a collector of trash or garbage
**dust mop** *n* (1953): DRY MOP
**dust off** *vt* (1940): to bring out or back to use again
**dust·pan** \ˈdəs(t)-ˌpan\, *n* (1783): a shovel-shaped pan for sweepings
**dust storm** *n* (1879) 1: a dust-laden whirlwind that moves across an arid region and is usu. associated with hot dry air and marked by high electrical tension 2: strong winds bearing clouds of dust
**dust-up** \ˈdəs-ˌtəp\ *n* (1897): ROW, FIGHT
**dust wrapper** *n* (1932): DUST JACKET
**dusty** \ˈdəs-tē\, *adj* **dust·i·er; -est** (13c) 1: covered or abounding with dust 2: consisting of dust: POWDERY 3: resembling dust 4: lacking vitality: DRY (~ scholarship) 5 *Brit*: UNSATISFACTORY — used esp. in the phrases *dusty answer* and *not so dusty* — **dust·i·ly** \-tə-lē\ *adv* — **dust·i·ness** \-tē-nəs\ *n*

**dusty miller** *n* (ca. 1825): any of several plants having ashy-gray white tomentose leaves; *esp*: an herbaceous artemisia (*Artemisia leriana*) with greyish foliage found along the eastern coast of the U.S.
**Dutch** \ˈdəch\, *adv, often cap* (1914) 1: with each person paying his or her own way
¹**Dutch** \ˈdəch\, *adj* [ME *Duch*, fr. MD *duutsch*; akin to OHG *diutisc* German, OE *thēod* nation, Goth *thiudisks* as a gentile, *thiuda* people, Oscan *touto* city] (14c) 1 *archaic*: of, relating to, or in any of the Germanic languages of Germany, Austria, Switzerland, and the Low Countries **b**: of, relating to, or in the Dutch of the Netherlands 2 *archaic*: of or relating to the Germanic peoples of Germany, Austria, Switzerland, and the Low Countries **b**: of or relating to the Netherlands or its inhabitants **c**? ²GERMAN 3: of or relating to the Pennsylvania Dutch or their language — **Dutch·ly** *adv*
²**Dutch** *n* (14c) 1 *archaic* (1): any of the Germanic languages of Germany, Austria, Switzerland, and the Low Countries (2): GERMAN 3 **b**: the Germanic language of the Netherlands 2 *archaic*: the Germanic peoples of Germany, Austria, Switzerland, the Low Countries **b**: GERMANS 2a, **b c**: the people of the Netherlands 3: PENNSYLVANIA DUTCH 4: DUTCH (in ~ with the boss)
**Dutch cheese** *n* (1829) *chiefly Northern*: COTTAGE CHEESE
**Dutch clover** *n* (1800): WHITE CLOVER
**Dutch Colonial** *adj* (1922): characterized by a gambrel roof overhanging eaves
**Dutch courage** *n* (1809): courage artificially stimulated esp. by drinking; *also*: drink taken for courage
**Dutch door** *n* (ca. 1890): a door divided horizontally so that the upper or lower part can be shut separately
**Dutch elm disease** *n* (1927): a disease of elms caused by an ascomycetous fungus (*Ceratocystis ulmi*) and characterized by yellowing of foliage, defoliation, and death
**Dutch hoe** *n* (1744): SCUFFLE HOE
**dutch·man** \ˈdəch-mən\, *n* (14c) 1 *cap*: a native or inhabitant of the Germanic peoples of Germany, Austria, Switzerland, and the Low Countries **b**: a native or inhabitant of the Netherlands **c**: a person of Dutch descent 2: GERMAN 1a, b 2: a device for hiding or correcting structural defects
**Dutch·man's-breech·es** \ˌdəch-mənz-ˈbri-chəz\, *n pl but sing or pl in constr* (1837): a spring-flowering herb (*Dicentra cucullaria*) of the fumitory family occurring in the eastern U.S. and having finely divided leaves and cream-white double-spurred flowers
**Dutchman's-pipe** \-ˈpīp\, *n, pl* **Dutchman's-pipes** \-ˈpīps\ (1845): a vine (*Aristolochia durior*) with large leaves and early summer flowers having the tube of the calyx curved like the bowl of a pipe
**Dutch oven** *n* (1769) 1: a metal shield for roasting before an open fire 2: a brick oven in which cooking is done by the preheated walls 3: a cast-iron kettle with a tight cover that is used for baking in an open fire 2: a heavy pot with a tight-fitting domed cover
**Dutch roll** *n* (1913): a combination of directional and lateral oscillation of an airplane



Dutchman's-breeches

**Dutch treat** *n, often cap D* (1887): a meal or other entertainment which each person pays his or her own way
**Dutch treat** *vt, often cap D* (1942): DUTCH (go dutch treat)
**Dutch-treat·ing** \ˈdəch-ˈtē-tiŋ\ *adj* [irreg. fr. *duty*] (1593): DUTIFUL, OBEDIENT
**du·ti·able** \ˈdü-tē-ə-bəl *also* ˈdyü-\ *adj* (1774) 1: subject to a duty
**du·ti·ful** \ˈdü-ti-fəl *also* ˈdyü-\ *adj* (1552) 1: filled with or motivated by a sense of duty 2: proceeding from or expressive of a sense of duty — **du·ti·ful·ly** \-f(ə-)lē\ *adv* — **du·ti·ful·ness** \-fəl-nəs\ *n*
¹**du·ty** \ˈdü-tē *also* ˈdyü-\, *n, pl* **duties** [ME *duete*, fr. AF *dueté*, fr. OF *deu* due] (13c) 1: conduct due to parents and superiors: RESPECT 2 **a**: obligatory tasks, conduct, service, or functions that arise from one's position (as in life or in a group) **b** (1): assigned service or business (2): active military service (3): a period of being on duty 3 **a**: a moral or legal obligation **b**: the force of moral obligation 4 **a**: a task or action that someone is required to perform **b**: something one is required to do: RESPONSIBILITY — ON DUTY: engaged in or responsible for an assigned task or duty
²**duty** *adj* (1806) 1: done as a duty 2: being on duty: assigned specified tasks or functions (the ~ officer)
**duty-free** \ˌdü-tē-ˈfrē, ˌdyü-, -ˈtē-\ *adj or adv* (1689) 1: exempt from payment of customs duties: free from duties (imported ~ goods) 2: relating to or selling duty-free goods (a ~ shop)
**du·um·vir** \dü-ˈəm-vər *also* dyü-\, *n, pl* -**virs** or -**viri** \-ˌvī-rī\ [L, fr. *duum* (gen. of *duo* two) + *vir* man] (1600) 1: one of two Roman officers or magistrates constituting a board or court 2: one of two people jointly holding an office — **du·um·vi·rate** \-və-rət, -rāt\ *n*
**du·vet** \dü-ˈvā, dyü-\, *n* [F] (1758): COMFORTER 2b
**du·ve·tyn** \ˈdü-və-tēn, ˈdyü-, -ˌtīn\ *n* [F *duvetine*, fr. *duvet* down, MF, alter. of (assumed) MF *dumet*, dim. of OF *dum*, *dun* down] (1917): a soft lustrous velvety fabric — more at DOWN] (1913): a smooth lustrous velvety fabric
**dux·elles** \dük-ˈsel, (ˌ)dü-ˈsel\, *n* [Marquis Louis Chalon du Blé d'Uxelles †1658 Fr. nobleman] (1877): a garnish or stuffing made of finely chopped sautéed mushrooms
¹**dwarf** \ˈdwȯrf\, *n, pl* **dwarfs** \ˈdwȯrfs\ *also* **dwarves** \ˈdwȯrvz\ [ME, fr. OE *dweorg*, *dweorh*; akin to OHG *twerg* dwarf] (bef. 12c) 1 **a**: a person of unusually small stature whose bodily proportions are abnormal **b**: an insignificant being 2: an animal or plant much below normal size 3 **a**: a small manlike being who is usu. misshapen and ugly and skilled in ...

always + ge, collective prefix + *hwæther* which of two, whether — more at AYE, CO (bef. 12c) 1 : being the one and the other of two : EACH (flowers blooming on ∼ side of the walk) 2 : being the one or the other of two (take ∼ road)

²either *pron* (bef. 12c) : the one or the other

³either *conj* (bef. 12c) — used as a function word before two or more coordinate words, phrases, or clauses joined usu. by *or* to indicate that what immediately follows is the first of two or more alternatives

⁴either *adj* (15c) 1 : LIKEWISE, MOREOVER — used for emphasis after a negative (not smart or handsome ∼) 2 : for that matter — used for emphasis after an alternative following a question or conditional clause esp. where negation is implied (who answers for the Irish parliament? or army ∼? —Robert Browning)

²ei-ther-or \-ē-thə(r)-ˈor also ˌī-\ *n* (1922) : an unavoidable choice or exclusive division between only two alternatives

²either—or *adj* (1926) : of or marked by either-or : BLACK-AND-WHITE

¹ejac-u-late \i-ˈja-kyə-ˌlāt\ *vb* -lat-ed; -lat-ing [L *ejaculatus*, pp. of *ejaculari* to throw out, fr. e- + *jaculari* to throw, fr. *jaculum* dart, fr. *jacere* to throw — more at JET] *vi* (1578) 1 : to eject from a living body; *specif* : to eject (semen) in orgasm 2 : to utter suddenly and vehemently ∼ *vi*: to eject a fluid — ejac-u-la-tor \-ˌlā-tər\ *n*

²ejac-u-late \-lət\ *n* (1927): the semen released by one ejaculation

ejac-u-la-tion \i-ˌja-kyə-ˈlā-shən\ *n* (1603) 1 : an act of ejaculating; *specif* : a sudden discharging of a fluid from a duct 2 : something ejaculated; *esp* : a short sudden emotional utterance

ejac-u-la-to-ry \i-ˈja-kyə-lə-ˌtor-ē adj\ (1644) 1 : marked by or given to vocal ejaculation 2 : casting or throwing out; *specif* : associated with or concerned in physiological ejaculation ⟨∼ vessels⟩

ejaculatory duct *n* (1751): a duct through which semen is ejaculated; *specif* : either of the paired ducts in the human male that are formed by the junction of the duct from the seminal vesicle with the vas deferens and that pass through the prostate to empty into the urethra by means of a small opening

eject \i-ˈjekt\ *vt* [ME, fr. L *ejectus*, pp. of *ejere*, fr. e- + *jacere*] (15c) 1 a : to drive out esp. by physical force b : to evict from property 2 : to throw out or off from within (∼s the empty cartridges) — eject-able \-ˈjek-tə-bəl\ *adj* — ejec-tion \i-ˈjek-shən\ *n* — ejec-tive \-ˈjek-tiv\ *adj*

SYN EJECT, EXPEL, OUST, EVICT mean to drive or force out. EJECT carries an esp. strong implication of throwing or thrusting out from within as a physical action (*ejected* an obnoxious patron from the bar). EXPEL stresses a thrusting out or driving away esp. permanently which need not be physical (a student *expelled* from college). OUST implies removal or dispossession by power of the law or by force or compulsion (got the sheriff to *oust* the squatters). EVICT chiefly applies to turning out of house and home (*evicted* for nonpayment of rent).

eject-a \i-ˈjek-tə\ *n pl but sing or pl in constr* [NL, fr. L, neut. pl. of *ejectus*] (1860) : material thrown out (as from a volcano)

ejection seat *n* (1945) : an emergency escape seat for propelling an occupant out and away from an airplane

eject-ment \i-ˈjekt(-)mənt\ *n* (1523) 1 : the act or an instance of ejecting : DISPOSSESSION 2 : an action for the recovery of possession of real property and damages and costs

ejec-tor \i-ˈjek-tər\ *n* (1640) 1 : one that ejects; *esp* : a mechanism of a firearm that ejects an empty cartridge 2 : a jet pump for withdrawing a gas, fluid, or powdery substance from a space

eka- \ˈā-kə-, ˈē-kə-\ *comb form* [ISV, fr. Skt *eka* one — more at ONE] : standing or assumed to stand next in order beyond (a specified element) in the same family of the periodic table — in names of chemical elements esp. when not yet discovered (*eka*-lead is the hypothetical element 114)

eke \ˈēk\ *adv* [ME, fr. OE *ēac*; akin to OHG *ouh* also, L *aut* or, Gk *au* again] (bef. 12c) *archaic* : ALSO

²eke *vt* eked; ek-ing [ME, fr. OE *ēacan, ēacan*; akin to OHG *ouhhōn* to add, L *augēre* to increase, Gk *auxein*] (bef. 12c) 1 a : INCREASE, LENGTHEN 2 : to get with great difficulty — usu. used with *out* (∼ out a living)

eke *out vt* (1596) 1 : to make up for the deficiencies of : SUPPLEMENT (*eked out* his income by getting a second job) 2 : to make (a supply) last by economy

ekis-tics \i-ˈkis-tiks\ *n pl but sing in constr* [NGk *oikistikē*, fr. fem. of *oikistikos* of settlement, fr. Gk, fr. *oikizein* to settle, colonize, fr. *oikos* house — more at VICINITY] (1958) : a science dealing with human settlements and drawing on the research and experience of professionals in various fields (as architecture, engineering, city planning, and sociology) — ekis-tic \-tik\ *adj*

Ek-man dredge \ˌek-mən-\ *n* [prob. fr. V. W. *Ekman* †1954 Swed. oceanographer] (1948) : a dredge that has opposable jaws operated by a messenger traveling down a cable to release a spring catch and that is used in ecology for sampling the bottom of a body of water

eke-le \ˈek-wə-ˌlā\ also ek-pwe-le \ek-ˈpwä-lə, -ˌlā\ *n pl* ekwele also ek-pweles [Fang (Bantu language of western equatorial Africa)] (ca. 1973): the basic monetary unit of Equatorial Guinea 1975–85

¹el \ˈel\ *n* (14c) : the letter *l*

²el *n, often cap* (ca. 1906) : an urban railway that operates chiefly on an elevated structure; *also* : a train belonging to such a railway

elab-o-rate \i-ˈla-b(ə-)rət\ *adj* [L *elaboratus*, fr. pp. of *elaborare* to work out, acquire by labor, fr. e- + *laborare* to work — more at LABORATORY] (1592) 1 : planned or carried out with great care (took ∼ precautions) 2 : marked by complexity, fullness of detail, or ornateness (∼ prose) — elab-o-rate-ly *adv* — elab-o-rate-ness *n*

²elab-o-rate \i-ˈla-bə-ˌrāt\ *vb* -rat-ed; -rat-ing *vt* (1611) 1 : to produce by labor 2 : to build up (as complex organic compounds) from simple ingredients 3 : to work out in detail : DEVELOP ∼ *vi* 1 : to expand something in detail (would you care to ∼ on that statement) — elab-o-ra-tion \-ˌla-bə-ˈrā-shən\ *n* — elab-o-ra-tive \i-ˈla-bə-ˌrā-tiv\ *adj*

Elaine \i-ˈlān\ *n* : any of several women in Arthurian legend; *esp* : one who dies for unrequited love of Lancelot

Elam-ite \ˈē-lə-ˌmīt\ *n* (1874) : a language of unknown affinities used contemporaneously from the 25th to the 6th centuries B.C.

élan \ā-ˈlä(n)\ *n* [F, fr. MF *eslan* rush, fr. *eslancer* to rush, fr. es- + *lancer* to hurl — more at LANCE] (1864) : vigorous spirit or enthusiasm

eland \ˈē-lənd, -ˌländ\ *n, pl* eland *also* elands [Afrik, elk, fr. D, fr. obs.

G *Elend*, prob. fr. obs. Lith *elnis*; akin to OHG *elaho* elk — more at ELK] (1600) : either of two large African antelopes (*Tragelaphus* and *T. derbianus*) bovine in form with short spirally twisted horns in both sexes

élan vi-tal \ā-ˌlä(n)-vē-ˈtäl\ *n* [F] (1907) : the vital force or impulse of life; *esp* : a creative principle held by Bergson to be immanent in all organisms and responsible for evolution

el-a-pid \ˈe-lə-pəd\ *n* [NL *Elaps, Elaps*, genus of snakes, fr. MGk *llaps*, alter. of Gk *elops*] (1885) : any of a family (Elapidae) of venomous snakes with grooved fangs

elapse \i-ˈlaps\ *vi* elapsed; elaps-ing [L *elapsus*, pp. of *elabi*, fr. e- + *labi* to slip — more at SLEEP] (1644) : to slip or glide away : PASS (∼ years *elapsed* before he returned)

²elapse *n* (ca. 1677) : PASSAGE (returned after an ∼ of 15 years)

elapsed time *n* (ca. 1909) : the actual time taken (as by a boat or mobile in traveling over a racecourse)

elas-mo-branch \i-ˈlaz-mo-ˌbraŋk\, *n, pl* -branchs [ultim. fr. Gk *elasmos* metal plate (fr. *elaunein*) + *branchia* gills] (1872): any of a class (Elasmobranchii) of cartilaginous fishes that have five to seven lateral to ventral gill openings on each side and that comprise sharks, rays, skates, and extinct related fishes — elasmobranch *adj*

elas-tase \i-ˈlas-ˌtās, -ˌtāz\ *n* (1928) : an enzyme that digests elastin

¹elas-tic \i-ˈlas-tik\ *adj* [NL *elasticus*, fr. LGk *elastos* ductile, beaten, Gk *elaunein* to drive, beat out; prob. akin to Gk *ēlythe* he went, *ēluth*] (1674) 1 a : capable of recovering size and shape after deformation b : being a collision between particles in which the kinetic energy of the particles remains unchanged 2 : capable of covering quickly esp. from depression or disappointment 3 : capable of being easily stretched or expanded and resuming former shape 4 : FLEXIBLE 4 a : capable of ready change or easy expansion — elas-ti-cal-ly \-ti-k(ə-)lē\ *adv* — elas-tic-i-ty \i-ˌlas-ˈti-sə-tē\ *n*

SYN ELASTIC, RESILIENT, SPRINGY, FLEXIBLE, SUPPLE mean able to endure strain without being permanently injured. ELASTIC implies the property of resisting deformation by stretching. RESILIENT implies the ability to recover shape quickly when deformed by compressing or bending. SPRINGY stresses both the ease with which something yields to pressure and the quickness of its return to original shape. FLEXIBLE applies to something which may or may not be resilient or elastic but which can be bent or folded without breaking. SUPPLE applies to something that is pliable readily bent, twisted, or folded without any sign of injury (supple leather).

²elastic *n* (1847) 1 a : easily stretched rubber usu. prepared in strings, or bands b : RUBBER BAND 2 : an elastic fabric usu. made of yarns containing rubber b : something made from this fabric

elastic fiber *n* (1849) : a thick very elastic smooth yellowish mosing fiber of connective tissue that contains elastin

elas-tici-ized \i-ˈlas-tə-ˌsīzd\ *adj* (1925) : made elastic by incorporating elastic threads

elas-ti-cized \i-ˈlas-tə-ˌsīzd\ *adj* (ca. 1909) : made with elastic inserts

elastic limit *n* (1898) : the greatest stress that an elastic solid can sustain without undergoing permanent deformation

elastic modulus *n* (1904) : the ratio of the stress in a body to the corresponding strain

elastic scattering *n* (1933) : a scattering of particles as the result of an elastic collision

E layer *n* (1933) : a layer of the ionosphere occurring about 60 (110 kilometers) above the earth's surface during daylight hours capable of reflecting shortwave frequencies

El-ba \ˈel-bə\, *n* [Elba (Mediterranean island), residence of Napoleon Bonaparte after his first abdication May 14, 1814 to Feb. 26, 1824] : a place of exile

¹el-bow \ˈel-ˌbō\ *n* [ME *elbowe*, fr. OE *elboga*, fr. el- (akin to OE *ell* OE *boga* bow — more at ELL, BOW] (bef. 12c) 1 a : the joint of the human arm b : a corresponding joint in the anterior limb of a vertebrate 2 : something (as macaroni or an angular pipe fitting) resembling an elbow — at one's elbow : at one's side

²elbow *vt* (1605) 1 : to push or shove aside by or as if with the elbow 2 : to force (as one's way) by pushing with or as if with the elbow ⟨∼ing our way through the crowd⟩ ∼ *vi*: to make one's way by elbowing

elbow grease *n* (1672) : physical effort

el-bow-room \ˈel-ˌbō-ˌrüm, -ˌrum\ *n* (ca. 1540) 1 a : room for free movement b : adequate space for work or operation 2 : free scope (∼ to try ∼)

in·cite \in-ˈsīt\ vt in·cit·ed; in·cit·ing [MF inciter, fr. L incitare, fr. in- + citare to put in motion — more at CITE] (15c) : to move to action : stir up : spur on : urge on — in·cit·ant \-ˈsīt-ᵊnt\ n — in·cite·ment \-ˈsīt-mənt\ n — in·cit·er n

**syn** INCITE, INSTIGATE, ABET, FOMENT mean to spur to action. INCITE stresses a stirring up and urging on, and may or may not imply deliberating (inciting a riot). INSTIGATE definitely implies responsibility for initiating another's action and often connotes underhandedness or evil intention (instigated a conspiracy). ABET implies both assisting and encouraging (aiding and abetting the enemy). FOMENT implies persistence in goading (fomenting rebellion).

in·ci·vil·i·ty \ˌin-(ˌ)sə-ˈvi-lə-tē\ n [MF incivilité, fr. LL incivilitat-, incivilitas, fr. incivilis, fr. L in- + civilis civil] (1584) 1 : the quality or state of being uncivil 2 : a rude or discourteous act
in·clem·en·cy \(ˌ)in-ˈkle-mən(t)-sē\ n (1559) 1 : the quality or state of being inclement
in·clem·ent \(ˌ)in-ˈkle-mənt, ˈin-klə-\ adj [L inclement-, inclemens, fr. in- + element, clemens clement] (1621) : lacking mildness: as a : archaic : severe in temper or action : UNMERCIFUL b : physically severe : STORMY (~ weather) — in·clem·ent·ly adv
in·clin·able \in-ˈklī-nə-bəl\ adj (15c) : having a tendency or inclination: also : disposed to favor or think well of
in·cli·na·tion \ˌin-klə-ˈnā-shən, ˌiŋ-\ n (14c) 1 obs : natural disposition : CHARACTER b : a particular disposition of mind or character : PROPENSITY; esp : LIKING (had little ~ for housekeeping) 2 : an act or the action of bending or inclining: as a : BOW, NOD b : a tilting of something 3 a : a deviation from the true vertical or horizontal : SLANT; also : the degree of such deviation b : an inclined surface : SLOPE c (1) : the angle determined by two lines or planes (2) : the angle made by a line with the x-axis measured counterclockwise from the positive direction of that axis b : a tendency to a particular aspect, state, character, or action (the clutch has an ~ to slip) — in·cli·na·tional \-shnəl, -shən-ᵊl\ adj
²in·cline \in-ˈklīn\ vb in·clined; in·clin·ing [ME, fr. MF incliner, fr. L inclinare, fr. in- + clinare to lean — more at LEAN] vi (14c) 1 : to bend the head or body forward : BOW 2 : to lean, tend, or become drawn toward an opinion or course of conduct 3 : to deviate from a line, direction, or course; specif : to deviate from the vertical or horizontal ~ vt 1 : to cause to stoop or bow : BEND 2 : to have influence on : PERSUADE (his love of books inclined him toward a literary career) 3 : to give a bend or slant to — in·clin·er n

**syn** INCLINE, BIAS, DISPOSE, PREDISPOSE mean to influence one to have or take an attitude toward something. INCLINE implies a tendency to favor one of two or more actions or conclusions (I incline to agree). BIAS suggests a settled and predictable inclining in one direction and connotes unfair prejudice (the experience biased him against foreigners). DISPOSE suggests an affecting of one's mood or temper so as to incline one toward something (his nature disposes her to trust others). PREDISPOSE implies the operation of a disposing influence well in advance of the opportunity to manifest itself (does fictional violence predispose them to accept real violence?).

²in·cline \ˈin-ˌklīn\ n (1846) : an inclined plane : GRADE, SLOPE
in·clined \in-ˈklīnd, 2 also ˈin-,\ adj (14c) 1 : having inclination, disposition, or tendency 2 a : having a leaning or slope b : making an angle with a line or plane
inclined plane n (1710) : a plane surface that makes an oblique angle with the plane of the horizon
in·cli·nom·e·ter \ˌin-klə-ˈnä-mə-tər, ˌiŋ-\ n (1852) : an instrument for indicating the inclination to the horizontal of an axis (as of an airplane)
in·clip \in-ˈklip\ vt (1608) archaic : CLASP, ENCLOSE
inclose, inclosure var of ENCLOSE, ENCLOSURE
in·clude \in-ˈklüd\ vt in·clud·ed; in·clud·ing [ME, fr. L includere, fr. in- + claudere to close — more at CLOSE] (15c) 1 : to shut up : EN-CLOSE 2 : to take in or comprise as a part of a whole 3 : to contain between or within (two sides and the included angle) — in·clud·able or in·clud·ible \-ˈklü-də-bəl\ adj

**syn** INCLUDE, COMPREHEND, EMBRACE, INVOLVE mean to contain within as part of the whole. INCLUDE suggests the containment of something as a constituent, component, or subordinate part of a larger whole (the price of dinner includes dessert). COMPREHEND implies that something comes within the scope of a statement or definition (his system comprehends all history). EMBRACE implies a gathering of separate items within a whole (her faith embraces both Christian and non Christian beliefs). INVOLVE suggests inclusion by virtue of the nature of the whole, whether by being its natural or inevitable consequence (the new job involves a lot of detail).

in·clu·sion \in-ˈklü-zhən\ n [L inclusion-, inclusio, fr. includere] (1600) 1 : the act of including : the state of being included 2 : something that is included: as a : a gaseous, liquid, or solid foreign body enclosed in a mass (as of a mineral) b : a passive usu. temporary product of cell activity (as a starch grain) within the cytoplasm or nucleus 3 : a relation between two classes that exists when all members of the first are also members of the second — compare MEMBERSHIP 3
inclusion body n (ca. 1919) : an inclusion, abnormal structure, or foreign cell within a cell; specif : an intracellular body that is characteristic of some virus diseases and that is the site of virus multiplication
in·clu·sive \in-ˈklü-siv, -ziv\ adj (15c) 1 : comprehending stated limits or extremes (from Monday to Friday ~) 2 a : broad in orientation or scope b : covering or intended to cover all items, costs, or services — in·clu·sive·ly adv — in·clu·sive·ness n
inclusive disjunction n (1942) : a complex sentence in logic that is true when either or both of its constituent propositions are true — see TRUTH TABLE table
inclusive of prep (1709) : including or taking into account (the cost of building inclusive of materials)
in·co·erc·i·ble \ˌin-kō-ˈər-sə-bəl\ adj (1710) : incapable of being controlled, checked, or confined
in·cog·i·tant \(ˌ)in-ˈkä-jə-tənt\ adj [L incogitant-, incogitans, fr. in- + cogitant, cogitans, prp. of cogitare to cogitate] (1628) : THOUGHTLESS, INCONSIDERATE

in·cog·ni·ta \ˌin-ˌkäg-ˈnē-tə also in-ˈkäg-nə-tə\ adv or adj (fem of incognito) (1638) : INCOGNITO — used only of a woman — incognita n
²in·cog·ni·ta \ˌin-ˌkäg-ˈnē-tə\ also in-ˈkäg-nə-tə\ n : a region or more at COGNITION] (1635) : with one's identity concealed
incognita unknown, fr. in- + cognita, fem. of cognoscere to know,
²incognito n, pl ~tos (1638) 1 : one appearing or living incognito 2 : the state or assumed identity of one living or traveling incognita
in·cog·ni·zant \(ˌ)in-ˈkäg-nə-zənt\ adj (1837) : lacking awareness or consciousness — in·cog·ni·zance \-zən(t)s\ n
in·co·her·ence \ˌin-kō-ˈhir-ən(t)s, -ˈher-\ n (1611) 1 : the quality or state of being incoherent 2 : something that is incoherent
in·co·her·ent \-ˈhir-ənt, -ˈher-\ adj (1626) 1 : lacking coherence: as a : lacking cohesion : loose b : lacking orderly continuity, arrangement, or relevance : INCONSISTENT 2 : lacking clarity or intelligibility usu. by reason of some emotional stress — in·co·her·ent·ly adv
in·com·bus·ti·ble \ˌin-kəm-ˈbəs-tə-bəl\ adj [ME, prob. fr. MF, fr. in- + combustible combustible] (15c) : not combustible : being burned — incombustible n — in·com·bus·ti·bil·i·ty \-ˌbəs-tə-ˈbi-lə-tē\ n — combustible n
in·come \ˈin-ˌkəm also ˈiŋ-kəm or ˈin-kəm\ n (14c) 1 : ENTRANCE, INFLUX (fluctuations in the nutrient ~ of a body) 2 : a gain or recurrent benefit usu. measured in money that derives from capital or labor; also : the amount of such gain received in a period of time (has an ~ of $20,000 a year)
income account n (1869) : a financial statement of a business the details of revenues, costs, expenses, losses, and profits for a period — called also income statement
income bond n (ca. 1864) : a bond that pays interest at a rate the issuer's earnings
income tax n (1799) : a tax on the net income of an individual or business
in·com·ing \ˈin-ˌkə-miŋ\ n (14c) 1 : the act of coming in : entrance 2 : INCOME — usu. used in pl.
²incoming adj (1753) 1 : coming in : ARRIVING (an ~ ship) 2 : taking a new place or position esp. as part of a succession (the ~president) 3 : just starting or beginning (the ~ year)
in·com·men·su·ra·ble \ˌin-kə-ˈmen(t)s-rə-bəl, -ˈmen(t)sh-, -shə-\ adj (1557) 1 : not commensurable: broadly : lacking a basis of comparison in respect to a quality normally subject to comparison — in·com·men·su·ra·bil·i·ty \-ˌmen(t)s-rə-ˈbi-lə-tē, -ˌmen(t)sh-, -shə-\ n — incommensurable n — in·com·men·su·ra·bly \-ˈmen(t)s-rə-blē, -ˈmen(t)sh-, -shə-blē\ adv
in·com·men·su·rate \ˌin-kə-ˈmen(t)s-rət, -ˈmen(t)sh-, -rᵊt\ adj (1650) 1 : not commensurate: as a : INCOMMENSURABLE 2 : INADEQUATE b : DISPROPORTIONATE
in·com·mode \ˌin-kə-ˈmōd\ vt -mod·ed; -mod·ing [MF & L; MF incommoder, fr. L incommodus inconvenient, fr. in- + commodus convenient — more at COMMODE] (1598) : to give inconvenience to : DISTURB
in·com·mo·di·ous \ˌin-kə-ˈmō-dē-əs\ adj (1551) : not comfortable : INCONVENIENT — in·com·mo·di·ous·ly adv — in·com·mo·di·ous·ness n
in·com·mod·i·ty \-ˈmä-də-tē\ n (15c) : a source of inconvenience : DISADVANTAGE
in·com·mu·ni·ca·ble \ˌin-kə-ˈmyü-ni-kə-bəl\ adj [MF or LL; LL incommunicabilis, fr. L in- + L communicabilis communicable] (1568) : not communicable: as a : incapable of being communicated or imparted b : UNCOMMUNICATIVE — in·com·mu·ni·ca·bil·i·ty \-ˌmyü-ni-kə-ˈbi-lə-tē\ n — in·com·mu·ni·ca·bly \-ˈmyü-ni-kə-blē\ adv
in·com·mu·ni·ca·do \ˌin-kə-ˌmyü-ni-ˈkä-(ˌ)dō\ adv or adj [Sp incomunicado, fr. pp. of incomunicar to deprive of communication, fr. in- + comunicar to communicate, fr. L communicare] (1844) : means of communication; also : in solitary confinement
in·com·mu·ni·ca·tive \ˌin-kə-ˈmyü-nə-ˌkā-tiv, -ni-kə-tiv\ adj : not COMMUNICATIVE
in·com·mut·able \ˌin-kə-ˈmyü-tə-bəl\ adj [ME & L; ME, fr. L; fr. in- & commutabilis commutable] (15c) : not commutable : not interchangeable b : UNCHANGEABLE — in·com·mut·a·bly adv
in·com·pa·ra·ble \(ˌ)in-ˈkäm-p(ə-)rə-bəl, ˌin-kəm-ˈpar-\ fr. MF, fr. L incomparabilis, fr. in- + comparabilis comparable] 1 : eminent beyond comparison : MATCHLESS 2 : not suitable for comparison — in·com·pa·ra·bil·i·ty \-ˌkäm-p(ə-)rə-ˈbi-, kəm-ˌpar-\ n — in·com·pa·ra·bly \(ˌ)in-ˈkäm-p(ə-)rə-blē, -ˈpar-ə-\ adv
in·com·pat·i·bil·i·ty \ˌin-kəm-ˌpa-tə-ˈbi-lə-tē\ n, pl -ties (1611) : the quality or state of being incompatible: b : lack of ability between two plants 2 pl : mutually antagonistic things or qualities
in·com·pat·i·ble \ˌin-kəm-ˈpa-tə-bəl\ adj [ME, fr. MF & ML incompatibilis, fr. L in- + ML compatibilis compatible] 1 : incapable of being held by one person at one time — used of offices 2 a : incapable of association or harmonious coexistence b : unsuitable for use together because of undesirable chemical or physiological effects (~ drugs) c : not both true (~ propositions) d : incapable of blending into a stable homogeneous mixture — incompatible n — in·com·pat·i·bly \-blē\ adv
in·com·pe·tence \(ˌ)in-ˈkäm-pə-tən(t)s\ n (1663) : the state or fact of being incompetent
in·com·pe·ten·cy \-tən(t)-sē\ n (1664) : INCOMPETENCE
in·com·pe·tent \(ˌ)in-ˈkäm-pə-tənt\ adj [MF incompetent or LL incompetent-, incompetens] (1597) 1 : not legally qualified 2 : not to or unsuitable for a particular purpose 3 a : lacking the qualities needed for effective action b : unable to function properly (~ valves) — incompetent n — in·com·pe·tent·ly adv
in·com·plete \ˌin-kəm-ˈplēt\ adj [ME incomplete, fr. LL incompletus, fr. L in- + completus complete] (14c) 1 : not complete : UNFINISHED a : lacking a part; esp : lacking one or more sets of floral organs (an insect metamorphosis : characterized by the absence of one between the immature stages and the adult of an insect young usu. resemble the adult — compare COMPLETE 5: 2

(assumed) VL *refusare*, perh. blend of L *refutare* to refute and *recusare* to demur — more at RECUSE] *vt* (14c) **1** : to express oneself as unwilling to accept ⟨~ a gift⟩ ⟨~ a promotion⟩ **2** : to show or express unwillingness to do or comply with ⟨*refused* to answer the question⟩ **3** : DENY ⟨they were *refused* admittance to the game⟩ **3 obs** : GIVE UP, RENOUNCE **4** *of a horse* : to decline to jump or leap over. ~ *vi* : to withhold acceptance, compliance, or permission — *syn* see DECLINE — **re·fus·er** *n*

**re-fuse** \'re-,fyüs, -,fyüz\ *n* [ME, fr. MF *refus* rejection, fr. OF, fr. *refuser*] (14c) **1** : the worthless or useless part of something : LEAVINGS **2** : TRASH, GARBAGE

**re-fuse** \'re-,fyüs, -,fyüz\ *adj* (15c) : thrown aside or left as worthless

**re-fuse-nik** *also* **re-fus-nik** \ri-'fyüz-(,)nik\ *n* [part. trans. of Russ *otkaznik*, fr. *otkaz* refusal] (1974) : a Soviet citizen and esp. a Jew refused permission to emigrate

**re-fu-ta-tion** \,re-fyu-'tā-shən\ *n* (ca. 1548) : the act or process of refuting

**re-fute** \ri-'fyüt\ *vt* **re-fut-ed; re-fut-ing** [L *refutare* to check, suppress, refute] (1597) **1** : to prove wrong by argument or evidence : show to be false or erroneous **2** : to deny the truth or accuracy of ⟨*refuted* the allegations⟩ — **re-fut-able** \-'fyü-tə-bəl, *adj* — **re-fut-ably** \-blē\ *adv* — **re-fut-er** *n*

**reg** \'reg\ *n* [by shortening] (ca. 1925) : REGULATION (federal ~s)

**re-gal** \'rē-gəl\ *adj* [ME, fr. MF *or* L, MF, fr. L *regalis* — more at ROYAL] (14c) **1** : of, relating to, or suitable for a king **2** : of notable excellence or magnificence : SPLENDID — **re-gal-i-ty** \ri-'ga-lə-tē\ *n* — **re-gal-ly** \'rē-gə-lē\ *adv*

**re-gale** \ri-'gāl\ *vb* **re-galed; re-gal-ing** [F *régaler*, fr. MF, fr. *regale*, n.] (ca. 1656) **1** : to entertain sumptuously : feast with delicacies **2** : to give pleasure or amusement to ⟨*regaled* us with tall tales⟩ ~ *vi* : to feast oneself : FEED

**re-gale** *n* [F *régal*, fr. MF *regale*, fr. *re-* + *galer* to have a good time — more at GALLANT] (1670) **1** : a sumptuous feast **2** : a choice food or drink

**re-ga-lia** \ri-'gāl-yə\ *n pl* [ML, fr. L, neut. pl. of *regalis*] (ca. 1540) **1** : royal rights or prerogatives **2** : the emblems, symbols, or paraphernalia indicative of royalty **b** : decorations or insignia indicative of an office or membership **3** : special dress; esp : FINERY

**re-gard** \ri-'gärd\ *n* [ME, fr. MF, fr. OF, fr. *regarder*] (14c) *archaic* : APPEARANCE **2 a** : ATTENTION, CONSIDERATION ⟨due ~ should be given to all facets of the question⟩ **b** : a protective interest : CARE ⟨ought to have more ~ for his health⟩ **3** : LOOK, GAZE **4** *a* : the worth or estimation in which something or someone is held ⟨a man of small ~⟩ **b** (1) : a feeling of respect and affection : ESTEEM ⟨his hard work won him the ~ of his colleagues⟩ (2) *pl* : friendly greetings implying such feeling ⟨give him my ~s⟩ **5** : a basis of action or opinion : MOTIVE **6** : an aspect to be taken into consideration : RESPECT ⟨is a small school, and is fortunate in this ~⟩ **7 obs** : INTENTION — in regard to : with respect to : CONCERNING — with regard to : in regard to

**re-gard** *vb* [ME, fr. MF *regarder* to look back at, regard, fr. OF, fr. *re-* + *garder* to guard, look at — more at GUARD] *vt* (14c) **1** : to consider and appraise usu. from a particular point of view ⟨is highly ~ed as a mechanic⟩ **2** : to pay attention to : take into consideration or account **3 a** : to show respect or consideration for **b** : to hold in high esteem **4** : to look at **5** *archaic* : to relate to ~ *vi* **1** : to look attentively : GAZE **2** : to pay attention : HEED — as regards : with respect to : CONCERNING

**syn** REGARD, RESPECT, ESTEEM, ADMIRE mean to recognize the worth of a person or thing. REGARD is a general term that is usu. qualified ⟨he is highly *regarded* in the profession⟩. RESPECT implies a considered evaluation or estimation ⟨after many years they came to *respect* her views⟩. ESTEEM implies greater warmth of feeling accompanying a high valuation ⟨no citizen of the town was more highly *esteemed*⟩. ADMIRE suggests usu. enthusiastic appreciation and often deep affection ⟨a friend that I truly *admire*⟩.

**re-gar-dant** \ri-'gär-dᵊnt\ *adj* [ME *regardant*, fr. MF *regardant*, prp. of *regarder*] (15c) : looking backward over the shoulder — used of a heraldic animal

**re-gard-ful** \ri-'gärd-fəl\ *adj* (ca. 1586) **1** : HEEDFUL, OBSERVANT **2** : full or expressive of regard or respect : RESPECTFUL — **re-gard-ful-ly** \-fə-lē\ *adv* — **re-gard-ful-ness** *n*

**re-gard-ing** *prep* (1866) : with respect to : CONCERNING

**re-gard-less** \ri-'gärd-ləs\ *adj* (1591) : HEEDLESS, CARELESS — **re-gard-less-ly** *adv* — **re-gard-less-ness** *n*

**regardless** *adv* (1872) : despite everything ⟨went ahead with their plans ~⟩ *usage* see IRREGARDLESS

**regardless of** *prep* (1784) : without taking into account ⟨accepts all *regardless* of age⟩; *also* : in spite of ⟨*regardless* of our mistakes⟩

**re-gat-ta** \ri-'gä-tə, -'ga-\ *n* [It *regatà*] (1652) **1** : a rowing, speedboat, or sailing race or a series of such races

**re-gen-cy** \'rē-jən(t)-sē\ *n, pl* **-cies** (15c) **1** : the office, jurisdiction, or government of a regent or body of regents **2** : a body of regents **3** : the period of rule of a regent or body of regents

**Regency** *adj* (1880) **1** : of, relating to, or characteristic of the styles of George IV's regency as Prince of Wales during the period 1811–20

**re-gen-er-a-cy** \ri-'je-nə-rə-sē, -'jen-rə-\ *n* (1626) : the state of being regenerated

**re-gen-er-ate** \-rət\ *adj* [ME *regenerate*, fr. L *regeneratus*, pp. of *regenerare* to regenerate, fr. *re-* + *generare* to generate — more at GENERATE] (15c) **1** : formed or created again **2** : spiritually reborn or converted **3** : restored to a better, higher, or more worthy state — **re-gen-er-ate-ly** *adv* — **re-gen-er-ate-ness** *n*

**re-gen-er-ate** \ri-'je-nə-,rāt\ *vt* (1541) **1** : to become formed again **2** : to become regenerated : REFORM **3** : to replace (a body part or organ) by regeneration **b** (1) : to generate anew **4** *a* : to generate or produce anew; *esp* : to replace (a body part) by a new growth of tissue **b** : to produce again sometimes in a physically changed form **3** : to restore to original strength or properties — **re-gen-er-a-ble** \-'je-nə-rə-bəl, -'jen-rə-\ *adj* — **re-gen-er-ate** \same as 1\ *n* (ca. 1569) : one that is regenerated as **a** : an individual who is spiritually reborn **b** (1) : an organism that has undergone regeneration (2) : a regenerated body part

**regenerated cellulose** *n* (1904) : cellulose obtained in a change by chemical treatment (as of a cellulose solution or derivative)

**re-gen-er-a-tion** \ri-,je-nə-'rā-shən, ,rē-\ *n* (14c) **1** : an act or process of regenerating : the state of being regenerated **2** : spiritual renewal or revival **3** : renewal or restoration of a body or body part after injury or as a normal process **4** : utilization by special heat or other products that would ordinarily be lost

**re-gen-er-a-tive** \ri-'je-nə-,rā-tiv, -'jen-rə-, -'jen-ə-rə-\ *adj* (15c) : of, relating to, or marked by regeneration **2** : tending to regenerate

**re-gen-er-a-tor** \ri-'je-nə-,rā-tər, ,rē-\ *n* (ca. 1550) **1** : one that regenerates **2** : a device used esp. with hot-air engines or gas furnaces for incoming air or gas is heated by contact with masses (as of brick) previously heated by outgoing hot air or gas

**re-gent** \'rē-jənt\ *n* [ME, fr. MF *or* ML, MF, fr. ML *regent-, regens,* fr. L prp. of *regere* to rule — more at RIGHT] (15c) **1** : one who governs a kingdom in the minority, absence, or disability of the sovereign **2** : one who rules or reigns **3** : GOVERNOR **3** : a member of a governing board (as of a state university) — **regent** *adj* — **re-gent-al** *adj*

**reg-gae** \'re-(,)gā, 'rā-\ *n* [origin unknown] (1968) : popular music of Jamaican origin that combines native styles with elements of rock; *specif* : popular music marked at moderate tempos with the accented offbeat

**reg-i-cide** \'re-jə-,sīd\ *n* [L *reg-, rex* king + E *-cide* — more at -CIDE] (ca. 1548) **1** : one who kills a king **2** : the killing of a king — **reg-i-cid-al** \,re-jə-'sī-dᵊl\ *adj*

**re-gime** *also* **ré-gime** \rā-'zhēm, ri- *also* ri-'jēm\ *n* [F *régime,* fr. L *regimin-, regimen*] (1776) **1** *a* : REGIMEN **1 b** : a regular pattern of occurrence or action (as of seasonal rainfall) **c** : the characteristic behavior or orderly procedure of a natural phenomenon or process **2** *a* : mode of rule or management **b** : a form of government ⟨a socialist ~⟩ **c** : a government in power ⟨predicted that the new ~ would be quite different⟩ **d** : a period of rule

**reg-i-men** \'re-jə-mən *also* 're-zhə-\ *n* [ME, fr. L *regimin-, regimen,* fr. *regere* to rule] (14c) **1 a** : a systematic plan (as of diet, therapy, or medication) esp. when designed to improve and maintain a patient **b** : a regular course of action and esp. of strenuous exercise ⟨the daily ~ of a top ballet dancer⟩ **2** : GOVERNMENT, RULE **3** : REGIME

**reg-i-ment** \'re-jə-mənt, 're-zhə-\ *n* (14c) **1 1** : to form into or assign to a regiment **2** : to organize rigidly esp. for the sake of regulation and control ⟨~ an entire country⟩ **b** : to subject to order or uniformity — **reg-i-men-ta-tion** \,re-jə-mən-'tā-shən, -,men-\ *n*

**reg-i-men-tal** \,re-jə-'men-tᵊl\ *adj* (1659) **1** : of or relating to a regiment **2** : standardized, DICTATORIAL — **reg-i-men-tals** \-tᵊlz\ *n pl* (1742) **1** : a regimental uniform

**re-gion** \'rē-jən\ *n* [ME, fr. AF, fr. MF *region, regio,* fr. *regere*] (14c) **1** : an administrative area, division, or district; *esp* : an administrative unit for local government in Scotland **2 a** : an indefinite area of the world or universe ⟨few unknown ~s left⟩ **b** : a broad geographical area distinguished by similar features ⟨tropical ~s⟩ **c** (1) : a major world area that supports a particular vegetational climax type (2) : area characterized by the prevalence of vegetational climax types **3 a** : any of the major subdivisions into which the body or one of its parts is divisible **b** : an indefinite area surrounding a specified body part ⟨a pain in the ~ of the liver⟩ **c** : a sphere of activity or interest : FIELD **5** : any of the zones into which the atmosphere is divided according to height or the sea according to depth **6** : an open connected set together with none, some, or all the points on its boundary ⟨a simple closed curve divides the plane into two ~s⟩

**re-gion-al** \'rēj-nəl, 'rē-jə-nᵊl\ *adj* (1837) **1** : affecting a particular region : LOCALIZED **2** : of, relating to, characteristic of, or serving a region ⟨~ high school⟩ **3** : marked by regionalism ⟨~ art⟩

**re-gion-al-ism** \'rēj-nə-,li-zəm, 'rē-jə-nᵊl-\ *n* (1881) **1** : consciousness of and loyalty to a distinct region with a homogeneous population **b** : development of a political social system based on one or more such areas **2** : emphasis on regional locale and characteristics in art or literature **3** : a characteristic feature (as of speech or a graphic area — **re-gion-al-ist** \-list, -list\ *n or adj* — **re-gion-al-is-tic** \,rēj-nə-'lis-tik, ,rē-jə-nᵊl-'lis-\ *adj*

**re-gion-al-ize** \'rēj-nə-,līz, 'rē-jə-nᵊl-\ *vt* **-ized; -iz-ing** **1** : to divide into regions or administrative districts : arrange **2** — **re-gion-al-iza-tion** \,rēj-nə-lə-'zā-shən, ,rē-jə-nᵊl-\ *n*

**re-gis-seur** *or* **ré-gis-seur** \,rā-zhē-'sər\ *n* [F *régisseur,* fr. *régir* to rule, fr. L *regere* to rule] (1828) : a director responsible for stage and technical work (as in ballet)

**reg-is-ter** \'re-jə-stər\ *n* [ME, fr. ML *registrum,* alter. of LL *regesta,* pl., register, fr. L neut. pl. of *regestus,* pp. of *regerere* to bring back, pile up, collect, fr. *re-* + *gerere* to bear] (14c) **1 a** : a written record containing regular entries of items or details **2** : a system of public records **b** : a roster of qualified or available **4 a** : a musical instrument (2) : a portion of such a range divided into subdivisions ⟨the lower ~ of the human voice⟩ **b** : any of the varieties of a language used in a particular social context **3 a** : a grille often with shutters or a damper to control ventilation (as in a floor) **b** : the registering apparatus **6** : REGISTRATION, REGISTRY **c** : an automatic device registering a number or a quantity **5 a** : exact correspondence in position **b** : a condition of correct adjustment (as for color printing or relative position in a machine (as in a computer) for the temporary storage and control esp. of data on which data can be both stored and acted on

**register** *vb* **reg-is-tered; reg-is-ter-ing** \-st(ə-)riŋ\ *vt* (14c) **1** : to make or secure official entry of in a register **b** : to enroll formally esp. as a voter or student **c** : to record automatically : INDICATE

b : to set aside (part of the consecrated elements) at the Eucharist for future use  c : to retain or hold over to a future time or place : DEFER ⟨~ one's judgment on a plan⟩  d : to make legal reservation of 2 : to set or have set aside or apart ⟨~ a hotel room⟩  **syn** see KEEP — reservable \-ˈzər-və-bəl\ adj
**re·serve** n, often attrib (1648)  1 : something reserved or set aside for a particular purpose, use, or reason: as  a (1) : a military force withheld from action for later decisive use — usu. used in pl.  (2) : forces not in the field but available  (3) : the military forces of a country not part of the regular services: also : RESERVIST  b : a tract (as of public land) set apart : RESERVATION  2 : something stored or kept available for future use or need : STOCK  3 : an act of reserving : QUALIFICATION  4 a : restraint, closeness, or caution in one's words and actions  b : forbearance from making a full explanation  5 : the price at which an article put up at auction is held or the lowest accepted offer : money or its equivalent kept in hand or set apart usu. to meet liabilities  b : the liquid resources of a concern to meet international payments  — in reserve : held back for future or special use
**re·serve bank** n (1905) : a central bank holding reserves of other banks
**reserve clause** n (1944) : a clause formerly placed in a professional athlete's contract that reserved for the club the exclusive right automatically to renew the contract and that bound the athlete to the club until retirement or until the athlete was traded or released
**re·served** \ri-ˈzərvd\ adj (1601)  1 : restrained in words and actions  2 : kept or set apart or aside for future or special use  **syn** see SILENT — **re·serv·ed·ly** \-ˈzər-vəd-lē\ adv — **re·serv·ed·ness** \-ˈzər-vəd-nəs\ n
**reserved power** n (1838) : a political power reserved by a constitution to the exclusive jurisdiction of a specified political authority
**reserve price** n (1919) : a price announced at an auction as the lowest that will be considered
**re·serv·ist** \ri-ˈzər-vist\ n (1870) : a member of a military reserve
**res·er·voir** \ˈre-zə-ˌvwär, -ˌzər-, -ˌvwȯr also -ˌvȯi\ n [F réservoir, fr. réserver]  1690)  1 a : a place where something is kept in store: as  a : an artificial lake where water is collected and kept in quantity for use  b : a part of an apparatus in which a liquid is held  c : SUPPLY, STORE ⟨a large ~ of educated people⟩  2 : an extra supply : RESERVE  3 : an organism in which a parasite that is pathogenic for some other species lives and multiplies without damaging its host; also : a noneconomic organism within which a pathogen of economic or medical importance flourishes
**re·set** \(ˌ)rē-ˈset, vi -set; -set·ting (1655)  1 : to set again or anew ⟨~ type⟩ ⟨~ a diamond⟩ ⟨~ a circuit breaker⟩  2 : to change the reading of often to zero ⟨~ an odometer⟩ — re·set \ˈrē-ˌset\ n — re·set·ta·ble \ˌrē-ˈse-tə-bəl\ adj
**res ges·tae** \ˈrās-ˈges-ˌtī, ˈrez-ˈjes-ˌtē\ n pl [L] (1616) : things done; esp : the facts that form the environment of a litigated issue and are admissible in evidence
**resh** \ˈrāsh\ n [Heb rēsh] (ca. 1823) : the 20th letter of the Hebrew alphabet — see ALPHABET table
**re·shape** \ˌrē-ˈshāp, vt (1827) : to give a new form or orientation to — **re·shap·er** n
**re·shuf·fle** \(ˌ)rē-ˈshə-fəl, vt (1830)  1 : to shuffle (as cards) again  2 : to reorganize usu. by the redistribution of existing elements (the ~ cabinet was reshuffled by the prime minister) — **reshuffle** n
**re·sid** \ri-ˈzid, n (1967) : RESIDUAL OIL
**re·side** \ri-ˈzīd\ vi re·sid·ed; re·sid·ing [ME, fr. MF or L; MF résider, fr. L, resídere to sit back, remain, abide, fr. re- + sedēre to sit — more at SIT] (15c)  1 a : to be an inhabitant or the incumbent of a benefice or office  b : to dwell permanently or continuously : occupy a place as one's legal domicile  2 : to be present as an element or quality  b : to reside as a right — **re·sid·er** n
**res·i·dence** \ˈre-zə-dən(t)s, ˈrez-dən(t)s\ n (14c)  1 a : the act or fact of dwelling in a place for some time  b : the act or fact of living or regularly staying at or in some place for the discharge of a duty or the enjoyment of a benefit  2 a (1) : the place where one actually lives as distinguished from one's domicile or a place of temporary sojourn  (2) : DOMICILE 2a  b : the place where a corporation is actually or officially established  c : the status of a legal resident  3 a : a building used as a home : DWELLING  b : housing or a unit of housing provided for students  4 a : the period or duration of abode in a place  b : a period of active and esp. full-time study, research, or teaching at a college or university — in residence : engaged to live and work at a particular place often for a specified time (poet in residence at a university)
**res·i·den·cy** \-dən-sē\ n, pl -cies (1694) : the duration of persistence of a mass or substance in a medium or place
**res·i·dent** \ˈre-zə-dənt(-)s, ˈrez-dən(t)s, ˈre-zə-ˌdent(s)\ adj [ME, fr. MF & L; MF, fr. L resident-, residens] (14c)  1 a : living in a place for some length of time : RESIDING  b : serving in a regular or full-time capacity (the ~ engineer for a highway department); also : being in residence 4  : PRESENT, INHERENT 3 : not migratory
**²resident** n (15c)  1 : one who resides in a place  2 : a diplomatic agent residing at a foreign court or seat of government; esp : one exercising authority in a protected state as representative of the protecting power  3 : a physician serving a residency
**resident commissioner** n (1902)  1 : a nonvoting representative of a dependency in the U.S. House of Representatives  2 : a resident administrator in a British colony or protectorate
**res·i·den·tial** \ˌre-zə-ˈden(t)-shəl\ adj (1654)  1 : used as a residence or by residents  b : providing living accommodations (~ neighborhoods (a ~ college)  2 : restricted to or occupied by residences — **res·i·den·tial·ly** \-ˈden(t)-shə-lē\ adv
**¹re·sid·u·al** \ri-ˈzi-jə-wəl, -jəl, -ˈzij-wəl, -ˈzi-jü-wəl\ [L residuum residual] (1557)  1 : REMAINDER, RESIDUE: as  a : the difference between results obtained by observation and by computation from a formula or between

the mean of several observations and any one of them  b : product or substance  c : an internal aftereffect of experience, activity that influences later behavior; esp : a disability remaining from disease or operation  2 : a payment (as to an actor or writer) for rerun after an initial showing (as of a TV show)
**²residual** adj (1570)  1 : of, relating to, or constituting a residue  : leaving a residue that remains effective for some time — **residually** adv
**residual oil** n (ca. 1948) : fuel oil that remains after the more valuable distillates (as gasoline) from petroleum and that is used by industry — called also resid
**residual power** n (1919) : power held to remain in the governmental authority after an enumeration or delegation of powers to other authorities
**re·sid·u·ary** \ri-ˈzij-ə-ˌwer-ē\ adj (1726) : of, relating to, or constituting a residue ⟨~ estate⟩
**res·i·due** \ˈre-zə-ˌdü, -ˌdyü\ n [ME, fr. MF residu, fr. L residuum, neut. of residuus left over, fr. residēre to remain] (14c)  1 : something that remains after a part is taken, separated, or designated : REMAINDER: as  a : the part of a testator's estate remaining after the satisfaction of all debts, charges, allowances, and previous devises and bequests  b : the remainder after subtracting a multiple of a prime number or a power of the integer that can appear at ones place  2 : the atoms, groups of atoms, or ions of two terms in a appropriate congruence (2 and 7 are residues of a usu. complex molecule (amino acid ~ from hydrolysis of proteins)  3 : the set of elements (as integers) that leaves the same remainder when divided by a given modulus
**re·sid·u·um** \ri-ˈzi-jə-wəm\ n, pl re·sid·ua \-ˌwə\ [L] (1670) : something left : RESIDUE: a : a residual product (as of distillation of petroleum)
**re·sign** \ri-ˈzīn\ vb [ME, fr. MF resigner, fr. L resignare, lit. to cancel, fr. re- + signare to sign, seal — more at SIGN] vt (14c)  1 : to give up deliberately; esp : to give (oneself) over without resistance to some influence  2 : to give up deliberately : to relinquish (a right, a position, or office) usu. formally  vi  1 : to give up one's office or position; esp : to give up an office or position as inevitable : SUBMIT
SEE RELINQUISH, ABDICATE — re·sign·ed·ly \-ˈzī-nəd-lē\ adv — re·sign·ed·ness \ri-ˈzī-nəd-nəs\ n — re·sign·er \-ˈzī-nər\ n
**re·sign** \(ˌ)rē-ˈsīn, -ˈzīn\ vt (1627) : to sign again
**res·ig·na·tion** \ˌre-zig-ˈnā-shən\ n (14c)  1 a : an act or instance of resigning something : SURRENDER  b : a formal notification of resigning  2 : the quality or state of being resigned : SUBMISSIVENESS  drawn, fr. L, to resign) (1529) : RECOIL, RETRACT; esp : to return to a prior position
**re·sil·ience** \ri-ˈzil-yən(t)s\ n (1824)  1 : the capability of a strained body to recover its size and shape after deformation caused esp. by compressive stress  2 : an ability to recover from or adjust easily to misfortune or change
**re·sil·ien·cy** \-yən(t)-sē\ n (ca. 1836) : RESILIENCE
**re·sil·ient** \-yənt\ adj [L resilient-, resiliens, prp. of resilire to rebound, recoil, fr. re- + salire to leap, jump — more at SALLY] (1674) characterized or marked by resilience: as  a : capable of withstanding shock without permanent deformation or rupture  b : tending to recover from or adjust easily to misfortune or change  **syn** see ELASTIC — **re·sil·ient·ly** adv
**res·in** \ˈre-zən\ n [ME, fr. MF resine, fr. L resina; akin to Gk rhētinē pine resin] (14c)  1 a : any of various solid or semisolid fusible flammable natural organic substances that are usu. transparent or translucent and yellowish to brown, are formed esp. in plant secretions, are soluble in organic solvents (as ether) but not in water, are electrical nonconductors, and are used chiefly in varnishes, inks, plastics, and sizes and in medicine  b : ROSIN  2 : any of a large class of synthetic products that have some of the physical properties of natural resins but are different chemically and are synthetic plastics  b : any various products made from a natural resin or a natural cellulose by chemical manipulation — **res·in·ous** \ˈrez-nəs, ˈre-zə-nəs\ adj
**²resin** vt res·ined; res·in·ing \ˈre-zə-niŋ, ˈrez-niŋ\ (1865) : to treat with resin
**res·in·oid** \ˈre-zə-ˌnȯid\ n  also adj -at·ed; -at·ing (ca. 1890) : to give flavor with resin
**res·in·ga·nal** n (1884) : a tubular intercellular space in a plant and some angiosperms that is lined with epithelial cells that secrete resin — called also resin duct
**res·in·oid** \ˈre-zə-ˌnȯid\ n (1880) : GUM RESIN
**re·sist** \ri-ˈzist\ vb [ME, fr. MF or L; MF resister, fr. L resistere, fr. re- + sistere to take a stand; akin to L stare to stand — more at STAND] vt (14c)  1 : to exert oneself in opposition ⟨~ arrest⟩  2 : to withstand the force or effect of : OPPOSE
**²resist** n (1836) : something (as a coating) that protects against chemical, electrical, or physical action
**re·sis·tance** \ri-ˈzis-tən(t)s\ n (14c)  1 : an act or instance of resisting : OPPOSITION  b : a means of resisting  2 : the ability of an organism to resist the effects of an antagonistic agent
**re·sis·tant** \-tənt\ adj (15c)  1 : giving or capable of resistance
**re·sist·er** \ri-ˈzis-tər\ n (14c)  1 : one that resists; esp : one who opposes the policies of a government
**re·sist·ible** \ri-ˈzis-tə-bəl\ adj (1600) : capable of being resisted
**re·sis·tive** \ri-ˈzis-tiv\ adj (1603) : marked by resistance
**re·sis·tiv·i·ty** \(ˌ)rē-ˌzis-ˈti-və-tē, ˌri-\ n, pl -ties (1885)  1 :

*(third column — heavily obscured)*

resistance of a uniform rod of ...
... the reciprocal of conductiv...
**re·sis·tor** \ri-ˈzis-tər\ n (1586)  1 : IRR
**re·sist·less·ly** adv — re·sist·le...
**re·sis·tor** \ri-ˈzis-tər\ n (1905)  : a device that is used in an electric circuit for pro ...
... sing : another sitting
... \ri-ˈzi-jə-ˌkāt-ə\ n [L, judge ... decided on its merits by a court ... subject to litigation again betwee ...
... firm determination : RESOLVED ...
... reso·lute·ly \-ˌlüt-lē, -lət-\ ...
... -lit-nəs, -ˌlət-, -lät-, ...
... a resolute person
... for in: an act of analyzin ...
... the passing of a voice part from a ...
... a progression of a chord from disso ...
... sing of a chemical compound or r ...
... the division of a prosodic elem ...
... substitution in Greek or Lat ...
... a long syllable  2 : the analysi ...
... of which it is the sum  b : the ...
... distinguishable the individual parts of ...
... images, or sources of light  2 : the ...
... of (as information)  3 : resol ...
... 1 : firmness ...
... 2 : firmnes ...
... 3 : the ...
... in one's life's work ...
... is worked out  **syn** see COU ...

**re·solve** \ri-ˈzälv\ n (1591) : something that ...
... is a legal or official determin ...

**1058    see-through • select**

**see-through** \'sē-ˌthrü\ *adj* (1945) : TRANSPARENT 1
**¹seg·ment** \'seg-mənt\ *n* [L *segmentum*, fr. *secare* to cut — more at SAW] (1570)  1 a : a separate piece of something : BIT, FRAGMENT ⟨chop the stalks into short ~s⟩  b : one of the constituent parts into which a body, entity, or quantity is divided or marked off by or as if by natural boundaries ⟨all ~s of the population agree⟩  2 a : a portion cut off from a geometric figure by one or more points, lines, or planes: as  a : the part of a circular arc bounded by a chord and an arc of that circle or so much of the area as is cut off by the chord  b : the part of a sphere cut off by a plane or included between two parallel planes  c : the finite part of a line between two points in the line  *syn* see PART
— seg·men·tary \-mən-ˌter-ē\ *adj*
**²seg·ment** \'seg-mənt\ *vt* (1859) : to separate into segments : give off as segments
**seg·men·tal** \seg-'men-tᵊl\ *adj* (1816)  1 a : of, relating to, or having the form of a segment and *esp.* the sector of a circle ⟨~ fanlight⟩  2 : of, relating to, or composed of somites or metameres : METAMERIC  3 a : divided into segments ⟨~ knowledge⟩  b : PARTIAL, INCOMPLETE  c : resulting from segmentation — seg·men·tal·ly \-tᵊl-ē\ *adv*
**seg·men·ta·tion** \ˌseg-mən-'tā-shən, -ˌmen-\ *n* (1851) : the process of dividing into segments; *esp* : the formation of many cells from a single cell (as in a developing egg)
**segmentation cavity** *n* (1888) : BLASTOCOEL
**seg·ment·ed** \'seg-ˌmen-təd, seg-'\ *adj* (1854) : divided into or composed of segments or sections ⟨~ worms⟩
**se·gno** \'sān-(ˌ)yō\ *n, pl* **segnos** [It, sign, fr. L *signum* — more at SIGN] (1908) : a notational sign; *specif* : the sign that marks the beginning or end of a musical repeat
**se·go lily** \ˌsē-gō-\ *n* [*sego* the bulb of the sego lily, fr. Southern Paiute *siyo'o*] (1913) : a mariposa lily (*Calochortus nuttallii*) of western No. America having mostly white or in some areas mostly yellow flowers mottled with a darker color
**seg·re·gant** \'se-gri-gənt\ *n* (1926) : a genetic segregate
**¹seg·re·gate** \'se-gri-ˌgāt\ *vb* -gat·ed; -gat·ing [L *segregatus*, pp. of *segregare*, fr. *se-* apart + *greg-, grex* herd — more at SECEDE] *vt* (1542)  1 : to separate or set apart from others or from the general mass : ISOLATE  2 : to cause or force the separation of (as from the rest of society) ~ *vi*  1 : SEPARATE, WITHDRAW  2 : to practice or enforce a policy of segregation  3 : to undergo genetic segregation —
**seg·re·ga·tive** \-ˌgā-tiv\ *adj*
**²seg·re·gate** \'se-gri-gət, -ˌgāt\ *n* (1871) : one that is in some respect segregated; *esp* : one that differs genetically from the parental line because of genetic segregation
**seg·re·gat·ed** *adj* (1652)  1 a : set apart or separated from others of the same kind or group ⟨~ account in a bank⟩  b : divided in facilities or administered separately for members of different groups or races ⟨~ education⟩  c : restricted to members of one group or one race by a policy of segregation ⟨~ schools⟩  2 : practicing or maintaining segregation *esp.* of races ⟨~ states⟩
**seg·re·ga·tion** \ˌse-gri-'gā-shən\ *n* (1555)  1 : the act or process of segregating : the state of being segregated  2 a : the separation or isolation of a race, class, or ethnic group by enforced or voluntary residence in a restricted area, by barriers to social intercourse, by separate educational facilities, or by other discriminatory means  b : the separation for special treatment or observation of individuals or items from a larger group ⟨~ of gifted children into accelerated classes⟩  3 : the separation of allelic genes that occurs typically during meiosis
**seg·re·ga·tion·ist** \-sh(ə-)nist\ *n* (1913) : a person who believes in or practices segregation *esp.* of races — **segregationist** *adj*
**¹se·gue** \'se(ˌ)gwā, 'sā-\ *vb imper* [It, there follows, fr. *seguire* to follow, fr. L *sequi* — more at SUE] (ca. 1740)  1 : proceed to what follows without pause — used as a direction in music  2 : perform the music that follows like that which has preceded — used as a direction in music
**²segue** *vi* **se·gued; se·gue·ing** (ca. 1913)  1 : to proceed without pause from one musical number or theme to another  2 : to make a transition without interruption from one activity, topic, scene, or part to another
**³segue** *n* (ca. 1937) : the act or an instance of seguing
**se·gui·dil·la** \ˌse-gə-'dē-yə, -'dēl-yə\ *n* [Sp, dim. of *seguida*, a dance, lit., sequence, fr. *seguido*, pp. of *seguir* to follow, fr. L *sequi*] (1763)  1 a : a Spanish dance with many regional variations  b : the music for such a dance  2 : a Spanish stanza of four or seven short partly assonant verses
**se·ce·no** \sə-'chen-(ˌ)hō\ *n* [It, lit., six-hundred, fr. *sei* six (fr. L *sex*) + *cento* hundred — more at SIX, CINQUECENTO] (ca. 1902) : the 17th century; *specif* : the 17th century period in Italian literature and art
**seiche** \'sāsh, 'sēsh\ *n* [F] (ca. 1839) : an oscillation of the surface of a landlocked body of water (as a lake) that varies in period from a few minutes to several hours
**sei·del** \'sī-dᵊl, 'zī-\ *n* [G, fr. MHG *sīdel*, fr. L *situla* bucket] (1908) : a large glass for beer
**Seid·litz powders** \'sed-ləts-\ *n pl* [*Sedlitz*, Sedlčany), village in Bohemia; fr. the similarity of their effect to that of the water of the village] (1815) : effervescing salts consisting of one powder of sodium bicarbonate and Rochelle salt and another of tartaric acid that are mixed in water and drunk as a mild cathartic
**se·gnieur** \sēn-'yər, sān-\ *n, often cap* [MF, fr. ML *senior*, fr. L adj., elder — more at SENIOR] (1592)  1 : a man of rank or authority; *esp* : the feudal lord of a manor  2 : a member of the landed gentry of Canada
**sei·gneur·ial** \-'yür-ē-əl, -'yər-\ *adj* (1650) : of, relating to, or befitting a seigneur
**sei·gneu·ry** \sān-'yə-rē\ *n, pl* -neur·ies (1683)  1 a : the territory under the government of a feudal lord  b : a landed estate held in Canada by feudal tenure until 1854  2 : the manor house of a Canadian seigneur
**sei·gnior** \'sān-ˌyór, 'sān-\ *n* [ME *seigniour*, fr. MF *seigneur*] (15c) : SEIGNEUR 1
**sei·gnior·age** *or* **sei·gnor·age** \'sān-yə-rij\ *n* [ME *seigneurage*, fr. MF,

right of the lord (esp. to coin money), fr. *seigneur*] (15c) : a government revenue from the manufacture of coins calculated as the difference between the face value and the metal value of the coins
**sei·gnio·ry** *or* **sei·gno·ry** \'sān-yə-rē\ *n, pl* -gnior·ies *or* -gno·ries (14c)  1 : LORDSHIP, DOMINION; *specif* : the power or authority of a feudal lord  2 : the territory over which a lord holds jurisdiction — **sei·gno·ri·al** \sān-'yōr-ē-əl, -'yór-\ *adj* (18c) : of, relating to, or befitting a seignior : MANORIAL
**¹seine** \'sān\ *n* [ME, fr. OE *segne*, fr. L *sagena*, fr. Gk *sagēnē*] (14c) : a large net with sinkers on one edge and floats on the other so it hangs vertically in the water and is used to enclose fish when its ends are pulled together or are drawn ashore
**²seine** *vi* **seined; sein·ing** *vi* (1836) : to fish with a seine ~ *vt* : to fish for or in with a seine — **sein·er** *n*
**sein·er** \'sā-nər\ *n* (1602)  1 : one who fishes with a seine
**seis·in** *or* **sei·sin** \'sē-zᵊn\ *n* [ME *seisine*, fr. OF *saisine*, fr. *saisir* — more at SEIZE] (14c)  1 : the possession of land or chattels  2 : possession of a freehold estate in land by one having title thereto
**seis·mic** \'sīz-mik, 'sīs-\ *adj* [Gk *seismos* shock, earthquake, fr. *seiein* to shake; prob. akin to *tviadshō* fear] (1858)  1 : of, subject to, or caused by an earthquake; also : of or relating to an earth tremor caused by something else (as an explosion or the impact of a great mass)  2 : of or relating to a vibration on the earth's surface comparable to a seismic event on earth  3 : having a strong or widespread impact : EARTHSHAKING ⟨~ social changes⟩ — **seis·mi·cal·ly** \-mi-k(ə-)lē\ *adv*
**seis·mic·i·ty** \sīz-'mi-sə-tē, sīs-\ *n* (1902) : the relative frequency and distribution of earthquakes
**seismo-** *comb form* [Gk, fr. *seismos*] : earthquake : vibration ⟨*seismometer*⟩
**seis·mo·gram** \'sīz-mə-ˌgram, 'sīs-\ *n* [ISV] (ca. 1891) : the record of an earth tremor by a seismograph
**seis·mo·graph** \-ˌgraf\ *n* [ISV] (1858) : an apparatus to measure and record vibrations within the earth and of the ground — **seis·mog·ra·pher** \sīz-'mä-grə-fər, sīs-\ *n* — **seis·mo·graph·ic** \ˌsīz-mə-'gra-fik\ *adj* — **seis·mog·ra·phy** \sīz-'mä-grə-fē, sīs-\ *n*
**seis·mol·o·gy** \sīz-'mä-lə-jē, sīs-\ *n* [ISV] (1858) : a science dealing with earthquakes and with artificially produced vibrations of the earth — **seis·mo·log·i·cal** \ˌsīz-mə-'lä-ji-kəl, sīs-\ *adj* — **seis·mo·log·i·cal·ly** \-k(ə-)lē\ *adv* — **seis·mol·o·gist** \sīz-'mä-lə-jist, sīs-\ *n*
**seis·mom·e·ter** \sīz-'mä-mə-tər, sīs-\ *n* (1841) : a seismograph measuring the actual movements of the ground (as on the earth or the moon) — **seis·mo·met·ric** \ˌsīz-mə-'me-trik, sīs-\ *adj*
**seis·mom·e·try** \sīz-'mä-mə-trē, sīs-\ *n* [ISV] (1858) : the study of earthquakes
**sei whale** \'sī-, 'sā-\ *n* [part trans. of Norw *seihval*, fr. *sei* + *hval* whale] (1912) : a common and widely distributed dark gray rorqual (*Balaenoptera borealis*) that has a ridge on the top of the head and grows to a length of nearly 60 feet (18 meters) — called also *sei*
**¹seize** \'sēz\ *vb* **seized; seiz·ing** [ME *saisen*, fr. OF *saisir*, fr. ML *sacire*, of Gmc origin; perh. akin to OE *settan* to set — more at SET] *vt* (14c)  1 a : one *seize* \'sēz\ : to vest ownership of a freehold estate in  b : *often* **seise** : to put in possession of something  2 a : to take possession of : CONFISCATE  b : to take possession by force ⟨*seized* all the cotton⟩  process  3 a : to possess or take by force : CAPTURE  b : to grab ⟨ONE : ARREST  4 a : to take hold of : CLUTCH  b : to possess or take hold of ⟨ORASP  c : to understand fully and distinctly : APPREHEND  c : to attack or overwhelm physically : AFFLICT ⟨suddenly *seized* by an acute illness — H. G. Armstrong⟩  b : to possess (as one's mind) completely or overwhelmingly ⟨*seized* the popular imagination — H. G. Armstrong⟩  6 : to bind at certain points together with a lashing of fine line ~ *vi*  1 : to take or lay hold of : grasp or forcibly  2 a : to cohere to a relatively moving part through excessive pressure, temperature, or friction — used *esp.* of machine bearings, brakes, or pistons)  b : to fail to operate due to friction  — a part — used of an engine  *syn* see TAKE — **seiz·er** *n*
**²seize** *n* (14c)  1 a : the cord or lashing used in binding  b : the fastening so made — see KNOT illustration  2 : binding or fastening together or binding with barred small stuff
**sei·zure** \'sē-zhər\ *n* (15c)  1 a : the act, action, or process of seizing  b : the state of being seized  c : the taking possession of person or property by legal process  2 : a sudden attack (as of disease): ONSET
**se·jant** \'sē-jənt\ *adj* [modif. of MF *seant*, prp. of *seoir* to sit : *sedere* — more at SIT] (ca. 1500) : SITTING — used of a heraldic animal
**sel** \'sel\ *chiefly Scot var of* SELF
**se·la·chi·an** \sə-'lā-kē-ən\ *n* [ultim. fr. Gk *selachos* cartilaginous fish] (1835) : any of a subclass (Selachii) or a less comprehensively defined group (Selachii) of cartilaginous fishes that include the elasmobranchs or all elasmobranchs except the chimaeras; sharks and rays or in its most restricted use the existing sharks and rays distinguished from the rays — **selachian** *adj*
**se·lag·i·nel·la** \sə-ˌla-jə-'ne-lə\ *n* [NL, fr. L *selago*, a plant resembling the savin] (1835) : any of a genus (Selaginella) of lower. trachaeophytes that are related to or grouped with mosses and have branching stems and scalelike leaves with one-celled sporangia containing both megaspores and microspores
**se·lah** \'sē-lə, -ˌlä\ *interj* [Heb *selāh*] (1530) — a term of uncertain meaning found in the Hebrew text of the Psalms and Habakkuk and usu. translated into some English version
**sel·couth** \'sel-ˌküth\ *adj* [ME *selcouth*, fr. OE *seldcūth*, fr. *seldan* seldom + *cūth* known — more at UNCOUTH] (bef. 12c) *archaic* : STRANGE
**sel·dom** \'sel-dəm\ *adv* [ME, fr. OE *seldan*; akin to OHG *seltan* seldom] (bef. 12c) : in few instances : RARELY, INFREQUENTLY
**²seldom** *adj* (12c) : RARE, INFREQUENT
**¹se·lect** \sə-'lekt\ *adj* [L *selectus*, pp. of *seligere* to select, fr. *se-* apart + *legere* to gather, select — more at LEGEND] (1565)  1 a : chosen from a number or group by fitness or preference  b : of special value or excellence : SUPERIOR, CHOICE  2 : judiciously chosen often with regard to social, economic, or other characteristics  3 : judicious or restrictive in choice : DISCRIMINATING

# 1116   sodium azide ● softshell

in nature in combined form and is very active chemically — see ELE-
MENT table
**sodium azide** n (ca. 1937) : a poisonous crystalline salt $NaN_3$ used
esp. to make lead azide
**sodium benzoate** n (ca. 1900) : a crystalline or granular salt
$C_7H_5O_2Na$ used chiefly as a food preservative
**sodium bicarbonate** n (1885) : a white crystalline weakly alkaline salt
$NaHCO_3$ used esp. in baking powders, fire extinguishers, and medicine
— called also *baking soda*, *bicarbonate of soda*
**sodium bo-ro-hy-dride** \-ˈbȯr-ō-ˈhī-drīd, -bȯr-\ n [*sodium* + *boron*
+ *hydride*] (1946) : a crystalline compound $NaBH_4$ used in various
industrial applications and as a reducing agent in organic chemistry
**sodium carbonate** n (1868) : a sodium salt of carbonic acid used esp.
in making soaps and chemicals, in water softening, in cleaning and
bleaching, and in photography: as a : a hygroscopic crystalline anhy-
drous strongly alkaline salt $Na_2CO_3$ b : WASHING SODA
**sodium chlorate** n (1885) : a colorless crystalline salt $NaClO_3$ used
esp. as an oxidizing agent and weed killer
**sodium chloride** n (1868) : an ionic crystalline chemical compound
consisting of equal numbers of sodium and chlorine atoms : SALT 1a
**sodium citrate** n (1919) : a crystalline salt $Na_3C_6H_5O_7$ used chiefly as
a buffering agent, as an emulsifier, as an alkalizer and cathartic in phar-
maceuticals, and as a blood anticoagulant
**sodium cyanide** n (1885) : a white deliquescent poisonous salt NaCN
used esp. in electroplating, in fumigating, and in treating steel
**sodium dichromate** n (ca. 1903) : a red crystalline salt $Na_2Cr_2O_7$ used
esp. in tanning leather, in cleaning metals, and as an oxidizing agent
**sodium fluoride** n (ca. 1903) : a poisonous crystalline salt NaF that is
used in trace amounts in the fluoridation of water, in metallurgy, as a
flux, and as a pesticide
**sodium fluo-ro-ac-e-tate** \-ˌflu̇r-ō-ˈa-sə-ˌtāt, -ˌflȯr-, -ˈflōr-\ n (1945) : a
poisonous powdery compound $C_2H_2FNaO_2$ — compare 1080
**sodium hydroxide** n (1885) : a white brittle solid NaOH that is a
strong caustic base used esp. in making soap, rayon, and paper
**sodium hypochlorite** n (1885) : an unstable salt NaOCl produced
usu. in aqueous solution and used as a bleaching and disinfecting agent
**sodium metasilicate** n (1890) \-ˌme-tə-ˈsi-lə-ˌkāt, -ˈsi-li-kət\ n (ca. 1926) : a
toxic corrosive crystalline salt $Na_2SiO_3$ used esp. as a detergent or as a
substitute for phosphates in detergent formulations
**sodium nitrate** n (1885) : a deliquescent crystalline salt $NaNO_3$ used
as a fertilizer and an oxidizing agent and in curing meat
**sodium nitrite** n (ca. 1903) : a salt $NaNO_2$ used esp. in dye manufac-
ture and as a meat preservative
**sodium pump** n (1951) : a molecular mechanism by which sodium
ions are actively transported across a cell membrane; esp : the one by
which the appropriate internal and external concentrations of sodium
and potassium ions are maintained in a nerve fiber and which involves
the active transport of sodium ions outward with movement of potas-
sium ions to the interior
**sodium salicylate** n (ca. 1904) : a crystalline salt $NaC_7H_5O_3$ that has
a sweetish saline taste and is used chiefly as an analgesic, antipyretic,
and antirheumatic
**sodium sulfate** n (1885) : a bitter salt $Na_2SO_4$ used esp. in detergents,
in the manufacture of wood pulp and rayon, in dyeing and finishing
textiles, and in its hydrated form as a cathartic — compare GLAUBER'S
SALT
**sodium thiosulfate** n (1885) : a hygroscopic crystalline salt $Na_2S_2O_3$
used esp. as a photographic fixing agent and a reducing or bleaching
agent — called also *hypo*
**sodium tri-poly-phos-phate** \-ˌtrī-ˌpä-li-ˈfäs-ˌfāt\ n (1945) : a crystal-
line salt $Na_5P_3O_{10}$ that is used as a food additive and as a component in
some detergents and is suspected of contributing to water pollution
**sodium–vapor lamp** n (1936) : an electric lamp that contains sodium
vapor and electrodes between which a luminous discharge takes place
and that is used esp. for lighting highways
**sod off** vi [*sod*] (1960) *Brit* : SCRAM — usu. used as a command
**Sod-om** \ˈsä-dəm\ n [*Sodom*, ancient city destroyed by God for its
wickedness in Gen 19] (1598) : a place notorious for vice or corruption
**sod-om-ist** \ˈsä-də-mist\ n (1893) : SODOMITE
**sod-om-ite** \-ˌmīt, n (1ɔ4) : one who practices sodomy
**sod-om-ize** \-ˌmīz\ vt -ized; -iz-ing (1868) : to perform sodomy on
**sod-omy** \ˈsä-də-mē\ n [ME, fr. OF *sodomie*, fr. LL *Sodoma* Sodom; fr.
the homosexual proclivities of the men of the city in Gen 19:1–11] (13c)
1 : copulation with a member of the same sex or with an animal 2
: noncoital anal, oral or anal copulation with a member of the op-
posite sex — sod-om-it-ic \ˌsä-də-ˈmi-tik\ or sod-om-it-i-cal \-ti-kəl\
*adj*
**so·ev·er** \sō-ˈe-vər\ *adv* [-soever (as in *howsoever*)] (12c) 1 : to any
possible or known extent — used after an adjective preceded by *how* or
a superlative preceded by the *how* fair — she may be 2 (the most selfish
~ in this world) 2 : of any or every kind that may be specified —
used after a noun modified esp. by *any*, *no*, or *what* (gives no informa-
tion ~)
**so-fa** \ˈsō-fə\ n [Ar *suffah* long bench] (1717) : a long upholstered seat
usu. with arms and a back and often convertible into a bed
**sofa bed** n (1816) : a sofa that can be made to serve as a bed by lower-
ing its hinged upholstered back to horizontal position or by pulling out
a concealed mattress
**so-far** \ˈsō-ˌfär\ n [*sound fixing and ranging*] (1946) : a system for lo-
cating an underwater explosion at sea by triangulation based on the
reception of the sound by three widely separated stations
**so far as** *conj* (1565) : INSOFAR AS
**sof-fit** \ˈsä-fət\ n [It *soffitta*, fr. It *soffitto*, fr. (assumed) VL *suffictus*, pp.
of L *suffigere* to fasten underneath — more at SUFFIX] (1592) : the
underside of a part or member of a building (as of an overhang or stair-
case); *esp* : the intrados of an arch
**so-fi** \ˈsō-fē\ n [Ar *sufi*] [ME, fr. OE *sǣfte*, akin to OHG *semfti*
soft] (bef. 12c) 1 a : pleasing or agreeable to the senses : bringing
ease, comfort, or quiet (the ~ influences of home) b : having a bland
or mellow rather than a sharp or acid taste c (1) : not bright or glar-
ing : SUBDUED (2) : having or producing little contrast or a relatively
short range of tones (a ~ photographic print) d : quiet in pitch or
volume e *of the eyes* : having a liquid or gentle appearance f
: smooth or delicate in texture, grain, or fiber (~ cashmere) (~ fur) g

(1) : balmy, mild, or clement in weather or temperature (2) :
or falling with slight force or impact : not violent (~ b...
: demanding little work or effort : EASY (a ~ job) 3 a :
in ice and zen respectively — used of *c* and *g* or their soun...
*consonant* : VOICED c : constituting a vowel before which th...
sound or a \y\-like modification of a consonant or contain...
sonant in whose articulation there is a \y\-like modification...
followed by a \y\ sound (as in Russian) 4 *archaic* : mov...
surely manner 5 : rising gradually (a ~ slope) 6 : having...
rounded outline : not harsh or jagged (~ hills against the b...
: marked by a gentleness, kindness, or tenderness: as a :
harsh or onerous in character (a policy of ~ competition)
on negotiation, conciliation, or flexibility rather than on for...
or intransigence (took a ~ line during the crisis) (3) : tend...
a soft line — usu. used with *on* or *dictators*) (~ on law...
b : tending to ingratiate or disarm : ENGAGING, KIND (a ~
turns away wrath — Prov 15:1 (RSV)) c : marked by mil...
ASSUMING, LOW-KEY 8 a : emotionally suggestible or resp...
PRESSIONABLE b : unduly susceptible to influence : (
: lacking firmness or strength of character : FEEBLE, UNMANL...
orously attracted or emotionally involved — used with *on* (s...
on her for years) 9 a : lacking robust strength, stamina, o...
ance esp. because of living in ease or luxury (grown ~ and i...
: weak or deficient mentally (~ in the head) 10 a : yieldi...
ical pressure b : requiring someone or something to sink...
of wet ground c (1) : of a consistency that may be shaped...
(2) : capable of being spread : easily magnetized and dem...
e : lacking relatively or comparatively in hardness (~ iron)...
cient in or free from substances (as calcium and magnesium)
prevent lathering of soap (~ water) 12 : having relatively...
(~ X rays) 13 *of news* : relatively less serious or significant...
curring at such a speed and under such circumstances as to...
structive impact (~ landing of a spacecraft on the moon)...
protected against enemy attack (a ~ aboveground launch...
targets) 16 : BIODEGRADABLE (a ~ detergent) (~ pesticide...
*drug* : considered less detrimental than a hard narcotic : n...
polarized — used of acids and bases 19 : of *currency* : ...
convertible b *of a loan* : not secured by collateral 20 a : ...
due to sluggish market conditions (~ prices) b : SLUGGISH, ...
market) 21 : not firmly committed (~ unreliable politic...
22 : SOFT-CORE (~ porn) 23 a : being or based on interm...
speculative data (~ evidence) b : utilizing or based on sof...
science) 24 : being of using renewable sources of energy...
radiation, wind, or tides) (~ technologies) — soft-ish \...
— soft-ly \ˈsȯf(t)-lē\ *adv* — soft-ness \ˈsȯf(t)-nəs\ n
**soft** *adv* (bef. 12c) : in a soft or gentle manner : SOFTLY
**soft** n (15c) : a soft object, material, or part (the ~ of the thu...
**soft-ball** \ˈsȯf(t)-ˌbȯl\ n (1926) 1 : a game resembling baseball ...
**soft-ball** \-ˌbȯl\ n (1926) : baseball played on a small diamon...
ball that is larger than a baseball and that is pitched underh...
: the ball used in this game — **soft-ball-er** \-ˌbȯ-lər\, n
**soft–boiled** \ˈsȯf(t)-ˈbȯi(-ə)ld\ *adj* (ca. 1902) 1 *of an egg* : boil...
consistency 2 : SENTIMENTAL
**soft–bound** \-ˈbau̇nd\ *adj* (1971) : SOFTCOVER
**soft–core** \-ˈkȯr\ *adj* (1859) : CHANCOOD
**soft coal** n (1789) : BITUMINOUS COAL
**soft–coated wheaten terrier** n (1948) : any of a breed...
medium-sized terriers developed in Ireland and having a...
light fawn coat
**soft–core** \ˈsȯf(t)-ˈkȯr, -ˈkȯr\ *adj* (1952) : bound in flexible cov...
in hard covers; *specif* : PAPERBACK (~ books) — **softcover** ...
**soft drink** n (1880) : a usu. carbonated nonalcoholic b...
: SODA POP
**soft-en** \ˈsȯf(t)-ən\ vb **soft-ened; soft-en-ing** \ˈsȯf(t)-ən-, -ə-n...
(14c) 1 : to make soft or softer 2 a : to weaken the ...
tance or the morale of esp. by harassment (as preliminary to...
ment) — often used with *up* b : to impair the strength or r...
— often used with *up* (~ up a sales prospect) ~ *vi* : to bec...
softer — **soft-en-er** \ˈsȯf-nər, -ˈfə-nər\ n
**soft–fo-cus** \ˈsȯf(t)-ˈfō-kəs\ *adj* (1916) 1 *of a photogr...
: having unsharp outlines 2 *of a lens* : producing an i...
unsharp outlines
**soft goods** n pl (1894) : goods that are not durable —
textile products
**soft hall** n (1894) : GRAUPEL
**soft-head-ed** \ˈsȯf(t)-ˈhe-dəd\ *adj* (1925) 1 : silly or feebleminded...
**soft-head-ed** \-ˈhe-dəd\ *adj* (1667) : having or indicatin...
unrealistic, or uncritical mind — **soft-head-ed-ly** *adv* —
ed-ness n
**soft-heart-ed** \ˈsȯf(t)-ˈhär-təd\ *adj* (1593) : emotionally respo...
THETIC — **soft-heart-ed-ly** *adv* — **soft-heart-ed-ness** n
**soft–land** \-ˈland\ vb [*back-formation fr. soft landing*] (...
cause to make a soft landing on a celestial body (as the m...
: to make a soft landing — **soft–lander** n
**soft–line** \-ˈlīn\ *adj* (1949) 1 : advocating or involving a
flexible course of action — **soft–lin-er** \-ˌlī-nər\ n
**soft palate** n (ca. 1811) : the fold at the back of the hard...
partially separates the mouth and pharynx
**soft–pedal** \ˈsȯf(t)-ˈpe-dəl\ vt (1925) 1 : PLAY DOWN...
the issue) 2 : to use the soft pedal in playing
**soft pedal** n (1814) 1 : a foot pedal on a piano that sof...
une of sound 2 : something that muffles, deadens, or r...
**soft rock** n (1967) : rock music that is less driving and...
ing than hard rock
**soft rot** n (1901) : a mushy, watery, or slimy decay of pl...
parts caused by bacteria or fungi
**soft sell** n (1954) : the use of suggestion or gentle persu...
rather than aggressive pressure — compare HARD SELL
**soft-shell** \ˈsȯf(t)-ˌshel\ n (1771) : any of a family (...
aquatic turtles that have sharp claws and mandibles ...

with soft leathery skin
with horny plates —
*so-soft-shelled turtle*
**soft** \ˈsȯf(t)-ˌshel\ *or* **soft-
shell crab** *adj* (1823)
as soft or fragile shell esp.
as of recent shedding (~...
**off-chan** n (1796) : an
coat of No. America
within friable shell and
tish and is used esp. for
— called also *soft-...
**soft-shell** \ˈsȯf(t)-ˌshel\ (1920)
tending to top dancing
isoled shoes without metal taps
**sol-soap** \ˈsȯf(t)-ˌsōp\ vt (1840) : to soothe...
(p.in (1634) 1 : a semifluid soap m...
n 2 : FLATTERY
**soft** \ˈsȯf(t)-\ *adj* (1609) : havin...
(1845) 1 : a sentimental weaken...
itable point (a *soft spot* in the defen...
fill (1939) : one who is easily impos...
**soft-ware** \-ˌwer\ n (1960) : som...
iterial contrasted with hardware: as...
ocedures, and related documentati...
i a computer system; *specif* : somet...
us with individual equipment
(1812) : a wheat with soft straw
thern
**soft-wood** \-ˌwu̇d\ n (1832) 1 : the woo...
sed whether hard or soft as disting...
rine tree 2 : a tree that yields softwo...
lf (1905) : having or made of soft
**soft** *or* finish 2 : SOFTWOOD
**soft-y** *or* **soft-ie** \ˈsȯf(t)-ē\ n, *pl* **softies** [1957...
rson 2 : a softhearted or sentimen...
**sog** \ˈsäg\ vb **sogged; sog-ging** ...
h lang of the Sogdiana —
**thine** — Sogdian *adj*
**so-gg** \ˈsä-gē\ *adj* **sog-gi-er; -est** [E di...
eter heavy with water or moisture
...lawn) b : heavy or doughy bec...
12 : heavily dull : SPIRITLESS (~ ...
ma 2 : sog-gi-ness \ˈsä-gē-nəs, ˈsȯ-...
As-wä-\ *or* **so-kah** \ˈsō-kə\ ...
...LLED (three ~ adj [Fr, lit., saint...
...ELL-GROOMED, SLEEK 2 : clegg...
...restaurant) (~ black dress)
...MU b (Fr. OF *souiller* to wa...
...rob. fr. L *solium* chair, bathtub; al...
...theme — Sogdian *adj*
...solchean esp. superficially : DIRT...
...person's reputation) by word or...

: SOILAGE, STAIN (prote...
...oilement : CORRUPTION 2 : somet...
...soil, fr. L *solium*, fr. L *solium* cha...
...l : the upper layer of earth that
...ich plants grow b : the superficial
...e part of the mantle of a planet (as t...
...LAND (our native ~) 4 : a the agric...
...on which something takes hold and
...ter unknown) (1605) 1 : to feed (live
...fresh grass or green food) *also*
...oil-bound fed from green food *also*
...oil-i-\ n [*soil*] (1926) : the act of s...

...oil (1928) : acreage set aside for som...
...(1955) : acreage retired from crop
...indling plants under a plan sponso
...provides subsidies to farmers for the
...: \ˈsȯil-ˌbȯrn, -ˌbȯrn\ *adj* (1944) : li
...c diseases)
...\ˈbȯi-lər\ *adj* (1938) : having, con...
...machine)
...(1835) : a pipe for carrying off wast...
...(1915) : a science dealing with s
...l scientist n
...(1903) 1 : a group of soils with si...
...parent materials under comparal
...(1955) : a plant of the genus s
...(1934) : a nocturnal resident
...—, during —, fr. L *diurnum* day —
...journ as a temporary resident : STOP
...journer n



DfW

PTO/SB/21 (02-04)
Approved for use through 07/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## TRANSMITTAL FORM

*(to be used for all correspondence after initial filing)*

| | |
|---|---|
| Application Number | 10/902,257 |
| Filing Date | July 30, 2004 |
| First Named Inventor | Douglas J. HOHLBEIN |
| Art Unit | 3731 |
| Examiner Name | M. SPISCH |
| Attorney Docket Number | 6989-01 |

Total Number of Pages in This Submission

### ENCLOSURES (check all that apply)

| | | |
|---|---|---|
| ☐ Fee Transmittal Form | ☐ Drawing(s) | ☐ After Allowance Communication to Group |
| ☐ Fee Attached | ☐ Licensing-related Papers | ☐ Appeal Communication to Board of Appeals and Interferences |
| ☒ Amendment / Reply | ☐ Petition (See attached IDS) | ☐ Appeal Communication to Group (Appeal Notice, Brief, Reply Brief) |
| ☐ After Final | ☐ Petition to Convert to a Provisional Application | ☐ Proprietary Information |
| ☐ Affidavits/declaration(s) | ☒ Change of Correspondence Address | ☐ Status Letter |
| ☐ Extension of Time Request | ☐ Terminal Disclaimer | ☐ Other Enclosure(s) *(please identify below):* |
| ☐ Express Abandonment Request | ☐ Request for Refund | |
| ☐ Information Disclosure Statement | ☐ CD, Number of CD(s) _____ | |
| ☐ Certified Copy of Priority Document(s) | Remarks | |
| ☐ Response to Missing Parts/ Incomplete Application | | |
| ☐ Response to Missing Parts under 37 CFR 1.52 or 1.53 | | |

### SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT

| Firm or Individual name | Darrell G. Mottley, Reg. No. 42, 912 |
|---|---|
| Signature | *Darrell G. Mottley* |
| Date | November 15, 2005 |

### CERTIFICATE OF TRANSMISSION/MAILING

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date shown below.

| Typed or printed name | |
|---|---|
| Signature | Date |

This collection of information is required by 37 CFR 1.5. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*



### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | Atty. Docket No.:  6989-01 |
| **Douglas J. Hohlbein** | |
| Serial No.:  10/902,257 | Group Art Unit:  3731 |
| Filed:     July 30, 2004 | Examiner:     Mark Spisich |
| For:     Oral Care Implement | Confirmation No.:  1397 |

### AMENDMENT

U.S. Patent and Trademark Office
220 20th Street S.
Customer Window
Crystal Plaza Two, Lobby, Room 1B03
Arlington, VA  22202

Sir:

This paper is responsive to the non final Office Action mailed August 15, 2005, please amend the instant application as follows:

**Amendments to the Claims** are reflected in the Listing of Claims, which begins on page 2 of this paper.

**Remarks/Arguments** begin on page 9 of this paper.

App. No. 10/902,257

**Listing of Claims:**

1. (Currently Amended)        An oral care implement comprising:

a base with a gripping region and an oral engaging region, the base having an aperture extending therethrough; and

a gripping member at least partially overlying the gripping region of the base and having a grip surface provided with at least one opening exposing a portion of the base; and

a resilient grip body in the gripping region and extending through the aperture, the gripping member having a different durometer characteristic than the resilient grip body.

2. (Currently Amended)        The oral care implement according to claim 1, in which the gripping member and the grip body comprises an elastomeric material.

3. (Currently Amended)        The oral care implement according to claim 2, in which the at least one opening exposed exposing a portion of the base are is recessed in the grip surface to define a cavity in the opening.

4. (Currently Amended)        The oral care implement according to claim 3, in which the base further includes at least one projection which has an outer surface, and the exposed portion of the base in the least one opening is being the outer surface of the projection.

5. (Currently Amended)        The oral care implement according to claim 2 wherein the at least one opening further comprises a plurality of the openings are provided in the grip surface gripping member.

6. (Currently Amended)        The oral care implement according to claim 5, in which the grip surface gripping member further includes a concaved region disposed between each pair of adjacent openings.

7. (Original)    The oral care implement according to claim 6, in which the base further includes a plurality of projections and a base surface extending between the projections, wherein the base

App. No. 10/902,257

surface between each adjacent pair of said projections has a groove disposed between the projections, and wherein the groove is disposed below the concaved regions.

8. (Original)   The oral care implement of claim 5, in which the openings are elongate, transverse slots.

9. (Original)   The oral care implement according to claim 8, in which the slots have varying lengths along a longitudinal direction of the gripping region.

10. (Currently Amended)    The oral care implement according to claim 5 wherein the base includes an aperture, and a resilient grip body is fixed in the aperture to define tactile finger gripping surfaces on opposite sides of the base.

11. (Currently Amended)    The oral care implement according to claim 10, in which the openings in the gripping member with exposed portions of the base are recessed in the grip surface.

12. (Currently Amended)    The oral care implement according to claim 11, in which the gripping region of the base includes a rear segment and a front segment that is inclined relative to the rear segment, the rear segment including the gripping member.

13. (Original) The oral care implement according to claim 12 wherein the aperture is formed in the front segment.

14. (Currently Amended) The oral care implement according to claim 2 further including an independent, resilient wherein the grip body is surrounded by the gripping member on one side of the aperture extending through the base.

15. (Currently Amended)    The oral care implement according to claim 1 14, in which the grip body is of a softer material than said gripping member.

JA00591

App. No. 10/902,257

16. (Original) The oral care implement according to claim 15 wherein the aperture and grip body received therein has a width at its largest dimension which is more than one half of the width of the base at the same location.

17. (Currently Amended)    The oral care implement according to claim 16 ~~1~~ wherein the at least one opening further comprises a plurality of ~~the~~ openings ~~are provided~~ in the ~~grip surface~~ gripping member.

18. (Currently Amended)    The oral care implement according to claim 17, in which the exposed portions of the base in the gripping member are recessed ~~in the grip surface~~.

19. (Currently Amended)    The oral care implement according to claim 1, wherein the ~~base includes an aperture, and a~~ resilient grip body is fixed in the aperture to define _tactile_ finger gripping surfaces on opposite sides of the base.

20. (Original) The oral care implement according to claim 19 wherein the aperture and grip body received therein has a width at its largest dimension which is more than one half of the width of the base at the same location.

21. (Currently Amended)    The oral care implement according to claim 1, in which the ~~handle~~ base includes first and second sections and an intermediate section that connects the first and second sections, wherein the intermediate section is narrower than the first and second sections.

22. (Original) The oral care implement according to claim 21, in which the first section is inclined relative to the second section.

23. (Currently Amended)    The oral care implement according to claim 1, in which the exposed portion of the base is recessed in the ~~grip surface~~ gripping member to define a cavity in the opening.

JA00592

App. No. 10/902,257

24. (Currently Amended)    The oral care implement according to claim 1, in which the gripping member is composed of a softer material than the base and the grip body is composed of a softer material than the gripping member.

25. (Currently Amended)    The oral care implement according to claim 24, in which the at least one opening includes a plurality of openings exposed exposing base portions that are recessed relative to the gripping member grip surface.

26. (Original) The oral care implement according to claim 1, in which the oral engaging region includes teeth cleaning elements.

27. (Currently Amended)    An oral care implement comprising:

        a base with a gripping region and an oral engaging region, the gripping region including a rear segment and a front segment inclined relative to the rear segment; wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion;

        a resilient grip surface being disposed on the rear segment; and

        a grip body extending through an aperture in the base and spaced from the grip surface, the grip body forming opposite finger gripping surfaces on the inclined portion of the base.

28. (Original) The oral care implement according to claim 27, in which the grip body comprises an elastomeric material.

29. (Original) The oral care implement according to claim 27, in which the grip body is configured to counterbalance forces acting on the handle.

30. (Original) The oral care implement according to claim 27, in which the grip body has a hardness of about 8-24 Shore A.

Page 5 of 14

App. No. 10/902,257

31. (Currently Amended)    The oral care implement according to claim 30, ~~in which the handle further includes a resilient grip surface on the base,~~ wherein the resilient grip surface has a hardness of about 13-50 Shore A.

32. (Currently Amended) The oral care implement according to claim 27 wherein <u>the grip body is spaced from the grip surface by a portion of the base</u> ~~front segment is inclined to the rear segment at about 5-40 degrees.~~

33. (Original) The oral care implement according to claim 27 wherein the aperture and grip body received therein has a width at its largest dimension which is more than one half of the width of the base at the same location.

34. (Original) The oral care implement according to claim 27 wherein each said finger gripping surface includes a plurality of projections.

35. (Original)  An oral care implement comprising:

a base with gripping region and an oral engaging region, the gripping region including an aperture extending through the base; and

a resilient grip body disposed in the aperture and extending through the base to define finger gripping surfaces on opposite sides of the base, the grip body further having a centroid that is shiftable within the aperture by user pressure to opposite sides of the base.

36. (Original) The oral care implement according to claim 35, in which the grip body comprises an elastomeric material.

37. (Currently Amended) The oral care implement of claim <u>35</u> ~~34~~, in which the grip <u>body</u> ~~element~~ is disposed in a widest portion of the base.

38. (Currently Amended)    The oral care implement according to claim <u>35</u> ~~34~~, in which the grip <u>body</u> ~~element~~ has hardness of about 8-24 Shore A.

Page 6 of 14

App. No. 10/902,257

39. (Currently Amended)    The oral care implement according to claim 35 34 wherein the aperture is defined by side surfaces that are inclined toward a central portion of the aperture to define a narrowed rounded edge surface.

40. (Currently Amended)    An oral care implement comprising:

a base with a gripping region and an oral engaging region, the gripping region including an aperture extending through the base, the aperture being defined by at least one inclined sidewall that defines a narrowed edge surface within the aperture; wherein the base includes a peripheral groove in the gripping region; and

a resilient grip body being molded into the aperture, the grip body defining grip surfaces exposed on opposite sides of the base.

41. (Previously Presented)    The oral care implement according to claim 40, in which the grip body comprises an elastomeric material.

42. (Original)  The oral care implement according to claim 40, in which the handle includes first and second sections and an intermediate section that connects the first and second sections, wherein the intermediate section is narrower than the first and second sections.

43. (Original)  The oral care implement according to claim 40 wherein the grip body has a hardness of about 8-25 Shore A.

44. (Original)  The oral care implement according to claim 43, further including a grip surface on the base, the grip surface having hardness of about 13-40 Shore A.

45. (Original)  The oral care implement according to claim 40 wherein the grip body has a hardness of about 11-15 Shore A.

46. (Original)  The oral care implement according to claim 40, in which the grip body is disposed in the widest portion of the base.

Page 7 of 14

App. No. 10/902,257

47. (Original)  An oral care implement comprising:

a base with a gripping region and an oral engaging region, the gripping region including an aperture extending through the base; and

a resilient grip body secured within the aperture to extend through the base and define a gripping surface on opposite sides of the base to be gripped by a thumb of a user and one finger, the grip body being configured to dampen the forces applied to the oral engaging region by the user holding the gripping region.

48. (Original)  The oral care implement according to claim 47 wherein the aperture and grip body received therein has a width at its largest dimension which is more than one half of the width of the base at the same location.

49. (Original)  The oral care implement according to claim 47 wherein the aperture is defined by side surfaces that are inclined toward a central portion of the aperture to define a narrowed rounded edge surface.

50. (Original)  The oral care implement according to claim 49 wherein the grip body defines a centroid that is shiftable to opposite sides of the rounded edge surface upon application of pressure by the user.

51. (Original)  The oral care implement according to claim 47 wherein the grip body has a hardness of about 8-25 Shore A.

52. (Original)  The oral care implement according to claim 47, in which the grip element is disposed in a widest portion of the base.

JA00596

App. No. 10/902,257

## **REMARKS**

These remarks are responsive to the non-final Office Action mailed August 15, 2005. Claims 1-6, 10-12, 14, 15, 17, 18, 19, 21, 23, 24, 25, 27, 31, 32 and 37-40 have been editorially amended.    Claims 1-52 are pending. No new matter has been added.    Reconsideration and allowance the application is respectfully requested.

*Claims Discussion*

Claim 1 recites an oral care implement a base with a gripping region and an oral engaging region, the base having an aperture extending therethrough; and a gripping member at least partially overlying the gripping region of the base and provided with at least one opening exposing a portion of the base, and a resilient grip body in the gripping region and extending through the aperture, the gripping member having a different durometer characteristic than the resilient grip body.  In this way, for example, the user is provided with a shock absorption advantage during brushing, while having comfort and control of the oral care implement.

Claim 1 was rejected under 35 U.S.C. § 102(b) by Blass (U.S. Pat. No. 6,325,626); or Davies (U.S. Pub. No. 2002/0138931).  The noted references fail to anticipate claim 1. For example, Blass and Davies fail to disclose the recited aperture extending through a base, and a resilient grip body. Additionally, both references fail to disclose the recited gripping member having a different durometer characteristic than the resilient grip body.  In view of the foregoing, claim 1 is allowable over Blass or Davies.   Claims 2-26, depending directly or indirectly from claim 1, are allowable for at least the reasons of claim 1 and for further features recited therein.

Independent claims 27, 35 40, and 47 were rejected under 35 U.S.C. § 102(e) by Weihrauch (U.S. Pat. No. 6,353,958). Regarding claim 27, Weihrauch fails to teach the recited oral care implement including a base with a gripping region and an oral engaging region, wherein the front segment is inclined relative to the rear segment at about 20-40 degrees thereby defining the inclined portion; a resilient grip surface being disposed on the rear segment. If Weihrauch's embodiments had a rear segment, there are no resilient grip surfaces shown or described on a rear segment.  Further, Weihrauch fails to disclose a grip body extending through an aperture in the base and spaced from the grip surface.   In view of the foregoing, claim 27 is

Page 9 of 14

App. No. 10/902,257

allowable.   Claims 28-34, depending directly or indirectly from claim 27, are allowable for at least the reasons of claim 27 and for further features recited therein.

Regarding claim 35, the Office Action alleges that an elastomeric material "would be capable of shifting within the aperture." (Office Action, pg. 3, para. 5). There is absolutely no teaching in Weihrauch of the recited oral care implement including a resilient grip body disposed in the aperture and extending through the base to define finger gripping surfaces on opposite sides of the base, the grip body further having a centroid that is shiftable within the aperture by user pressure to opposite sides of the base.   Nothing in Weihrauch provides one of ordinary skill to gleam the inventive concepts as recited in claim 35.   Hence, claim 35 is not anticipated Weihrauch.    Claims 36-39, depending directly or indirectly from claim 35, are allowable for at least the reasons of claim 35 and for further features recited therein.

Regarding claim 40, Weihrauch fails to disclose the recited oral care implement including a base with a gripping region and an oral engaging region, wherein the base includes a peripheral groove in the gripping region. In the instant application, the peripheral groove is at least shown in FIG. 7. Claim 40 is not anticipated by Weihrauch.    Claims 41-46, depending directly or indirectly from claim 40, are allowable for at least the reasons of claim 40 and for further features recited therein.

Regarding claim 47, there is absolutely no teaching in Weihrauch of the recited oral care implement including a resilient grip body secured within an aperture to extend through a base and define a gripping surface on opposite sides of the base to be gripped by a thumb of a user and one finger, the grip body being configured to dampen the forces applied to the oral engaging region by the user holding the gripping region.   Weihrauch merely mentions grip elements 10, 11 could be made of an elastomer.  There is no grip body being configured to dampen the forces applied to the oral engaging region during use of the oral care implement.  Nothing in Weihrauch provides one of ordinary skill to gleam the inventive concepts as recited in claim 47.  Hence, claim 47 is not anticipated Weihrauch.

App. No. 10/902,257

Claims 48-52, depending directly or indirectly from claim 47, are allowable for at least the reasons of claim 47 and for further features recited therein. Regarding claim 48, Weihrauch has no teaching of the dimensional feature recited therein. Claim 48 is allowable at least on this basis. Regarding claim 49, among other lacking features, Weihrauch has no teaching of the recited narrowed rounded edge surface disposed with the aperture. Claim 49 is allowable at least on this basis. Regarding claim 50, among other lacking features, Weihrauch is devoid of a grip body with a centriod that is shiftable as recited. Claim 50 is allowable at least on this basis.

Independent claims 35 and 47 were rejected under 35 U.S.C. § 102(e) by Desimone et al. (U.S. Pat. 5,339,482). Regarding claim 35, there is absolutely no teaching in Desimone et al. of the recited oral care implement including a resilient grip body disposed in the aperture and extending through the base to define finger gripping surfaces on opposite sides of the base, the grip body further having a centroid that is shiftable within the aperture by user pressure to opposite sides of the base. Nothing in Desimone et al. provides one of ordinary skill to gleam the inventive concepts as recited in claim 35. Hence, claim 35 is not anticipated Desimone et al. Claims 36-39, depending directly or indirectly from claim 35, are allowable for at least the reasons of claim 35 and for further features recited therein.

Regarding claim 47, there is absolutely no teaching in Desimone et al. of the recited oral care implement including a resilient grip body secured within an aperture to extend through a base and define a gripping surface on opposite sides of the base to be gripped by a thumb of a user and one finger, the grip body being configured to dampen the forces applied to the oral engaging region by the user holding the gripping region. Desimore et al. merely states that the insert 22 could be made of an elastomer. There is no grip body being configured to dampen the forces applied to the oral engaging region during use of the oral care implement. Nothing in Desimore et al. provides one of ordinary skill to gleam the inventive concepts as recited in claim 47. Hence, claim 47 is not anticipated Desimore et al. Claims 48-52, depending directly or indirectly from claim 47, are allowable for at least the reasons of claim 47 and for further features recited therein.

Page 11 of 14

App. No. 10/902,257

Claim 1 was rejected under 35 U.S.C. § 103(a) under a combination of Caradarelli (U.S. Pat. No. 6,070,286) and Lai (U.S. Pat. 6,408,524). Caradarelli fails to disclose the recited oral care implement. For example, Caradarelli fails to disclose the recited aperture extending through a base, a resilient grip body and the recited gripping member having a different durometer characteristic than the resilient grip body. Additionally, Lai fails to make up for the deficiencies of Caradarelli.

The combination of Lai and Caradarelli is improper. Lai merely pertains to a tableware grip structure. Contrary to the assertions in the Office Action, Lai does not disclose any elastomeric grip member. Lai is completely devoid of suggesting use with oral care implements and is completely devoid of a toothbrush or any oral care implement. The references are not combinable in that the references deal with completely different areas. Further, motivation to combine Caradarelli and Lai is simply lacking. Hence, one of ordinary skill in the oral care art would not have considered Lai or modified Caradarelli. In view of the foregoing, claim 1 is allowable. Claims 2-26, depending directly or indirectly from claim 1, are allowable for at least the reasons of claim 1 and for further features recited therein.

Claims 6 and 7 were rejected under 35 U.S.C. § 103(a) under a combination of Caradarelli (U.S. Pat. No. 6,070,286) and Lai (U.S. Pat. 6,408,524) and Sweet et al. (U.S. Pat. 3,848,871). Claims 6 and 7 depend from claim 1. The arguments against the combination of Caradarelli and Lai with respect to claim 1 are incorporated herein. Furthermore, the alleged combination of Sweet is improper. Sweet merely pertains to hand grip for a tennis racket. Sweet is completely devoid of suggesting use with oral care implements and is completely devoid of a toothbrush or any oral care implement. The references are not combinable in that the references deal with completely different areas (e.g., oral care, tableware, and the sport of tennis). Further, motivation to combine Sweet is simply lacking. There is no reason why Lai's tableware grip sections 12 would be modified with Sweet's suction cups 35 (See, Sweet col. 2, lines 53-55). Hence, one of ordinary skill in the oral care art would not have considered Sweet. Claims 6 and 7 are allowable.

Claim 1 was rejected under 35 U.S.C. § 103(a) under a combination of Munro U.S. Pat. No. 6,266,840) and Sweet et al. Munro fails to disclose the recited oral care implement with an

Page 12 of 14

**JA00600**

App. No. 10/902,257

aperture extending through a base, a resilient grip body and the recited gripping member having a different durometer characteristic than the resilient grip body. The combination of Munro and Sweet et al. is improper. Sweet merely pertains to hand grip for a tennis racket. Sweet is completely devoid of suggesting use with oral care implements and is completely devoid of a toothbrush or any oral care implement. The references are not combinable in that the references deal with completely different areas (e.g., oral care, and the sport of tennis). Further, motivation to combine Sweet is simply lacking. There is no reason why Munro would be modified with Sweet's suction cups 35 (See, Sweet col. 2, lines 53-55). Hence, one of ordinary skill in the oral care art would not have considered Sweet. Nevertheless, Sweet et al. is devoid of the recited oral care implement with a base including a peripheral groove for retaining the grip member on the base. In view of the foregoing, claim 1 is allowable. Claims 2-26, depending directly or indirectly from claim 1, are allowable for at least the reasons of claim 1 and for further features recited therein.

The Office Action rejected claims 30, 31, 38, 43-45 and 51 under 35 U.S.C. § 103(a) under a combination of Weihrauch (U.S. Pat. 6,353,958) and Beals et al. (U.S. Pat. 6,298,516). Claims 30, 31, 32 and 38 depend from independent claim 27. The previous comments for allowability of claim 27 are incorporated herein. Claims 43-45 depend from independent claim 40. The previous arguments for allowability of claim 40 are incorporated herein. Claim 51 is allowable for at least the reason of independent claim 47.

The Office Action rejected claims 10-16, 19 and 20 under 35 U.S.C. § 103(a) under a combination of Davies (U.S. Pub 2002/0138931) and Desimone et al. (U.S. Pat. 5,339,482). The noted claims are allowable for at least the reasons of independent claim 1. For example, Davies fails to disclose the recited aperture extending through a base, and a resilient grip body. Further, Davies fails to disclose the recited gripping member having a different durometer characteristic than the resilient grip body. Desimone et al. fails to make up the deficiencies of Davies et al. Furthermore, none of the cited references in combination or singularity teaches as a whole the recited oral implement of claim 1. Regarding claim 10, there is no teaching of the recited conical shape finger gripping surfaces. Regarding claim 14, nothing in Davies and Desimone et

App. No. 10/902,257

al. teaches or suggests the grip body being surrounded by the grip member.  In view of the foregoing reasons, claims 10-16, 19 and 20 are allowable.

<u>CONCLUSION</u>

For the foregoing reasons, it is respectfully submitted that this application is in condition for allowance.  Should the Examiner believe that anything further is desirable in order to place the application in better form for allowance, the Examiner is respectfully urged to contact Applicants' undersigned representative at the below-listed number. If any additional fees are required or if an overpayment has been made the Commissioner is authorized to charge or credit Deposit Account No. 19-0733.

Respectfully submitted,

BANNER & WITCOFF, LTD.

Dated:  November 15, 2005          By:

Darrell G. Mottley
Registration No. 42,912

1001 G Street, N.W.
Washington, D.C.  20001-4597
Tel:    (202) 824-3000
Fax:    (202) 824-3001

Page 14 of 14



**A GENUINE MERRIAM-WEBSTER**

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster™* is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 2001 by Merriam-Webster, Incorporated

Philippines Copyright 2001 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data
Main entry under title:

Merriam-Webster's collegiate dictionary. — 10th ed.
   p.   cm.
   Includes index.
   ISBN 0-87779-708-0 (unindexed : alk. paper). — ISBN 0-87779-709-9
(indexed : alk. paper). — ISBN 0-87779-710-2 (deluxe indexed : alk. paper).
— ISBN 0-87779-707-2 (laminated cover, unindexed).
   1. English language—Dictionaries.   I. Merriam-Webster, Inc.
PE1628.M36    1998
423—dc21                                     97-41846
                                              CIP

Merriam-Webster's Collegiate® Dictionary, Tenth Edition principal copyright 1993

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

313233RT:WC01

**44   anecdote ● Angle**



**Designation: D 2240 – 05**

# Standard Test Method for
# Rubber Property—Durometer Hardness[1]

This standard is issued under the fixed designation D 2240; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

*This standard has been approved for use by agencies of the Department of Defense.*

## 1. Scope

1.1 This test method covers twelve types of rubber hardness measurement devices known as durometers: Types A, B, C, D, DO, E, M, O, OO, OOO, OOO-S, and R. The procedure for determining indentation hardness of substances classified as thermoplastic elastomers, vulcanized (thermoset) rubber, elastomeric materials, cellular materials, gel-like materials, and some plastics is also described.

1.2 This test method is not equivalent to other indentation hardness methods and instrument types, specifically those described in Test Method D 1415.

1.3 This test method is not applicable to the testing of coated fabrics.

1.4 All materials, instruments, or equipment used for the determination of mass, force, or dimension shall have traceability to the National Institute for Standards and Technology, or other internationally recognized organizations parallel in nature.

1.5 The values stated in SI units are to be regarded as standard. The values given in parentheses are for information only. Many of the stated dimensions in SI are direct conversions from the U. S. Customary System to accommodate the instrumentation, practices, and procedures that existed prior to the Metric Conversion Act of 1975.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:* [2]
D 374 Test Methods for Thickness of Solid Electrical Insulation
D 618 Practice for Conditioning Plastics for Testing

D 785 Test Method for Rockwell Hardness of Plastics and Electrical Insulating Materials
D 1349 Practice for Rubber—Standard Temperatures for Testing
D 1415 Test Method for Rubber Property—International Hardness
D 4483 Practice for Determining Precision for Test Method Standards in the Rubber and Carbon Black Industries
F 1957 Test Method for Composite Foam Hardness-Durometer Hardness
2.2 *ISO Standard:* [3]
ISO/IEC 17025: 1999 General Requirements for the Competence of Testing and Calibration Laboratories

## 3. Summary of Test Method

3.1 This test method permits hardness measurements based on either initial indentation or indentation after a specified period of time, or both. Durometers with maximum reading indicators used to determine maximum hardness values of a material may yield lower hardness when the maximum indicator is used.

3.2 The procedures for Type M, or micro hardness durometers, accommodate specimens that are, by their dimensions or configuration, ordinarily unable to have their durometer hardness determined by the other durometer types described. Type M durometers are intended for the testing of specimens having a thickness or cross-sectional diameter of 1.25 mm (0.050 in.) or greater, although specimens of lesser dimensions may be successfully accommodated under the conditions specified in Section 6, and have a Type M durometer hardness range between 20 and 90. Those specimens which have a durometer hardness range other than specified shall use another suitable procedure for determining durometer hardness.

## 4. Significance and Use

4.1 This test method is based on the penetration of a specific type of indentor when forced into the material under specified conditions. The indentation hardness is inversely related to the penetration and is dependent on the elastic modulus and viscoelastic behavior of the material. *The geometry of the*

---

[1] This test method is under the jurisdiction of ASTM Committee D11 on Rubber and is the direct responsibility of Subcommittee D11.10 on Physical Testing.
Current edition approved Aug. 15, 2005. Published September 2005. Originally approved in 1964. Last previous edition approved in 2004 as D 2240–04[ε1].
[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

[3] Available from International Organization for Standardization (ISO), 1 rue de Varembé, Case postale 56, CH-1211, Geneva 20, Switzerland.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.



**FIG. 1 (a) Type A and C Indentor**

*indentor and the applied force influence the measurements such that no simple relationship exists between the measurements obtained with one type of durometer and those obtained with another type of durometer or other instruments used for measuring hardness.* This test method is an empirical test intended primarily for control purposes. No simple relationship exists between indentation hardness determined by this test method and any fundamental property of the material tested. For specification purposes, it is recommended that Test Method D 785 be used for materials other than those described in 1.1.

**5. Apparatus**

5.1 *Hardness Measuring Apparatus, or Durometer, and an Operating Stand*, Type 1, Type 2, or Type 3 (see 5.1.2) consisting of the following components:

5.1.1 *Durometer:*

5.1.1.1 *Presser Foot*, the configuration and the total area of a durometer presser foot may produce varying results when there are significant differences between them. It is recommended that when comparing durometer hardness determinations of the same type (see 4.1), that the comparisons be between durometers of similar presser foot configurations and total area, and that the presser foot configuration and size be noted in the Hardness Measurement Report (see 10.2.4 and 5.1.1.3).

5.1.1.2 *Presser Foot*, Types A, B, C, D, DO, E, O, OO, OOO, and OOO-S, with an orifice (to allow for the protrusion of the indentor) having a diameter as specified in Fig. 1 (a, b, c, d, e, f, and g), with the center a minimum of 6.0 mm (0.24 in.) from any edge of the foot. When the presser foot is not of a flat circular design, the area shall not be less than 500 mm² (19.7 in.²).

Note 1—The Type OOO and the Type OOO-S, designated herein, differ in their indentor configuration, spring force, and the results obtained. See Table 1 and Fig. 1 (e and g).

5.1.1.3 *Presser Foot*—flat circular designs designated as Type *xR*, where *x* is the standard durometer designation and *R* indicates the flat circular press foot described herein, for example, Type *aR*, *dR*, and the like. The presser foot, having a

centrally located orifice (to allow for the protrusion of the indentor) of a diameter as specified in Fig. 1 (a through g). The flat circular presser foot shall be 18 ± 0.5 mm (0.71 ± 0.02 in.) in diameter. These durometer types shall be used in an operating stand (see 5.1.2).

*(a)* Durometers having a presser foot configuration other than that indicated in 5.1.1.3 shall not use the Type *xR* designation, and it is recommended that their presser foot configuration and size be stated in the Hardness Measurement Report (see 10.2.4).

5.1.1.4 *Presser Foot, Type M*, with a centrally located orifice (to allow for the protrusion of the indentor), having a diameter as specified in Fig. 1 (d), with the center a minimum of 1.60 mm (0.063 in.) from any edge of the flat circular presser foot. The Type M durometer shall be used in a Type 3 operating stand (see 5.1.2.4).

5.1.1.5 *Indentor*, formed from steel rod and hardened to 500 HV10 and shaped in accordance with Fig. 1 (a, b, c, d, e, or g), polished over the contact area so that no flaws are visible under 20× magnification, with an indentor extension of 2.50 ± 0.04 mm (0.098 ± 0.002 in.).

5.1.1.6 *Indentor, Type OOO-S*, formed from steel rod and hardened to 500 HV10, shaped in accordance with Fig. 1 (f), polished over the contact area so that no flaws are visible under 20× magnification, with an indentor extension of 5.00 ± 0.04 mm (0.198 ± 0.002 in.).

5.1.1.7 *Indentor, Type M*, formed from steel rod and hardened to 500 HV10 and shaped in accordance with Fig. 1 (d), polished over the contact area so that no flaws are visible under 50× magnification, with an indentor extension of 1.25 ± 0.02 mm (0.049 ± 0.001 in.).

5.1.1.8 *Indentor Extension Indicator*, analog or digital electronic, having a display that is an inverse function of the indentor extension so that:

*(1)* The display shall indicate from 0 to 100 with no less than 100 equal divisions throughout the range at a rate of one hardness point for each 0.025 mm (0.001 in.) of indentor movement,

2
Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

D 2240 – 05



AT ZERO
READING

FIG. 1 (b) Type B and D Indentor *(continued)*



AT ZERO
READING

FIG. 1 (c) Type O, DO, and OO Indentor *(continued)*



AT ZERO
READING

FIG. 1 (d) Type M Indentor *(continued)*

*(2)* The display for Type OOO-S durometers shall indicate from 0 to 100 with no less than 100 equal divisions throughout the range at a rate of one hardness point for each 0.050 mm (0.002 in.) of indentor movement,

*(3)* The display for Type M durometers shall indicate from 0 to 100 with no less than 100 equal divisions at a rate of one hardness point for each 0.0125 mm (0.0005 in.) of indentor movement, and

*(4)* In the case of analog dial indicators having a display of 360°, the points indicating 0 and 100 may be at the same point on the dial and indicate 0, 100, or both.

5.1.1.9 *Timing Device (optional)*, capable of being set to a desired elapsed time, signaling the operator or holding the hardness reading when the desired elapsed time has been reached. The timer shall be automatically activated when the presser foot is in contact with the specimen being tested, for example, the initial indentor travel has ceased. Digital electronic durometers may be equipped with electronic timing devices that shall not affect the indicated reading or determinations attained by more than one-half of the calibration tolerance stated in Table 1.

5.1.1.10 *Maximum Indicators (optional)*, maximum indicating pointers are auxiliary analog indicating hands designed to remain at the maximum hardness value attained until reset by

3

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

JA00607



D 2240 – 05

FIG. 1 (e) Type OOO Indentor *(continued)*



FIG. 1 (f) Type OOO-S Indentor *(continued)*

the operator. Electronic maximum indicators are digital displays electronically indicating and maintaining the maximum value hardness valued achieved until reset by the operator.

5.1.1.11 Analog maximum indicating pointers have been shown to have a nominal effect on the values attained, however, this effect is greater on durometers of lesser total mainspring loads; for example, the effect of a maximum indicating pointer on Type D durometer determinations will be less than those determinations achieved using a Type A durometer. Analog style durometers may be equipped with maximum indicating pointers. The effect of a maximum indicating pointer shall be noted at the time of calibration in the calibration report (see 10.1.5), and when reporting hardness determinations (see 10.2.4). Analog Type M, OO, OOO, and Type OOO-S durometers shall not be equipped with maximum indicating pointers.

5.1.1.12 Digital electronic durometers may be equipped with electronic maximum indicators that shall not affect the indicated reading or determinations attained by more than one half of the spring calibration tolerance stated in Table 1.

5.1.1.13 *Calibrated Spring*, for applying force to the indentor, in accordance with Fig. 1 (a through g) and capable of applying the forces as specified in Table 1.

5.1.2 *Operating Stand* (Fig. 2):

5.1.2.1 Type 1, Type 2, and Type 3 shall be capable of supporting the durometer presser foot surface parallel to the specimen support table (Fig. 3) throughout the travel of each. The durometer presser foot to specimen support table parallelism shall be verified each time the test specimen support table is adjusted to accommodate specimens of varying dimensions. This may be accomplished by applying the durometer presser foot to the point of contact with the specimen support table and making adjustments by way of the durometer mounting assembly or as specified by the manufacturer.

5.1.2.2 *Operating Stand, Type 1* (specimen to indentor type), shall be capable of applying the specimen to the indentor in a manner that minimizes shock.

5.1.2.3 *Operating Stand, Type 2* (indentor to specimen type), shall be capable of controlling the rate of descent of the indentor to the specimen at a maximum of 3.20 mm/s (0.125

4

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.



FIG. 1 (g) Type E Indentor *(continued)*

TABLE 1 Durometer Spring Force Calibration[A]
All Values are in N

| Indicated Value | Type A, B, E, O | Type C, D, DO | Type M | Type OO, OOO | Type OOO-S |
|---|---|---|---|---|---|
| 0 | 0.55 | 0 | 0.324 | 0.203 | 0.167 |
| 10 | 1.3 | 4.445 | 0.368 | 0.294 | 0.343 |
| 20 | 2.05 | 8.89 | 0.412 | 0.385 | 0.520 |
| 30 | 2.8 | 13.335 | 0.456 | 0.476 | 0.696 |
| 40 | 3.55 | 17.78 | 0.5 | 0.566 | 0.873 |
| 50 | 4.3 | 22.225 | 0.544 | 0.657 | 1.049 |
| 60 | 5.05 | 26.67 | 0.589 | 0.748 | 1.226 |
| 70 | 5.8 | 31.115 | 0.633 | 0.839 | 1.402 |
| 80 | 6.55 | 35.56 | 0.677 | 0.93 | 1.579 |
| 90 | 7.3 | 40.005 | 0.721 | 1.02 | 1.755 |
| 100 | 8.05 | 44.45 | 0.765 | 1.111 | 1.932 |
| N/durometer unit | 0.075 | 0.4445 | 0.0044 | 0.00908 | 0.01765 |
| Spring Calibration Tolerance | ± 0.075 N | ± 0.4445 N | ± 0.0176 N | ± 0.0182 N | ± 0.0353 N |

[A] Refer to 5.1.1.3 for the Type *xR* designation.

in./s) and applying a force sufficient to overcome the calibrated spring force as shown in Table 1.

5.1.2.4 *Operating Stand, Type 3* (indentor to specimen type), hydraulic dampening, pneumatic dampening, or electro-mechanical (required for the operation of Type M durometers) shall be capable of controlling the rate of descent of the indentor to the specimen at a maximum of 3.2 mm/s (0.125 in./s) and applying a force sufficient to overcome the calibrated spring force as shown in Table 1. Manual application, Type 1 or Type 2 operating stands are not acceptable for Type M durometer operation.

5.1.2.5 The entire instrument should be plumb and level, and resting on a surface that will minimize vibration. Operating the instrument under adverse conditions will negatively affect the determinations attained.

5.1.2.6 *Specimen Support Table*, (Fig. 3) integral to the operating stand, and having a solid flat surface. The specimen support platform may have orifices designed to accept various inserts or support fixtures (Fig. 3) to provide for the support of irregularly configured specimens. When inserts are used to support test specimens, care must be taken to align the indentor to the center of the insert, or the point at which the indentor is to contact the specimen. Care should be exercised to assure that

the indentor does not abruptly contact the specimen support table as damage to the indentor may result.

**6. Test Specimen**

6.1 The test specimen, herein referred to as "specimen" or "test specimen" interchangeably, shall be at least 6.0 mm (0.24 in.) in thickness unless it is known that results equivalent to the 6.0-mm (0.24-in.) values are obtained with a thinner specimen.

6.1.1 A specimen may be composed of plied pieces to obtain the necessary thickness, but determinations made on such specimens may not agree with those made on solid specimens, as the surfaces of the plied specimens may not be in complete contact. The lateral dimensions of the specimen shall be sufficient to permit measurements at least 12.0 mm (0.48 in.) from any edge, unless it is known that identical results are obtained when measurements are made at a lesser distance from an edge.

6.1.2 The surfaces of the specimen shall be flat and parallel over an area to permit the presser foot to contact the specimen over an area having a radius of at least 6.0 mm (0.24 in.) from the indentor point. The specimen shall be suitably supported to provide for positioning and stability. *A suitable hardness*

5

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.



D 2240 – 05

FIG. 2 Durometer Operating Stand

FIG. 3 Small Specimen Support Table



*determination cannot be made on an uneven or rough point of contact with the indentor.*

6.2 Type OOO, OOO-S, and M test specimens should be at least 1.25 mm (0.05 in.) in thickness, unless it is known that results equivalent to the 1.25-mm (0.05-in.) values are obtained with a thinner specimen.

6.2.1 A Type M specimen that is not of a configuration described in 6.2.2 may be composed of plied pieces to obtain

6

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.





FIG. 4 Detail of Indentor Extension and Display Adjustment

the necessary thickness, but determinations made on such specimens may not agree with those made on solid specimens because the surfaces of the plied specimens may not be in complete contact. The lateral dimensions of the specimen should be sufficient to permit measurements at least 2.50 mm (0.10 in.) from any edge unless it is known that identical results are obtained when measurements are made at lesser distance from an edge. *A suitable hardness determination cannot be made on an uneven or rough point of contact with the indentor.*

6.2.2 The Type M specimen, when configured as an o-ring, circular band, or other irregular shape shall be at least 1.25 mm (0.05 in.) in cross-sectional diameter, unless it is known that results equivalent to the 1.25-mm (0.05-in.) values are obtained with a thinner specimen. The specimen shall be suitably supported in a fixture (Fig. 3) to provide for positioning and stability.

6.3 The minimum requirement for the thickness of the specimen is dependent on the extent of penetration of the indentor into the specimen; for example, thinner specimens may be used for materials having higher hardness values. The minimum distance from the edge at which measurements may be made likewise decreases as the hardness increases.

## 7. Calibration

7.1 *Indentor Extension Adjustment Procedure:*

7.1.1 Place precision ground dimensional blocks (Grade B or better) on the support table and beneath the durometer presser foot and indentor. Arrange the blocks so that the durometer presser foot contacts the larger block(s) and the indentor tip just contacts the smaller block (Fig. 4). It is necessary to observe the arrangement of the blocks and the presser foot/indentor under a minimum of 20× magnification to assure proper alignment.

7.1.2 Indentor extension and shape shall be in accordance with 5.1.1.5, 5.1.1.6, or 5.1.1.7, respective to durometer type. See Fig. 1 (a through g). Examination of the indentor under 20× magnification, 50× for Type M indentors, is required to examine the indentor condition. Misshapen or damaged indentors shall be replaced.

7.1.3 A combination of dimensional gage blocks shall be used to achieve a difference of 2.54 + 0.00/–0.0254 mm (0.100 + 0.00/–0.001 in.) between them. For Type OOO-S durometers, the gage block dimensions are 5.08 + 0.00/–0.0508 mm (0.200 + 0.00/–0.002 in.). For Type M durometers, the gage block

dimensions are 1.27 + 0.0/–0.0127 mm (0.050 + 0.00/–0.0005 in.) between them (Fig. 4).

7.1.4 Carefully lower the durometer presser foot until it contacts the largest dimensional block(s), the indentor tip should just contact the smaller block, verifying full indentor extension.

7.1.5 Adjust the indentor extension to 2.50 ± 0.04 mm (0.098 ± 0.002 in.). For Type OOO-S durometers, adjust the indentor extension to 5.0 ± 0.04 mm (0.198 ± 0.002 in.). For Type M durometers, adjust the indentor extension to 1.25 ± 0.02 mm (0.049 ± 0.001 in.), following the manufacturer's recommended procedure.

7.1.5.1 When performing the procedures in 7.1, care should be used so as not to cause damage to the indentor tip. Fig. 4 depicts a suitable arrangement for gaging indentor extension.

7.1.6 Parallelism of the durometer presser foot to the support surface, and hence the dimensional gage blocks, at the time of instrument calibration, may be in accordance with Test Methods D 374, Machinist's Micrometers, or otherwise accomplished in accordance with the procedures specified by the manufacturer.

7.2 *Indentor Display Adjustment:*

7.2.1 After adjusting the indentor extension as indicated in 7.1, use a similar arrangement of dimensional gage blocks to verify the linear relationship between indentor travel and indicated display at two points: 0 and 100. Following the manufacturer's recommendations, make adjustments so that:

7.2.2 The indicator displays a value equal to the indentor travel measured to within:

–0.0 +1.0 durometer units measured at 0;

±0.50 durometer units measured at 100;

±1 durometer units at all other points delineated in 7.4.

7.2.3 Each durometer point indicated is equal to 0.025 mm (0.001 in.) of indentor travel, except for:

7.2.3.1 Type M Durometers, each indicated point is equal to 0.0125 mm (0.0005 in.) of indentor travel;

7.2.3.2 Type OOO-S Durometers, each indicated point is equal to 0.050 mm (0.002 in.) of indentor travel.

7.2.4 The indicator shall not display a value greater than 100 or less than 0 at the time of calibration.

7.2.5 Other means of determining indentor extension or indentor travel, such as optical or laser measurement methods, are acceptable. The instrumentation used shall have traceability as described in 1.4.

7.2.6 The durometer shall be supported in a suitable fashion when performing the procedures described in 7.1 and 7.2.

7.3 *Calibration Device:*

7.3.1 The durometer spring shall be calibrated by supporting the durometer in a calibrating device, see Fig. 5, in a vertical position and applying a measurable force to the indentor tip. The force may be measured by means of a balance as depicted in Fig. 5, or an electronic force cell. The calibrating device shall be capable of measuring applied force to within 0.5 % of the maximum spring force necessary to achieve 100 durometer units.

7.3.2 Care should be taken to ensure that the force is applied vertically to the indentor tip, as lateral force will cause errors in calibration. See 7.1.5.1 and 7.1.6.

7

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.



**FIG. 5 Example of Durometer Calibration Apparatus**

7.4 *Spring Calibration*—The durometer spring shall be calibrated at displayed readings of 10, 20, 30, 40, 50, 60, 70, 80, and 90. The measured force (9.8× mass in kilograms) shall be within the spring calibration tolerance specified in Table 1. Table 1 identifies the measured force applied to the indentor for the entire range of the instrument, although it is necessary only to verify the spring calibration at points listed herein.

7.5 *Spring Calibration Procedure*:

7.5.1 Ensure that the indentor extension has been adjusted in accordance with 7.1, and the linear relationship between indentor travel and display is as specified in 7.2.

7.5.2 Place the durometer in the calibration device as depicted in Fig. 5. Apply the forces indicated in Table 1 so that forces applied are aligned with the centerline of the indentor in a fashion that eliminates shock or vibration and adjust the durometer according to manufacturers' recommendations so that:

7.5.3 At the points enumerated in 7.4, the display shall indicate a value equal to 0.025 mm (0.001 in.) of indentor travel. For Type OOO-S durometers, the display shall indicate a value equal to 0.05 mm (0.002 in.) of indentor travel. For Type M durometers, the display shall indicate a value equal to 0.0125 mm (0.0005 in.) of indentor travel within the spring calibration tolerances specified in 7.6.

7.6 Spring calibration tolerances are ±1.0 durometer units for Types A, B, C, D, E, O, and DO, ±2.0 durometer units for Types OO, OOO, and OOO-S, and ±4.0 durometer units for Type M, while not indicating below 0 or above 100 at the time of calibration (see Table 1).

7.7 *Spring Force Combinations*:

7.7.1 For Type A, B, E, and O durometers:
Force, N = 0.55 + 0.075 HA
Where HA = hardness reading on Type A, B, E, and O durometers.

7.7.2 For Type C, D, and DO durometers:
Force, N = 0.4445 HD
Where HD = hardness reading on Type C, D, and DO durometers.

7.7.3 For Type M durometers:
Force, N = 0.324 + 0.0044 HM
Where HM = hardness reading on Type M durometers.

7.7.4 For Type OO and OOO durometers:
Force, N = 0.203 + 0.00908 HOO
Where HOO = hardness reading on Type OO durometers.

7.7.5 For Type OOO-S durometers:
Force, N = 0.167 + 0.01765 HOOO-S
Where HOOO-S = hardness reading on Type OOO-S durometers.

7.8 The rubber reference block(s) provided for verifying durometer operation and state of calibration are not to be relied upon as calibration standards. The calibration procedures outlined in Section 7 are the only valid calibration procedures.

7.8.1 The use of metal reference blocks is no longer recommended (see Note 2).

7.9 Verifying the state of durometer calibration, *during routine use*, may be accomplished by:

7.9.1 Verifying that the zero reading is no more than 1 indicated point above zero, and not below zero (on durometers so equipped), when the durometer is positioned so that no external force is placed upon the indentor.

7.9.2 Verifying that the 100 reading is no more than 100 and no less than 99 when the durometer is positioned on a flat surface of a non-metallic material so that the presser foot is in complete contact, causing the indentor to be fully retracted.

7.9.2.1 It is important that when performing the verification of 100, as described in 7.9.2, that extreme care be taken so as to not cause damage to the indentor. Verification of the 100 value is not recommended for durometers having a spring force greater than 10 N (Types C, D, and DO).

7.9.2.2 When performing the verification of 100, as described in 7.9.2, the non-metallic material shall be of a hardness value greater than 100 of the type (scale) of the durometer being employed. Tempered glass of a thickness greater than 6.35 mm (0.25 in.) has been found satisfactory for this application.

7.9.3 Verifying the displayed reading at any other point using commercially available rubber reference blocks which are certified to a stated value of the type (scale) of the durometer being employed. The displayed value of the durometer should be within ±2 durometer points of the reference block's stated value.

7.9.4 Verification of the zero and 100 readings of a durometer provide reasonable assurance that the linear relationship between the indicated display and the durometer mechanism remain valid.

7.9.5 Verification of points between zero and 100 provide reasonable assurance that the curvilinear relationship between the indicated display and the durometer mechanism remain valid.

7.9.6 *This is not a calibration procedure, it is a means by which a user may routinely verify that the durometer may be functioning correctly.* (See Note 2.)

**8. Laboratory Atmosphere and Test Specimen Conditioning**

8.1 Tests shall be conducted in the standard laboratory atmosphere, as defined in Practice D 618, Section 4.2.

8.2 The instrument shall be maintained in the standard laboratory atmosphere, as defined in Practice D 618, Section 4.1, for 12 h prior to performing a test.

8

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

D 2240 – 05

8.3 The specimen shall be conditioned in accordance with condition 40/23 exclusive of humidity control, as described in Practice D 618, Section 8.1, Procedure A and tested under the same conditions, exclusive of humidity control.

8.4 These procedures may be modified if agreed upon between laboratories or between supplier and user and are in accordance with alternative procedures identified in Practice D 618.

8.5 No conclusive evaluation has been made on durometers at temperatures other than 23.0 ± 2.0°C (73.4 ± 3.6°F). Conditioning at temperatures other than the above may show changes in calibration. Durometer use at temperatures other than the above should be decided locally (see Practice D 1349).

## 9. Procedure

9.1 *Operating Stand Operation (Type 3 Operating Stand Required for Type M):*

9.1.1 Care shall be exercised to minimize the exposure of the instrument to environmental conditions that are adverse to the performance of the instrument, or adversely affect test results.

9.1.2 Adjust the presser foot to support table parallelism as described in 5.1.2.1. It is necessary to make this adjustment each time the support table is moved to accommodate specimens of varying dimensions.

9.1.3 Prior to conducting a test, adjust the vertical distance from the presser foot to the contact surface of the test specimen to 25.4 ± 2.5 mm (1.00 ± 0.100 in.), unless it is known that identical results are obtained with presser foot at a greater or lesser vertical distance from the test specimen contact surface, or if otherwise stipulated by the manufacturer.

9.1.4 Place the specimen on the specimen support table, in a manner that the contact point of the indentor is in accordance with Section 6, unless it is known that identical results are obtained when measurements are made with the indentor at a lesser distance from the edge of the test specimen.

9.1.5 Actuate the release lever (Fig. 2) of the operating stand or activate the electromechanical device, allowing the durometer to descend at a controlled rate and apply the presser foot to the specimen in accordance with 5.1.2. In the case of "specimen to indentor" type operating stands, operate the lever or other mechanism to apply the specimen to the indentor in a manner that assures parallel contact of the specimen to the durometer presser foot without shock and with just sufficient force to overcome the calibrated spring force as shown in Table 1.

9.1.6 An operating stand that applies the mass at a controlled rate of descent, without shock is mandatory for Type M durometers. Hand-held application or the use of a Type 1 or Type 2 operating stand for the Type M durometer is not an acceptable practice, see 5.1.2.4.

9.1.7 For any material covered in 1.1, once the presser foot is in contact with the specimen, for example, when the initial indentor travel has ceased, the maximum indicated reading shall be recorded. The time interval of 1 s, between initial indentor travel cessation and the recording of the indicated reading, shall be considered standard. Other time intervals, when agreed upon among laboratories or between supplier and

user, may be used and reported accordingly. The indicated hardness reading may change with time.

9.1.7.1 If the durometer is equipped with an electronic maximum indicator or timing device (refer to 5.1.1.9) the indicated reading shall be recorded within 1 ± 0.3 s of the cessation of indentor travel and recorded (refer to 10.2.9 for reporting protocols), unless otherwise noted.

9.1.7.2 If the durometer is equipped with an analog type maximum indicator (refer to 5.1.1.10), the maximum indicated reading may be recorded and shall be reported (refer to 10.2.9), unless otherwise noted.

9.1.7.3 If the durometer is not equipped with the devices described in 5.1.1.9 or 5.1.1.10, the indicated reading shall be recorded within 1 s as is possible and reported (refer to 10.2.9), unless otherwise noted.

9.1.8 Make five determinations of hardness at different positions on the specimen at least 6.0 mm (0.24 in.) apart, 0.80 mm (0.030 in.) apart for Type M; and calculate the arithmetic mean, or alternatively calculate the median. The means of calculating the determinations shall be reported according to 10.2.8

9.2 *Manual (Hand Held) Operation of Durometer:*

9.2.1 Care shall be exercised to minimize the exposure of the instrument to environmental conditions that are adverse to the performance of the instrument, or adversely affect test results.

9.2.2 Place the specimen on a flat, hard, horizontal surface. Hold the durometer in a vertical position with the indentor tip at a distance from any edge of the specimen as described in Section 6, unless it is known that identical results are obtained when measurements are made with the indentor at a lesser distance.

9.2.3 Apply the presser foot to the specimen, maintaining it in a vertical position keeping the presser foot parallel to the specimen, with a firm smooth downward action that will avoid shock, rolling of the presser foot over the specimen, or the application of lateral force. Apply sufficient pressure to assure firm contact between the presser foot and the specimen.

9.2.4 For any material covered in 1.1, after the presser foot is in contact with the specimen, the indicated reading shall be recorded within 1 ± 0.1 s, or after any period of time agreed upon among laboratories or between supplier and user. If the durometer is equipped with a maximum indicator, the maximum indicated reading shall be recorded within 1 ± 0.1 s of the cessation of initial indentor travel. The indicated hardness reading may change with time.

9.2.5 Make five determinations of hardness at different positions on the specimen at least 6.0 mm (0.24 in.) apart and calculate the arithmetic mean, or alternatively calculate the median. The means of calculating the determinations shall be reported according to 10.2.8.

9.3 It is acknowledged that durometer readings below 20 or above 90 are not considered reliable. It is suggested that readings in these ranges not be recorded.

9.4 Manual operation (handheld) of a durometer will cause variations in the results attained. Improved repeatability may be obtained by using a mass, securely affixed to the durometer and centered on the axis of the indentor. Recommended masses

9

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

D 2240 – 05

**TABLE 2 Type 1 Precision—Type M Durometer Method**

| Material | | Within Laboratories | | | Between Laboratories | | |
|---|---|---|---|---|---|---|---|
| | MEAN | $Sr^A$ | $r^B$ | $(r)^C$ | $SR^D$ | $R^E$ | $(R)^F$ |
| 1 | 31.8 | 1.26 | 3.58 | 11.24 | 3.76 | 10.63 | 33.41 |
| 2 | 40.8 | 1.14 | 3.23 | 7.90 | 2.47 | 7.00 | 17.13 |
| 3 | 54.0 | 0.975 | 2.76 | 5.11 | 2.38 | 6.73 | 12.46 |
| 4 | 62.6 | 0.782 | 2.21 | 3.52 | 2.24 | 6.34 | 10.10 |
| 5 | 70.9 | 0.709 | 2.01 | 2.83 | 0.974 | 2.76 | 3.89 |
| 6 | 80.6 | 1.686 | 4.77 | 5.92 | 1.61 | 4.56 | 5.65 |
| 7 | 87.7 | 1.15 | 3.25 | 3.71 | 2.63 | 7.45 | 8.50 |
| 8 | 32.4 | 0.947 | 2.68 | 8.26 | 3.64 | 10.29 | 31.73 |
| 9 | 41.8 | 0.797 | 2.26 | 5.40 | 2.23 | 6.31 | 15.11 |
| 10 | 53.3 | 0.669 | 1.89 | 3.55 | 2.29 | 6.49 | 12.17 |
| 11 | 63.2 | 0.485 | 1.37 | 2.17 | 2.19 | 6.20 | 9.80 |
| 12 | 69.6 | 0.737 | 2.09 | 3.00 | 0.99 | 2.80 | 4.02 |
| 13 | 78.3 | 0.784 | 2.22 | 2.84 | 1.04 | 2.94 | 3.75 |
| 14 | 87.6 | 1.121 | 3.17 | 3.62 | 2.65 | 7.49 | 8.55 |
| 15 | 34.1 | 0.85 | 2.40 | 7.05 | 1.84 | 5.20 | 15.25 |
| 16 | 42.3 | 0.635 | 1.80 | 4.25 | 1.20 | 3.39 | 8.01 |
| 17 | 54.6 | 0.56 | 1.59 | 2.90 | 2.15 | 6.09 | 11.15 |
| 18 | 62.9 | 1.12 | 3.17 | 5.04 | 1.47 | 4.16 | 6.61 |
| 19 | 70.3 | 0.689 | 1.95 | 2.77 | 0.944 | 2.67 | 3.80 |
| 20 | 81.7 | 0.483 | 1.37 | 1.67 | 1.10 | 3.10 | 3.80 |
| 21 | 87.9 | 0.879 | 2.49 | 2.83 | 2.07 | 5.86 | 6.67 |
| AVERAGE | 61.4 | | | | | | |
| POOLED VALUES | | 0.924 | 2.62 | 4.26 | 2.146 | 6.07 | 9.89 |

$^A$ $Sr$ = repeatability standard deviation, measurement units.
$^B$ $r$ = repeatability = 2.83 × $Sr$, measurement units.
$^C$ $(r)$ = repeatability, relative, (that is, in percent).
$^D$ $SR$ = reproducibility standard deviation, measurement units.
$^E$ $R$ = reproducibility = 2.83 × $SR$, measurement units.
$^F$ $(R)$ = reproducibility, relative, (that is, in percent).

**TABLE 3 Type 1 Precision—Type A Durometer Method**

| Material | Average Level | Within Laboratories | | | Between Laboratories | | |
|---|---|---|---|---|---|---|---|
| | | $Sr^C$ | $r^B$ | $(r)^C$ | $SR^D$ | $R^E$ | $(R)^F$ |
| 1 | 51.4 | 0.646 | 1.83 | 3.56 | 1.56 | 4.41 | 8.59 |
| 2 | 65.3 | 0.878 | 2.48 | 3.81 | 2.21 | 6.06 | 9.27 |
| 3 | 68.0 | 0.433 | 1.23 | 1.80 | 2.28 | 6.45 | 9.49 |
| Pooled | 61.6 | 0.677 | 1.92 | 3.11 | 2.018 | 5.72 | 9.28 |

$^A$ $Sr$ = repeatability standard deviation, measurement units.
$^B$ $r$ = repeatability = 2.83 × $Sr$, measurement units.
$^C$ $(r)$ = repeatability, relative, (that is, in percent).
$^D$ $SR$ = reproducibility standard deviation, measurement units.
$^E$ $R$ = reproducibility = 2.83 × $SR$, measurement units.
$^F$ $(R)$ = reproducibility, relative, (that is, in percent).

**TABLE 4 Type 1 Precision—Type D Durometer Method**

| Material | Average Level | Within Laboratories | | | Between Laboratories | | |
|---|---|---|---|---|---|---|---|
| | | $Sr^A$ | $r^B$ | $(r)^C$ | $SR^D$ | $R^E$ | $(R)^F$ |
| 1 | 42.6 | 0.316 | 0.894 | 2.10 | 2.82 | 7.98 | 18.7 |
| 2 | 54.5 | 0.791 | 2.24 | 4.11 | 3.54 | 10.0 | 18.4 |
| 3 | 82.3 | 1.01 | 2.86 | 3.47 | 3.54 | 10.0 | 12.2 |
| Pooled | 59.8 | 0.762 | 2.16 | 3.61 | 3.32 | 9.40 | 15.7 |

$^A$ $Sr$ = repeatability standard deviation, measurement units.
$^B$ $r$ = repeatability = 2.83 × $Sr$, measurement units.
$^C$ $(r)$ = repeatability, relative, (that is, in percent).
$^D$ $SR$ = reproducibility standard deviation, measurement units.
$^E$ $R$ = reproducibility = 2.83 × $SR$, measurement units.
$^F$ $(R)$ = reproducibility, relative, (that is, in percent).

are 1 kg for Type A, B, E, and O durometers, 5 kg for Type C, D, and DO durometers, and 400 g for Type OO, OOO, and OOO-S durometers. The introduction of an additional mass on Type M durometers is not permitted. Further improvement may be achieved by the use of a durometer operating stand that controls the rate of descent of the durometer presser foot to the test specimen and incorporates the masses described above.

## 10. Report

10.1 *Instrument Calibration Report (Durometer or Operating Stand):*

10.1.1 Date of calibration.

10.1.2 Date of last calibration.

10.1.3 Calibration due date (see Note 2).

10.1.4 Manufacturer, type, model, and serial number of the instrument, and a notation when a maximum indicator or timing device is present.

10.1.5 Values obtained (pre- and post-calibration results), including a notation of the effect of a maximum indicator, if present. The method of reporting the calibrated value shall be by attaining the arithmetic mean of the determinations.

10.1.6 Ambient temperature.

10.1.7 Relative humidity.

10.1.8 Technician identification.

10.1.9 Applicable standards to which the instrument is calibrated.

10.1.10 Calibrating instrument information to include type, serial number, manufacturer, date of last calibration, calibration due date (see Note 2), and a statement of traceability of standards used to NIST or other acceptable organization. See 1.4.

10.2 *Hardness Measurement Report:*

10.2.1 Date of test.

10.2.2 Relative humidity.

10.2.3 Ambient temperature.

10.2.4 Manufacturer, type, and serial number of the durometer or operating stand, or both, including a notation when a maximum indicator or timing device is present, date of last calibration, and calibration due date (see Note 2).

NOTE 2—The calibration interval (calibration due date) for a durometer is to be determined by the user, based upon frequency of use, severity of conditions, environmental factors, and other variables.

Periodic checking of the operation and state of durometer calibration using commercially available rubber test blocks (refer to 7.8), specifically designed for this purpose, is recommended.

An instrument that has been exposed to severe shock, is visibly damaged, produces test determinations more than 2 points different from calibrated rubber test blocks or other reference standard, or is otherwise suspected of unreliability, should be removed from service and returned to a qualified calibration facility.

A calibration interval of one year is recommended for durometer test blocks and durometer instruments that are infrequently used, more often for others.

The calibration interval for instruments and peripheral devices employed in the calibration of durometers is to be determined by the calibration service provider. It is recommended that the protocols outlined in ISO/IEC 17025, as required by the manufacturer, and those to which the service is provided, be followed.

10.2.5 Means of testing, whether manual (hand held), Type 1 operating stand (specimen to indentor), Type 2 operating stand (indentor to specimen type), or Type 3 operating stand (electromechanical or hydraulically dampened).

10.2.6 Description of test specimen, including thickness, number of pieces plied if less than the thickness indicated in Section 6, including the vulcanization date.

10.2.7 Complete identification of material tested.

10.2.8 Hardness value obtained and method of calculation, either arithmetic mean or alternatively, the median.

10

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

**JA00614**

D 2240 – 05

10.2.9 Indentation hardness time interval at which determination was made. Readings may be reported in the form: M/60/1 where M is the type of durometer, 60 the reading, and 1 the time in seconds that the presser foot is in contact with the specimen or from an electronic timing device.

## 11. Precision and Bias

11.1 These precision and bias statements have been prepared in accordance with Practice D 4483. Refer to this Practice for terminology and other testing and statistical concepts.

11.2 The Type 1 precision for the Type M method was determined from an interlaboratory program with 21 materials of varying hardness, with six participating laboratories. Tests were conducted on two separate days in each laboratory for the Type M testing program. All materials were supplied from a single source, being those commonly supplied as reference materials with the instruments from the manufacturer.

11.3 The precision results in this precision and bias section give an estimate of the precision of this test method with the materials (rubbers) used in the particular interlaboratory program as described above. The precision parameters should not be used for acceptance or rejection testing, or both, of any group of materials without documentation that they are applicable to those particular materials and the specific testing protocols that include this test method.

11.4 The Type 1 precision for both Type A and D methods was determined from an interlaboratory program with 3 materials of varying hardness, with six participating laboratories. Tests were conducted on two separate days in each laboratory for both A and D testing programs. All materials were supplied from a single source.

11.5 A test result for hardness, for Types A, D, and M, was the median of five individual hardness readings on each day in each laboratory.

11.6 Table 2 shows the precision results for Type M method,[4] Table 3 shows the precision results for Type A method,[5] and Table 4 gives the precision results for Type D method.[5]

11.7 *Precision*—The precision of this test method may be expressed in the format of the following statements which use as appropriate value $r$, $R$, $(r)$, or $(R)$, that is, that value to be used in decisions about test results (obtained with the test method). The appropriate value is that value of $r$ or $R$ associated with a mean level in Table 1 closest to the mean level under consideration (at any given time, for any given material) in routine testing operations.

NOTE 3—A Type 1 precision statement for Types E, OOO, OOO-S, and R have not yet been made available.

11.7.1 *Repeatability*—The repeatability, $r$, of these test methods has been established as the appropriate value tabulated in Tables 2-4. Two single test results, obtained under normal test method procedures, that differ by more than this tabulated $r$ (for any given level) must be considered as derived from different or non-identical sample populations.

11.7.2 *Reproducibility*—The reproducibility, $R$, of these test methods has been established as the appropriate value tabulated in Tables 2-4. Two single test results obtained in two different laboratories, under normal test method procedures, that differ by more than the tabulated $R$ (for any given level) must be considered to have come from different or non-identical sample populations.

11.7.3 Repeatability and reproducibility are expressed as a percentage of the mean level, $(r)$ and $(R)$, and have equivalent application statements as above for $r$ and $R$. For the $(r)$ and $(R)$ statements, the difference in the two single test results is expressed as a percentage of the arithmetic mean of the two test results.

11.8 *Bias*—In test method terminology, bias is the difference between an average test value and the reference (or true) test property value. Reference values do not exist for this test method since the value (of the test property) is exclusively defined by this test method. Bias, therefore cannot be determined.

## 12. Keywords

12.1 durometer; durometer hardness; hardness; indentation hardness; micro durometer hardness

---

[4] Supporting data have been filed at ASTM International Headquarters and may be obtained by requesting Research Report RR: D11-1091.

[5] Supporting data have been filed at ASTM International Headquarters and may be obtained by requesting Research Report RR: D11-1029.

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

**JA00615**

 **D 2240 – 05**

### APPENDIXES

(Nonmandatory Information)

### X1. DUROMETER SELECTION GUIDE

X1.1  The durometer selection guide is designed to assist in the selection of the proper durometer type for various applications.

X1.2  It is generally recognized that durometer hardness determination below 20 and above 90 are unreliable. It is recommended that the next lower or higher type (scale) be used in these situations.

X1.3  It is also recommended that, whenever possible, an operating stand be employed in performing durometer hardness tests.

**TABLE X1.1  Durometer Selection: Typical Uses**

| Type (Scale) | Typical Examples of Materials Tested | Durometer Hardness (Typical Uses) |
|---|---|---|
| A | Soft vulcanized rubber, natural rubber, nitriles, thermoplastic elastomers, flexible polyacrylics and thermosets, wax, felt, and leathers | 20–90 A |
| B | Moderately hard rubber, thermoplastic elastomers, paper products, and fibrous materials | Above 90 A<br>Below 20 D |
| C | Medium-hard rubber, thermoplastic elastomers, medium-hard plastics, and thermoplastics | Above 90 B<br>Below 20 D |
| D | Hard rubber, thermoplastic elastomers, harder plastics, and rigid thermoplastics | Above 90 A |
| DO | Moderately hard rubber, thermoplastic elastomers, and very dense textile windings | Above 90 C<br>Below 20 D |
| M | Thin, irregularly shaped rubber, thermoplastic elastomer, and plastic specimens | 20–85 A |
| O | Soft rubber, thermoplastic elastomers, very soft plastics and thermoplastics, medium-density textile windings | Below 20 DO |
| OO | Extremely soft rubber, thermoplastic elastomers, sponge, extremely soft plastics and thermoplastics, foams, low-density textile windings, human and animal tissue | Below 20 O |
| CF | Composite foam materials, such as amusement ride safety cushions, vehicle seats, dashboards, headrests, armrests, and door panels | See Test Method F 1957 |

### X2. RELATED TEST METHODS[2]

C 367  Test Methods for Strength Properties of Prefabricated Architectural Acoustical Tile or Lay-In Ceiling Panels

C 473  Test Methods for Physical Testing of Gypsum Panel Products

C 581  Practice for Determining Chemical Resistance of Thermosetting Resins Used in Glass-Fiber-Reinforced Structures Intended for Liquid Service

C 661  Test Method for Indentation Hardness of Elastomeric-Type Sealants by Means of a Durometer

C 836  Specification for High Solids Content, Cold Liquid-Applied Elastomeric Waterproofing Membrane for Use with Separate Wearing Course

D 461  Test Methods for Felt

D 531  Test Method for Rubber Property—Pusey and Jones Indentation

D 619  Test Methods for Vulcanized Fibre Used for Electrical Insulation

D 1037  Test Methods for Evaluating Properties of Wood-Base Fiber and Particle Panel Materials

D 1054  Test Method for Rubber Property—Resilience Using a Goodyear-Healey Rebound Pendulum

D 1414  Test Methods for Rubber O-Rings

D 1474  Test Methods for Indentation Hardness of Organic Coatings

D 2134  Test Method for Determining the Hardness of Organic Coatings with a Sward-Type Hardness Rocker

D 2287  Specification for Nonrigid Vinyl Chloride Polymer and Copolymer Molding and Extrusion Compounds

D 2583  Test Method for Indentation Hardness of Rigid Plastics by Means of a Barcol Impressor

12

Copyright by ASTM Int'l (all rights reserved); Tue May 1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

**D 2240 – 05**

D 2632 Test Method for Rubber Property—Resilience by Vertical Rebound

D 4289 Test Method for Elastomer Compatibility of Lubricating Greases and Fluids

D 5672 Test Method for Flexible Cellular Materials Measurement of Indentation Force Deflection Using a 25-mm (1-in.) Deflection Technique

D 6546 Test Methods for and Suggested Limits for Determining Compatibility of Elastomer Seals for Industrial Hydraulic Fluid Applications

F 1151 Test Method for Determining Variations in Hardness of Film Ribbon Pancakes

NOTE X2.1—The hardness testing of other nonmetallic materials may be under the jurisdiction of one or more ASTM committees; the respective committee should be contacted for specific information.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

Copyright by ASTM Int'l (all rights reserved); Tue May  1 15:35:36 EDT 2007
Downloaded/printed by
Scott Crossman () pursuant to License Agreement. No further reproductions authorized.

**JA00617**

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on May 22, 2007, I caused a copy of the foregoing document to be served by hand-delivery on the following counsel of record:

Steven J. Balick
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19801
sbalick@ashby-geddes.com

I, Francis DiGiovanni, hereby certify that on May 22, 2007, I caused a copy of the foregoing document to be served by Federal Express on the following counsel of record:

James Moskal, Esq.
Warner Norcross & Judd LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
jmoskal@wnj.com

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building – 9th Floor
1007 North Orange Street
Wilmington, Delaware 19801
(302) 658-9141
fdigiovanni@cblh.com